UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUSTAINABLE FIBER TECHNOLOGIES LLC, a Nevada limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> DARBY KREITZ, an individual, ALLNORTH CONSULTANTS LTD., a Canadian limited company; ALLNORTH AMERICAS INC., a Nevada corporation; RED LEAF FIBRE LTD., a Canadian limited company; and RED LEAF PULP, LTD., a Canadian limited company, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Sustainable Fiber Technologies, LLC ("SFT") complains and alleges as follows against Defendants Darby Kreitz, an individual, Allnorth Consultants Ltd., a Canadian limited corporation ("Allnorth Consultants"), Allnorth Americas Inc., a Nevada corporation ("Allnorth Americas"), Red Leaf Fibre Ltd. a Canadian limited company ("Red Leaf Fibre"), and Red Leaf Pulp Ltd. a Canadian limited company ("Red Leaf Pulp"), (collectively, "Defendants").

COMPLAINT - 1

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

**NATURE OF ACTION**

1.      This case arises out of the concerted effort by Darby Kreitz to use his network of related entities including Allnorth Consultants, Allnorth Americas, Red Leaf Fibre, and Red Leaf Pulp, to willfully and maliciously misappropriate SFT's trade secrets not only to compete directly with SFT in the non-wood pulp industry, but also to enter into a lucrative contract with the Canadian government claiming SFT's technology as its own.

2.      SFT is the pioneer in non-wood pulp fiber technologies.  SFT's proprietary and trade secret formulae and processes allow its licensees to use sustainable, renewable, non-wood pulp fibers in a manner previously limited to wood pulp, including in paper, packaging, tissue and toweling, and disposable plates and bowls.  For years, Allnorth Consultants and Allnorth Americas acted as a consultant to SFT and its clients, assisting its clients in building factories designed to utilize SFT's technology.

3.      In the fall of 2017, Mr. Kreitz asked to become one of SFT's customers, and, over the course of more than a year, personally negotiated a contract granting, Red Leaf Fibre (a shell company incorporated by Mr. Kreitz's family holding company), further access to SFT's technology.  In 2019, Mr. Kreitz directed the creation of Red Leaf Pulp and, without informing SFT, shifted Red Leaf Fibre's operations to this separate entity.  Then, acting under the guise of their customer relationship, Defendants gained access to SFT's facility in Dayton, Washington that specialized in wheat straw pulp.

4.      On June 25, 2021, just days before Red Leaf Pulp was required to make a $1,500,000 license fee payment to SFT, Red Leaf Pulp announced their own "proprietary" non-wood pulp process.  Mr. Kreitz informed SFT that he was terminating the license agreement and refused to pay SFT the license fee payment, then past due.  On information and belief, Red Leaf Pulp's "proprietary" non-wood pulp process is based entirely on SFT's trade secret technology, which Defendants accessed under the guise of being a legitimate SFT customer.

COMPLAINT - 2

BN 49382775v8

5.    Shortly thereafter, Allnorth Consultants and Red Leaf Pulp announced a contract with the Canadian government to manufacture wheat straw pulp—the very technology they had asked SFT to disclose to them the year before.  On information and belief, Red Leaf Pulp failed to disclose to the Canadian government its license agreement with and contractual obligations to SFT, or that Red Leaf Pulp's "proprietary" formulae and processes was improperly obtained from SFT.

**PARTIES**

6.    SFT is a limited liability company organized and existing under the laws of Nevada with its principal place of business at 234 SW 43rd St., Suite MB, Renton, Washington 98057.  SFT has members that reside in and are citizens of the states of Colorado, Texas, Virginia, and Washington.  SFT does not have any members that reside in or are citizens of the state of Nevada or the country of Canada.

7.    SFT is informed and believes that Darby Kreitz is an individual Canadian citizen residing in British Columbia, Canada.

8.    SFT is informed and believes that Defendant Allnorth Consultants is a corporation organized and existing under the laws of British Columbia, Canada with a principal place of business at 206-3200 Richter Street, Kelowna, British Columbia, Canada.

9.    SFT is informed and believes that Defendant Allnorth Americas is a corporation organized and existing under the laws of the state of Nevada with a principal business at 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada 90169.

10.    SFT is informed and believes that Defendant Red Leaf Fibre is a limited company organized and existing under the laws of British Columbia, Canada with a principal business at 1600 – 925 West Georgia Street, Vancouver, British Columbia, Canada V6C 3L2.

11.    SFT is informed and believes that Defendant Red Leaf Pulp is a limited company organized and existing under the laws of British Columbia, Canada with a principal business at 1600 – 925 West Georgia Street, Vancouver, British Columbia, Canada V6C 3L2.

COMPLAINT - 3

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, this action arising under the laws of the United States, 28 U.S.C. §§ 1836, this action arising under the Acts of Congress protecting trade secrets, and 28 U.S.C. § 1367, provides for supplemental jurisdiction because the other claims are so related to the federal claims that they form part of the same case or controversy.

13.     Further, this Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are of diverse citizenship and the amount of controversy exceeds $75,000, exclusive of interest and costs, per Defendant.

14.     This Court has personal jurisdiction over the Defendants because the Defendants established minimum contacts with the forum as set forth in this Complaint such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice and have committed intentional acts, including, but not limited to, misappropriation of trade secrets and breach of contract in this Judicial District.  Further, this Court has personal jurisdiction pursuant to due process and/or the Washington Long Arm Statute, specifically under RCW 4.28.185 and Fed. R. Civ. P. 4(k) because Defendants purposefully availed themselves of the benefits of conducting business in Washington by, among other things:  (i) traveling to and negotiating the contracts discussed in this Complaint with Plaintiff within this District; (ii) finalizing and delivering the contracts discussed in this Complaint within this District; and/or (iii) purposefully targeting Plaintiff to commit trade secret misappropriation and breach of contract against Plaintiff, who is domiciled within this District.  More specifically:

a.     This Court has personal jurisdiction over Darby Kreitz because he has sufficient minimum contacts with this jurisdiction.  Specifically, on multiple occasions, Mr. Kreitz travelled to the State of Washington, including the cities of Seattle and Renton to personally negotiate the contract that is the subject matter of this litigation and, during those

COMPLAINT - 4

meetings, made fraudulent representations to representatives of SFT including SFT's Chief Executive Officer, Mark Lewis.

b.    This Court has personal jurisdiction over Allnorth Consultants because it has sufficient minimum contacts with this jurisdiction.  Corporate representatives of Allnorth Consultants, specifically Darby Kreitz, Allnorth Consultants's Chief Executive Officer, and Thomas Sitar, Allnorth Consultants's then Chief Financial Officer, came, in person, to Renton, Washington to negotiate the terms of the License Agreement that is the basis for SFT's claims.  In addition, Allnorth Consultants committed acts in furtherance of the breach of contract and misappropriation of trade secrets alleged herein in the State of Washington by sending representatives to a facility controlled by SFT in Dayton, Washington, and by directing emails and other correspondence to SFT personnel in the State of Washington for the purpose of obtaining additional information about SFT's trade secrets without disclosing Allnorth Consultants's true intent to improperly obtain and use SFT's trade secrets for its own benefit.

c.    This Court has personal jurisdiction over Allnorth Americas because it entered into a Mutual Nondisclosure Agreement with SFT with a choice of law provision that specifically provides that the Mutual Nondisclosure Agreement would be "governed by the laws of the state of Washington."  Further, Allnorth Americas committed acts in furtherance of the breach of contract and misappropriation of trade secrets alleged herein in the State of Washington by sending representatives to a facility controlled by SFT in Dayton, Washington, and by directing emails and other correspondence to SFT personnel in the State of Washington for the purpose of obtaining additional information about SFT's trade secrets without disclosing Allnorth Americas' true intent to improperly obtain and use SFT's trade secrets for its own benefit.

d.    This Court has personal jurisdiction over Red Leaf Fibre because Red Leaf Fibre consented to jurisdiction when it entered into the License Agreement with SFT that provides, in pertinent part, "[a]ny action to enforce this Agreement must be brought in the state or federal courts located in Seattle, Washington, U.S.A."  Further, Red Leaf Fibre has sufficient

COMPLAINT - 5

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

minimum contacts with this jurisdiction because corporate representatives of Red Leaf Fibre, specifically Darby Kreitz, Red Leaf Fibre's Chief Executive Officer, came, in person, to Renton, Washington to negotiate the terms of the License Agreement that is the basis for SFT's claims.

e. This Court has personal jurisdiction over Red Leaf Pulp because, on information and belief, Red Leaf Pulp is the assignee and/or successor in interest of all of Red Leaf Fibre's rights and obligations under the License Agreement. In addition, Red Leaf Pulp committed acts in furtherance of the breach of contract and misappropriation of trade secrets alleged herein in the State of Washington by sending representatives to a facility controlled by SFT in Dayton, Washington, and by directing emails and other correspondence to SFT personnel in the State of Washington for the purpose of obtaining additional information about SFT's trade secrets without disclosing Red Leaf Pulp's true intent to improperly obtain and use SFT's trade secrets for its own benefit.

15. Venue is proper in this Court under 28 U.S.C. § 1391, which provides for venue in federal court general because a "substantial part of the events or omissions giving rise to the claim occurred" in the Western District of Washington, including without limitation: (i) Defendants committed tortious acts within this District, (ii) Plaintiff suffered the harm caused by Defendants' misappropriation of trade secrets and breaches of contract in this District, where Plaintiff resides and/or maintains its principal place or business; (ii) the contracts at issue in this matter were negotiated within this District; (iii) the License Agreement, which Defendant Red Leaf executed and is at issue in this action, provides that "[a]ny action to enforce this Agreement must be brought in the state or federal courts located in Washington"; and (iv) the Mutual Nondisclosure Agreement that Defendant Allnorth executed and is at issue in this action, provides that it is "governed by the laws of the state of Washington."

COMPLAINT - 6

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

**FACTUAL ALLEGATIONS**

**SFT'S PROPRIETARY, CONFIDENTIAL AND TRADE SECRET INFORMATION**

16.     At all relevant times, SFT was, and still is, in the business of developing technologies to produce sustainable, environmentally friendly non-wood pulp.  SFT licenses the technologies it has developed to companies for the use of the non-wood pulp in the production of sustainable packaging, molded products, tissue and toweling, printing and writing paper.  This technology uses agricultural residue as well as fiber specific crops as the raw material to make pulp for sustainable papers and packaging.

17.     SFT's proprietary formulae and processes also result in the production of co-product that can be biopolymers, fertilizer, and other natural products.  When properly manufactured, revenue sales of co-product are significant, and can even match revenue from sales of the primary product.

18.     SFT offers a valuable service that fulfills a significant global marketplace need to create solutions for a more sustainable future using less chemicals and energy than traditional manufacturing methods.  SFT operates in a highly competitive market in which pulp processing companies actively compete with each for customers.  SFT's business involves the use of proprietary, confidential and trade secret information; including but not limited to, documents and information pertaining to methods, procedures, processes, chemical formulations, and specifications, including chemicals, substitute chemicals, additives, methods of mixing, supply sources, and documentation relating to the certain proprietary methods, procedures, and processes developed by Company for the processing and use of chemical additives to produce pulp, lignin, and hemicellulose from cereal straws and agricultural residuals and to otherwise convert straw into market grade pulp.  The confidential, proprietary and trade secret information previously described is collectively referred to hereinafter as the "Trade Secrets."

19.     As few others had developed an effective way to process non-wood pulp, there were no competitors.  SFT's non-wood pulp technologies have quickly become a commercial

COMPLAINT - 7

BN 49382775v8

success.  With its success, SFT began collaborating with Allnorth regarding the engineering and design of mills for manufacturing the non-wood pulp and licensing its non-wood pulp technologies directly to existing or prospective mill owners such as Red Leaf.

20.    SFT's Trade Secrets are a vital source of economic advantage in a highly competitive industry.  SFT invests significant time, money and other resources in generating and keeping confidential its Trade Secrets.

21.    SFT has made every effort to ensure that the Trade Secrets remain the confidential property of SFT.  SFT has had a long standing policy that all information and documents relating to SFT's proprietary, confidential and trade secret information are confidential and must be kept confidential by all of SFT's employees, both during and after their employment with SFT.

22.    SFT maintains the Trade Secrets in a confidential manner, including, but not limited to, on a computer system accessible only by its authorized employees.  Not all employees of SFT have access to the Trade Secrets and the Trade Secrets are kept confidential from the public domain.  Authorized employees may use the Trade Secrets for legitimate business purposes only and are prohibited from disseminating such information to the general public.

23.    SFT requires any potential business partner to sign a nondisclosure agreement in order to protect the confidentiality and use and disclosure of its Trade Secrets.  SFT also requires any licensee to sign a License Agreement, which contains nondisclosure and confidentiality provisions.  Moreover, licensees are required to restrict access to all proprietary, confidential and trade secret information to limited individuals who need to know and who access the sensitive areas in the manufacturing facilities via electronic key cards.

24.    SFT has invested decades of research to develop its Trade Secrets, for instance:

a.    SFT's founder and Chief Executive Officer, Mark Lewis has spent the last 40 years researching and developing technologies to produce sustainable, environmentally friendly non-wood pulping.  His research began 40 years ago when he was in university studying pulping corn stover.  After university, Lewis worked in the research department at Weyerhaeuser

COMPLAINT - 8

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

Company, one of the world's largest producers of lumber, wood pulp, paper packaging materials and other wood-related paper products. He later worked at Noram Testing Equipment and was further engaged in papermaking research. Lewis then spent the next 17 years as a professor at the University of Washington teaching papermaking, fiber physics and pulping and bleaching. In 2015, Mr. Lewis left teaching and founded SFT where he, along with Tyler Campbell and Ed Draper collaborated together to develop SFT's Trade Secrets including the Phoenix Process for non-wood pulping and other inventions relating to non-wood pulping and its byproducts.

b.      SFT's Director of Engineering, Tyler Campbell obtained a B.S. degree in Pulp and Paper Engineering from the University of Washington and has spent the last 14 years in the paper industry with expertise in research and development, process and equipment design, operations and project engineering. Campbell worked at the Nippon Paper's Port Angeles Mill for 5 years as the Pulping and Utilities Assistant Superintendent and later at Direct Contact LLC as a Design and Consulting Lead Process Engineer.

25.     SFT maintains the confidentiality of its documents and information and devotes other valuable resources to the creation and maintenance of its Trade Secret information. As such, the Trade Secrets are central to SFT's continuing operations and such information represents significant proprietary, confidential and trade secret information maintained by SFT and its employees. SFT's efforts, including but not limited to, time, expense and manpower, to develop unique chemical formulae and processes for the manufacturing of non-wood pulp is of immense value to SFT, and is deserving of trade secret protection.

26.     The immense value of the Trade Secrets is the reason why unscrupulous companies like Defendants seek to misappropriate same for their own ill-gotten gain at the expense of SFT, a cutting edge company who obtained its Trade Secret information the right way – through hard work, effort and ingenuity – all of which the Defendants sought to avoid by the thefts and misappropriations that are the subject of this Complaint.

COMPLAINT - 9

27.    At all times mentioned herein, SFT is informed and believes and thereon alleges that Defendants were unlawfully misappropriating Trade Secrets without the consent or authorization of SFT. SFT is further informed and believes and thereon alleges that Defendants misappropriated the Trade Secrets for the purpose of, among other things, usurping business that belonged to SFT, unfairly and improperly developing a competing business, and disrupting and materially injuring SFT's business.

## ALLNORTH AGREES TO PROVIDE CONSULTING SERVICES TO SFT'S CUSTOMERS

28.    Allnorth Consultants is an engineering, project delivery, and construction services company whose clients include companies in the pulp and paper business sectors. Allnorth Consultants was founded by its Chief Executive Officer, Darby Kreitz.

29.    In or around, July 2015, SFT's Chief Executive Officer, Mr. Lewis and Mr. Kreitz began to discuss the potential for Allnorth Consultants to provide services to SFT's customers to assist them in building facilities capable of using SFT's proprietary technology to product non-wood pulp fiber. At that time, Allnorth Consultants advertised its experience with pulp and paper generally, but did not claim any experience or ability with non-wood pulp fibers.

30.    Based on those discussions, SFT recommended to its customers that they retain Allnorth Consultants to assist in engineering tasks including placement of equipment and utility access prescribed by SFT to operate a manufacturing facility capable of producing non-wood pulp products using SFT's technology.

31.    To facilitate Allnorth Consultants's consulting work, the parties entered into project-specific Professional Services Agreements that contained mutual confidentiality language to protect the ownership and use of the information SFT and Allnorth Consultants were required to disclose to each other to facilitate the projects. SFT understood that these agreements prohibited Allnorth Consultants from using SFT's Trade Secrets for any other purpose, such as the creation of Allnorth Consultants's own non-wood pulp manufacturing facility.

COMPLAINT - 10

BN 49382775v8

32.     As early as mid-2015, Allnorth Consultants provided a contract to SFT that listed "Allnorth Americas, LLC" rather than Allnorth Consultants as the counter-party. When asked, Mr. Kreitz informed Mr. Lewis that he had multiple different entities with different names, but that Mr. Kreitz controlled all of them as part of a single going concern. Mr. Kreitz assured Mr. Lewis that SFT should consider all of Allnorth Consultants's related entities as part of Allnorth Consultants.

33.     As part of these projects, SFT was required to disclose some of its Trade Secrets to Allnorth Consultants. At the same time, the Trade Secrets SFT disclosed to Allnorth Consultants to permit it to construct customer facilities was insufficient to allow Allnorth Consultants to construct and operate its own fully-functioning non-wood fiber pulp facility. For example, each type of raw material requires specific modifications to the process known only to SFT, and only SFT knew how properly to manufacture co-product for sale as a secondary revenue source. SFT disclosed these Trade Secrets to its customers, but not to Allnorth Consultants or its affiliates.

34.     Allnorth Consultants and Allnorth Americas' work for SFT's customers was highly lucrative. On information and belief, Allnorth Consultants and Allnorth Americas' average annual revenue from these projects ranged from $10,000,000 to $15,000,000. As a result of Allnorth Consultants's relationship with SFT, Mr. Kreitz recognized the significant value of SFT's Trade Secrets. In or about late 2016 and early 2017, Mr. Kreitz offered to buy SFT. Mr. Lewis declined.

COMPLAINT - 11

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

## KREITZ ASKS SFT TO LICENSE ITS TECHNOLOGY TO ALLNORTH; HIS FAMILY HOLDING COMPANY INCORPORATE RED LEAF FIBRE

35. Sometime in or around late 2017 or early 2018, Mr. Kreitz approached Mr. Lewis about licensing SFT's Trade Secrets to allow Allnorth Consultants to set up a non-wood fiber product plant.

36. In order to facilitate the discussion, on or about June 1, 2018 the parties entered into a Mutual Nondisclosure Agreement ("NDA") which requires Allnorth Consultants to protect and not use or disclose any of SFT's proprietary, confidential and trade secret information that SFT discloses to Allnorth Consultants, and to ensure that Allnorth Consultants did not attempt to use SFT's proprietary and trade secret information to compete with SFT rather than acting as SFT's customer.

37. The NDA contains numerous provisions protecting SFT's proprietary, confidential and trade secret information including a confidentiality provision, non-use and nondisclosure provision, specific protection of Trade Secrets provisions with accompanying $2,000,000 liquidated damages for breach and a non-competition provision.

38. When asked to sign the NDA, Mr. Kreitz wrote in "Allnorth Americas" as the executing party and signed the NDA as Chief Executive Officer of Allnorth Americas. A true and correct copy of the NDA is attached hereto as **Exhibit 1**.

39. SFT and Allnorth Consultants continued to negotiate terms of the planned License Agreement throughout 2018.

40. On or about April 20, 2018, Mr. Kreitz, along with Allnorth Consultants's Manager of Business Development, Nick Nazar, visited SFT's offices in Renton, Washington. Mr. Kreitz met personally with SFT's Chief Executive Officer, Mr. Lewis.

41. During the April 20, 2018 meeting, Mr. Kreitz made clear that he was negotiating on behalf of Allnorth Consultants that, although the License Agreement would be in the name of

COMPLAINT - 12

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

a subsidiary or related entity, Mr. Kreitz and Allnorth Consultants would be in full control of that entity.

42.    Mr. Kreitz represented to Mr. Lewis that he had no interest in competing with SFT; Allnorth Consultants wanted to act as SFT's customer, licensing SFT's Trade Secrets like the SFT customers Allnorth Consultants had assisted in constructing their facilities.

43.    On or about August 1, 2018, Mr. Kreitz, through his family holding company, Kreitz Family Holdings, Ltd., incorporated Red Leaf Fibre.  SFT is informed and believes that Krietz Family Holdings, Ltd. owns a significant majority of Allnorth Consultants.

44.    In anticipation of the execution of a formal agreement, Allnorth Consultants, through Red Leaf Fibre, began to request assistance.  Initial communications often took place with employees SFT had previously known as Allnorth Consultants employees.  For example, SFT had previously known Lauren Nottebrock as a Project Manager for Allnorth Consultants, however in late 2018, Ms. Nottebrock began corresponding using an @redleaffibre.com email address.

45.    In or about late October 2018, Ms. Nottebrock met personally with SFT personnel, including Mr. Lewis at SFT's Renton, Washington offices.  Following that meeting, she wrote Mr. Lewis and asked how Red Leaf Fibre could arrange to send samples of raw feedstock to SFT for testing.

46.    Testing feedstock is a critical initial element of developing a non-wood fibre facility.  Not all feedstock is the same.  A customer may have access to various potential feedstocks such as hemp, wheat, switchgrass, or a number of other non-wood fibers.  In order to determine which feedstock will best suit the customer's needs, and will result in the best product and co-product, it must be tested.  Testing feedstock for use with SFT's technology is a proprietary process solely within the knowledge of SFT.  Absent this testing, Red Leaf Fibre could not move forward with its plans.  However, once provide with test results, Red Leaf Fibre would know what qualities to look for in procuring future feedstock.

COMPLAINT - 13

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

47.     SFT declined to perform the requested feedstock testing without an executed License Agreement.

48.     In mid- November, 2018, Mr. Kreitz, along with Allnorth Consultants's then Chief Financial Officer, Thomas Sitar, and Allnorth Consultants's outside counsel, travelled to Seattle, Washington for an in-person meeting at the offices of SFT's outside counsel.

49.     During that meeting, Mr. Kreitz again represented to SFT's CEO, Mark Lewis, that he had no interest in competing with SFT.  Allnorth Consultants simply wanted to license SFT's technology so that it could manufacture product and co-product.

50.     On or about November 21, 2018, Mr. Kreitz circulated a revised draft License Agreement that identified Red Leaf Fibre as the intended licensee.  The revised draft License Agreement included numerous comments by Mr. Sitar.  On information and belief, Mr. Sitar at all times acted in his capacity as Chief Financial Officer of Allnorth Consultants.  On information and belief, Mr. Sitar never held any position at Red Leaf Fibre.

51.     On or about January 22, 2019, SFT, and Red Leaf Fibre executed a License Agreement with an effective date of July 1, 2018 (the "License Agreement").  Mr. Kreitz signed the License Agreement as Chief Executive Officer of Red Leaf Fibre.  A true and correct copy of the License Agreement is attached hereto as **Exhibit 2**.

52.     Mr. Kreitz asked that SFT agree to backdate the effective date of the License Aagreement to July 1, 2018.  This seemed odd given that Red Leaf Fibre had not yet been incorporated as of July 1, 2018.  Mr. Kreitz stated that it was important to have the July 1, 2018 so that Red Leaf Fibre could take advantage of potential funding opportunities from the Canadian government.

53.     Based on Mr. Kreitz and Mr. Sitar's representations during negotiations, and the parties' representations in the License Agreement, SFT understood that Allnorth Consultants, through its subsidiary, Red Leaf Fibre intended to open a non-wood fiber processing and/or manufacturing facility using SFT's technology licensed to Red Leaf Fibre, and for no other

COMPLAINT - 14

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

purpose. In particular, based on Mr. Kreitz's express representations to Mr. Lewis, SFT understood that neither Allnorth Consultants nor Red Leaf Fibre intended to use SFT's technology to compete with SFT.

54. The License Agreement contemplates an ongoing relationship between the parties, absent breach. There is no "at-will" termination provision for either party.

55. The License Agreement contained robust provisions designed to protect the SFT proprietary, confidential and trade secret information from any unauthorized use or disclosure, prohibited any reverse engineering, an acknowledgment of the trade secret nature of SFT's licensed technology and affirmed that the technology and any improvements were owned by SFT. License Agreement § 2.7 (defining trade secrets), § 2.9 (Licensee improvements owned by Licensor), § 2.12 (Licensee Developments owned by Licensor), § 11.1-11.8 (Confidentiality).

56. The License Agreement also required Red Leaf Fibre to pay $2,000,000 "as partial consideration for the License," in three installments (i) $250,000 by January 31, 2019, (ii) $250,000 by January 31, 2020, and (iii) $1,500,000 no later than 36 months from the Effective Date, i.e. July 1, 2021. License Agreement § 4.1.

57. With the License Agreement consummated, SFT began to move forward as it would with any other licensee, to assist Red Leaf Fibre in constructing its facility to produce non-wood pulp fiber products using SFT's proprietary technology. On January 23, 2019, the day after the License Agreement was executed, Ms. Nottebrock again reached out to SFT "hoping to organize testing on the Saskatchewan hemp, wheat, oat, barley, and flax bales that we were discussing last fall." She also requested SFT produce samples of molded non-wood fiber products to show to potential customers. Neither testing nor sample products are services SFT would provide to a competitor.

58. On or about January 23, 2019, Kreitz Family Holdings, Ltd. paid the initial $250,000 payment due under the License Agreement.

COMPLAINT - 15

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

**MR. KREITZ SHIFTS OPERATIONS TO RED LEAF PULP**

59.    On or about July 25, 2019, Red Leaf Fibre filed an incorporation application for Red Leaf Pulp, Ltd., with Red Leaf Fibre acting as incorporator.  SFT is informed and believes that Red Leaf Fibre incorporated Red Leaf Pulp as a successor in interest and transferred all assets and business to Red Leaf Pulp following its formation.

60.    Shortly thereafter, all "Red Leaf" communications regarding the License Agreement began to come from personnel using the domain name @redleafpulp.com.  For example, Ms. Nottebrock stopped using her @redleaffibre.com email address and began to communicate using an @redleafpulp.com address.  At the time, SFT was unaware Red Leaf Fibre had separately incorporated Red Leaf Pulp and assumed this was a simple name change.  Even the company's logo remained the same.

61.    Aside from the apparent name change, everything else appeared to be proceeding as planned.  SFT continued to work with Red Leaf Pulp personnel to move the contemplated relationship under the License Agreement forward.  SFT continued to share critical confidential and trade secret business information with Red Leaf Pulp, believing they were acting as a good faith customer and licensee.

62.    For example, in October 2019, SFT shared with Red Leaf Pulp information regarding how SFT produces and markets "co-product," a byproduct of SFT's proprietary technology with significant commercial value.  The ability to produce and market co-product is one of several area of trade secret and proprietary information that Allnorth Consultants did not have access to when it acted solely as a consultant to SFT's customers rather than as a customer itself.

63.    On October 10, 2019, Scott Longmuir, Red Leaf Pulp's Vice-President of Product Development wrote to Sabrina Burkhardt of SFT, thanking her for the information SFT had provided regarding co-product and stating, "the work you've been doing and subsequently the information that has been compiled, is advantageous to Red Leaf. It helps us to gain an

COMPLAINT - 16

BUCHALTER
1420 5ᴛʜ Avenue, Suite 3100
Seattle, Washington 98101
Telephone: 206.319.7052

BN 49382775v8

understanding on how to proceed within the Canadian (and US) markets for de-icing, dust abatement, anti-corrosion. It also helps with regard to emerging market targets, namely in fertilizer, soil supplements, feed binders, and the work with our agronomist and other professionals in that space." SFT would not have shared this information with Red Leaf Pulp absent the existence of the License Agreement and its confidentiality provisions.

64. On or about November 1, 2019, Allnorth Consultants asked for an opportunity to tour a wheat straw pulp processing facility controlled by SFT in Dayton, Washington. Jay Miele (Allnorth Americas' Vice President of Operations) and Nick Nazar (Allnorth Consultants's Business Development Manager) represented that the purpose of the visit was to better understand SFT's proprietary technology and how it could operate at Red Leaf Pulp's planned facility. Believing Allnorth Consultants was acting in its capacity of a customer of SFT, SFT agreed.

65. On or about December 17 and 18, 2019, Mr. Miele, Mr. Nazar, and Kevin Peterson (a mechanical engineer at Allnorth Consultants) toured SFT's Dayton, Washington facility. Following the visit, Mr. Miele wrote Tyler Campbell of SFT to thank him, explaining, "I now have a much better understanding of the process and the wheat straw pulp, this visit was very beneficial for me. Looking forward to continued collaboration with SFT." A true and correct copy of Mr. Miele's December 20, 2019 email is attached hereto as **Exhibit 3**.

66. In late 2019, Mr. Kreitz again sought to buy SFT outright. Mr. Lewis again declined.

67. On or about January 10, 2020, Kreitz Family Holdings, Ltd. made the second $250,000 installment due under the License Agreement.

68. In mid-January 2020, Red Leaf Pulp's Chief Executive Officer, Martin Pudlas also toured SFT's Dayton facility. On January 17, 2020, Mr. Pudlas wrote SFT's Chief Executive Officer, Mr. Lewis, to thank him, stating, "I will likely ask a lot of questions to understand the differences between wood and straw pulp from an [sic] technical perspective, but mainly to have the confidence and understanding in the process when pursuing governmental funding or support

COMPLAINT - 17

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

from the financing community.  They may not ask, but as one of my old bosses said 'I don't need to know, but I need to know if you know'."  A true and correct copy of Mr. Pudlas's January 17, 2020 email is attached hereto as **Exhibit 4**.

69.     In the following weeks and months, at the request of Mr. Pudlas and others at Red Leaf Pulp, Allnorth Consultants, and Allnorth Americas, SFT shared additional information about SFT'sTrade Secrets, particularly as applied to wheat straw.  For example, from February 25 through 27, 2020, multiple Allnorth Consulting representatives including Mr. Nazar, Mr. Peterson, Chris Mathie (an Electrical Engineer for Allnorth Consultants), Ryan Sinclair (a Division Manager for Allnorth Consultants), Paul Jacobson (a Structural Engineer for Allnorth Consultants), and Stephan Rayner (a Mechanical Engineer for Allnorth Consultants) attended an in person meeting at SFT's Dayton, Washington facility for the purpose of better understanding SFT's proprietary processes.

70.     At no point did Mr. Pudlas, or anyone at Red Leaf Pulp, Allnorth Consultants, Allnorth Americas indicate that Red Leaf Pulp intended to cancel the License Agreement or directly compete with SFT.

71.     SFT would not have allowed Allnorth Consultants, Allnorth Americas, or Red Leaf Pulp personnel to tour the Dayton facility and provide information about its wheat straw pulp operations absent the confidentiality provisions in the NDA and License Agreement, or if it believed they intended to directly compete with SFT in the marketplace.

**ALLNORTH AND RED LEAF PULP ANNOUNCE THEY ARE OPENING A COMPETING NON-WOOD FIBER BUSINESS AND PURPORT TO TERMINATE THE LICENSE AGREEMENT**

72.     The final, $1,5000,000 payment under the License Agreement would not be due until July 1, 2021.

73.     Just days prior to that deadline, on or about June 25, 2021, Red Leaf Pulp issued a press release announcing an "exclusive teaming agreement" with Valmet, Ltd. "to exclusively

COMPLAINT - 18

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

collaborate and pursue commercialization of Red Leaf's innovative ag-based pulping process . . . of market pulp from waste wheat straw . . . ." https://www.newswire.ca/news-releases/valmet-and-red-leaf-pulp-sign-exclusive-teaming-agreement-for-new-pulp-technology-856519905.html.

74.    Red Leaf Pulp claimed to be "developing the first non-wood pulp mill in Canada." *Id.* Red Leaf claims it "will be Canada's first entity to develop, construct, and operate a non-wood fibre pulp plant." https://www.redleafpulp.com/about-us. Red Leaf acknowledged that it has "common ownership" with Allnorth and that "Allnorth will provide all engineering, permitting, mill operations and maintenance services on the Red Leaf Pulp facility." *Id.*

75.    Red Leaf Pulp's press release was the first time SFT had any indication Red Leaf Pulp was developing its own non-wood fiber technology. SFT was also shocked to see that Red Leaf Pulp was claiming a process for using wheat straw, the very thing both Allnorth Consultants and SFT personnel had thanked them for sharing in their visit to SFT's Dayton facility. SFT visited Red Leaf Pulp's website and discovered that Red Leaf Pulp has posted pictures of what it claimed was processed pulp using Red Leaf Pulp's technology. In fact, the images were of pulp SFT had processed and provided to Red Leaf Pulp as samples.

76.    Red Leaf Pulp did not make the $1,500,000 payment on July 1, 2021.

77.    SFT immediately contacted both Mr. Kreitz and Mr. Pudlas to inquire about the press release and non-payment. Mr. Kreitz did not respond, but Mr. Lewis was able to contact Mr. Pudlas who, in a telephone call, stated that Red Leaf Pulp intended to pursue its own, competing, non-wood pulp fiber business and would not pay SFT the $1,500,000 owed under the License Agreement.

78.    On July 6, 2021, Mr. Lewis wrote Mr. Kreitz and Mr. Pudlas. Mr. Lewis directly asked Mr. Kreitz, to "grant me the professional courtesy of responding to this email letting us know you are acceptable with your default on the license agreement."

COMPLAINT - 19

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

79.    Mr. Kreitz responded, "Per your discussion with Martin, we have decided to let the SFT license expire."  The License Agreement does not provide for any specific term or "expiration."

80.    Subsequently, the Red Leaf/Valmet transaction was publicized in the September/October 2021 issue of Paper 360, and industry magazine, it was announced that a third-party company, Valmet "has signed a long-term Teaming Agreement with Red Leaf Pulp Ltd. to exclusively collaborate and pursue commercialization of Red Leaf's proprietary ag-based pulping process in North America, using Valmet's fiberline and other value-added equipment." Paper 360 Sept/Oct 2021 at p. 9.

81.    Further, on December 1, 2021, Red Leaf announced a $3.8 Million CAN contract with Sustainable Development Technology Canada, a Canadian government agency promoting sustainable technology. The release claimed Red Leaf's planned plant "will have the capacity to produce approximately 182,000 tonnes of market pulp annually from wheat straw. . . ." https://512a7cdb-a9df-4ad5-ba32-953c48f110f9.filesusr.com/ugd/747f98_2a5c5a5a 4d1e499090ebea4555e4ccbf.pdf.

82.    At the same time, the Canadian government put out a release touting Red Leaf's technology stating "[t]his environmentally conscious pulping method could be a game changer in the     paper     industry."     https://www.canada.ca/en/innovation-science-economic-development/news/2021/12/government-of-canada-funds-cutting-edge-company-specializing-in-non-wood-pulp-production-that-reduces-waste-and-conserves-forests.html.

83.    On information and belief, Red Leaf Pulp' claimed "proprietary" process for wheat straw pulp is derived from, and was created using SFT's Trade Secrets disclosed to Allnorth Consultants, Allnorth Americas, Red Leaf Fibre, and Red Leaf Pulp under the NDA and License Agreement.

84.    As a direct result of the Defendants' unlawful misappropriation of the Trade Secrets, use of SFT's Trade Secrets as part of their business, SFT has been injured, and will

COMPLAINT - 20

continue to be injured, and has suffered, and will continue to suffer harm and has incurred additional consequential damages.  All of these losses are ongoing and in an amount to be established at trial.

85.    As a result of the Defendants' misappropriation of the Trade Secrets for their benefit, SFT has been irreparably harmed as it has lost valuable Trade Secrets, as well as the competitive advantage such information provided and constituted.

86.    SFT is informed and believes and thereon alleges that the Defendants have improperly benefited from their improper activities and have, or will, realize profit that they are not entitled to receive.  As a result, SFT may lose customers, vendor relationships, licensee relationships, transactions and revenue, and has suffered damage to its reputation, all of which is ongoing and in excess of the jurisdictional limit of this Court.

## FIRST CLAIM FOR RELIEF

### (MISAPPROPRIATION OF TRADE SECRETS: AGAINST ALL DEFENDANTS)

### (Defend Trade Secrets Act, 18 U.S.C. § 1836)

87.    SFT realleges and incorporates by reference each of the allegations contained in paragraphs 1-86 as if fully set forth herein.

88.    SFT's Trade Secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

89.    SFT is the owner of the Trade Secrets because SFT is the entity in whom or in which rightful legal or equitable title to, or license in, the Trade Secrets are reposed.

90.    The Trade Secrets derive independent economic value, actual and/or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

91.    SFT has invested substantial amounts of money and resources in the development of the Trade Secrets misappropriated by Defendants, and this information is of significant commercial importance to SFT.

COMPLAINT - 21

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

92.     Additionally, SFT, as the owner of the Trade Secrets, used reasonable measures to keep such information secret, including but not limited requiring signed non-disclosure agreements from all potential business partners, including Defendants, and requiring signed license agreements with non-disclosure obligations from any business partner including Red Leaf.

93.     On information and belief, and thereupon alleged, Defendants unlawfully misappropriated the Trade Secrets of SFT by disclosing and/or using SFT's Trade Secrets without SFT's express or implied consent, even though, at the time of disclosure and/or use, Defendants knew or had reason to know that their knowledge of the Trade Secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and/or limit the use of the Trade Secrets.

94.     On information and belief, and thereupon alleged, specifically, Defendants have, and will continue to, use and disclose the Trade Secrets in connection with their new business venture with Sustainable Development Technology Canada, which is based on the Trade Secrets and intellectual property of SFT, even though Defendants knew that it acquired the Trade Secrets as a result of its ongoing, confidential relationship with SFT pursuant to the NDA, and the License Agreement.

95.     As a direct and proximate result of Defendants' misappropriation, SFT has suffered injury and harm, and Defendants have been unjustly enriched, in amounts according to proof.

96.     Defendants' trade secret misappropriation has caused and continues to cause SFT irreparable injury and cannot be fully redressed through damages alone. An injunction is necessary to provide SFT complete relief.

97.     Defendants' misappropriation of SFT's Trade Secrets has been willful and malicious, entitling SFT to an award of its reasonable attorneys' fees and to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D).

COMPLAINT - 22

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

## SECOND CLAIM FOR RELIEF

### (MISAPPROPRIATION OF TRADE SECRETS: AGAINST ALL DEFENDANTS)

### (Washington's Uniform Trade Secrets Act, RCW 19.108.010 *et seq.*)

98. SFT realleges and incorporates by reference each of the allegations contained in paragraphs 1-86 as if fully set forth herein.

99. SFT is informed and believes and on that basis alleges that Defendants willfully and maliciously misappropriated SFT's Trade Secrets in violation of Washington's Uniform Trade Secrets Act, RCW 19.108.010 *et seq.* and the common law; that Defendants use, and have used, knowledge of the Trade Secrets to Plaintiff's detriment to compete directly with SFT; and that as a direct result thereof, SFT has suffered and continues to suffer damage and irreparable harm.

100. SFT is the owner of the Trade Secrets because SFT is the entity in whom or in which rightful legal or equitable title to, or license in, the Trade Secrets are reposed.

101. The Trade Secrets derive independent economic value, actual and/or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

102. SFT has invested substantial amounts of money and resources in the development of the Trade Secrets misappropriated by Defendants, and this information is of significant commercial importance to SFT.

103. Additionally, SFT, as the owner of the Trade Secrets, used reasonable measures to keep such information secret, including but not limited to requiring signed non-disclosure agreements from all potential business partners, including Defendants, and requesting the signed License Agreement with non-disclosure obligations from any business partner including Red Leaf Fibre and its successor in interest, Red Leaf Pulp.

104. On information and belief, and thereupon alleged, Defendants unlawfully misappropriated the Trade Secrets of SFT by disclosing and/or using SFT's Trade Secrets without

COMPLAINT - 23

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

SFT's express or implied consent, even though, at the time of disclosure and/or use, Defendants knew or had reason to know that their knowledge of the Trade Secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and/or limit the use of the Trade Secrets.

105. On information and belief, and thereupon alleged, specifically, Defendants have, and will continue to, use and disclose the Trade Secrets in connection with their new business venture with Valmet and Sustainable Development Technology Canada, which is based on the Trade Secrets and intellectual property of SFT, even though Defendants knew that it acquired the Trade Secrets as a result of its ongoing, confidential relationship with SFT pursuant to the NDAs, and the License Agreement.

106. As a direct and proximate result of Defendants' misappropriation, SFT has suffered injury and harm, and Defendants have been unjustly enriched, in amounts according to proof.

107. Defendants' Trade Secret misappropriation has caused and continues to cause SFT irreparable injury and cannot be fully redressed through damages alone. An injunction is necessary to provide SFT complete relief.

108. Defendants' misappropriation of SFT's Trade Secrets has been willful and malicious, entitling SFT to an award of its reasonable attorneys' fees and to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D).

**THIRD CLAIM FOR RELIEF**

**(FRAUD, AGAINST DEFENDANTS DARBY KREITZ, ALLNORTH CONSULTANTS, ALLNORTH AMERICAS, AND RED LEAF FIBRE)**

109. SFT realleges and incorporates by reference each of the allegations contained in paragraphs 1-86 as if fully set forth herein.

110. Darby Kreitz is the Chief Executive Officer of Allnorth Consultants, Allnorth Americas, and Red Leaf Fibre.

COMPLAINT - 24

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

111.   Darby Kreitz represented to SFT, including its CEO, Mark Lewis, that Mr. Kreitz and his various companies including Allnorth Consultants desired to act as a customer or licensee of SFT and did not intend to act as a competitor to SFT.

112.   Mr. Kreitz, by executing the License Agreement, also represented to SFT that Mr. Krietz or his entities would pay SFT a partial license fee of $2,000,000 to license SFT's technology.

113.   On information and belief, at the time Mr. Kreitz made these representations he knew them to be false.   On information and belief, at the time Mr. Kreitz made these representations he specifically intended to compete with SFT, and did not intend to pay SFT the $2,000,000 partial license fee owed under the License Agreement.

114.   On information and belief, Mr. Kreitz intended that SFT rely on his representations and knew that, absent these representations, SFT would not enter into a license agreement with him.

115.   SFT reasonably relied on Mr. Kreitz's representations including by executing the License Agreement and

116.   SFT was harmed as a result of its reasonable reliance on Mr. Kreitz's representations in an amount exceeding $75,000 to be proven at trial.

### THIRD CLAIM FOR RELIEF

**(BREACH OF CONTRACT - MUTUAL NONDISCLOSURE AGREEMENT: AGAINST DEFENDANT ALLNORTH AMERICAS)**

117.   SFT realleges and incorporates by reference each of the allegations contained in paragraphs 1-86 as if fully set forth herein.

118.   On or about June 1, 2018, SFT and Defendant Allnorth Americas entered into a valid and enforceable Mutual Nondisclosure Agreement ("NDA") wherein Allnorth Americas agreed to refrain from using confidential SFT's information either directly or indirectly to compete against SFT.  Ex. 1.

COMPLAINT - 25

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

119.    Allnorth Americas agreed that the purpose of the NDA was so that the parties could explore a business opportunity of mutual interest and that in connection with that the parties may disclosure confidential and proprietary technical and business information (the "Confidential Information." Ex. 1, § 1.  The Confidential Information was described more fully in the Appendix to the NDA as follows:

> The Nondisclosure Agreement signed between the parties includes all Confidential Information (as therein defined), including the following:
>
> All information provided by Company to Recipient describing the methods, procedures, processes, chemical formulations, and specifications, including chemicals, substitute chemicals, additives, methods of mixing, supply sources, and documentation relating to the certain proprietary methods, procedures, and processes developed by Company for the processing and use of chemical additives to produce pulp, lignin, and hemicellulose from cereal straws and agricultural residuals and to otherwise convert straw into market grade pulp.

Ex. 1 at Appx.

120.    Allnorth Americas agreed that it would not use any Confidential Information that it received from SFT for any other purpose and that it would not disclose SFT's Confidential Information to any third party without SFT's consent.  Ex. 1, §§ 3 and 4.  Allnorth Americas further agreed that it would reverse engineer, disassemble, or decompile any products, chemicals, devices, or other objects that constitute SFT's Confidential Information which SFT provided to Allnorth Americas pursuant to the NDA.  *Id*., § 3.

121.    Allnorth Americas further acknowledged that the Confidential Information it received from SFT was owned by SFT and that Allnorth Americas would not assert any ownership interest or property right in it.  Ex. 1 § 8.  Additionally, Allnorth Americas acknowledged that SFT was not granting it a license or any other right to the Confidential Information.  *Id*., § 11.

122.    Moreover, the NDA makes clear that all information that Allnorth Americas received from SFT "relating to the process and operating conditions, process controls and

COMPLAINT - 26

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

diagrams, equipment design, specifications, and layouts, chemical formulations, specifications, including substitute chemicals, methods of mixing, and supply sources, and methodologies, procedures, and processes, including documentation for all of the above, developed or owned by Company to produce commercial grade pulp from non-wood fibers are [SFT's] valuable trade secrets, constituting confidential and proprietary property of [SFT]" (referred to collectively as "SFT Property")."  Ex. 1, § 9

123.    Allnorth Americas agreed to protect the SFT Property as a trade secret and agreed to use the highest degree of care to do so including not disclosing the SFT Property to any third party without express authorization from SFT.  Ex. 1, § 9.  Allnorth Americas acknowledged that any breach of the NDA would cause irreparable harm to SFT and that it may seek equitable relief without the requirement or posting a bond of other security and that it may recover its attorneys' fees, costs and expenses in any enforcement action.  *Id*. § 13.

124.    Where Allnorth Americas engaged in the unauthorized use or disclosure of SFT's information it agreed to indemnify SFT for any damages, loss, cost or liability of any kind (including reasonable attorney fees) resulting from Allnorth's unauthorized use or disclosure.  Ex. 1, § 14.

125.    Allnorth Americas further agreed that SFT was entitled to liquidated damages in the event that Allnorth breaches its obligations to protect the SFT Property as a trade secret:

> 16. <u>Liquidated Damages</u>. Recipient agrees that if it is found to be in breach of <u>Section 9</u> and/or <u>Section 15</u>, which would necessarily violate Recipient's obligations under <u>Section 8.</u> by a court of competent jurisdiction, Recipient will be obligated to pay to Company as liquidated damages and not as a penalty the amount of two million ($2,000,000) dollars, in addition to Recipient's obligation to indemnify Company under <u>Section 14</u>.

Ex. 1, § 16.

126.    As part of the NDA, Allnorth Americas entered into a covenant not to compete with SFT during the term of the NDA and for a period of seven (7) years thereafter, under which Allnorth agreed, among other things, that it would not perform services for a business in

COMPLAINT - 27

BN 49382775v8

connection with the development, manufacture, marketing, or sale of any non wood fiber products and/or services that compete with SFT.  Ex. 1, § 17.

127.    SFT has performed all conditions, covenants, and promises required by it, or on its behalf, in accordance with the terms and conditions of the NDA.

128.    Upon information and belief, Plaintiff SFT alleges that Allnorth Americas breached the agreement by gathering the confidential SFT information identified throughout this Complaint and using that information to take part in a commercial endeavor, i.e., competing with SFT by participating with Red Leaf Pulp in misappropriating SFT's trade secret pulping technology and developing a competing business.

129.    As a direct and proximate result of Allnorth Americas's breaches, Allnorth Americas has used and disclosed highly-sensitive, valuable, confidential information and intellectual property, and has allowed such use and disclosure.

130.    As a direct and proximate result of Allnorth Americas's breaches, SFT has suffered injury and harm, and Allnorth Americas has been unjustly enrichment, in amounts accordingly to proof, as to be determined.

131.    As a direct and proximate result of Allnorth Americas's breaches, and as agreed-upon in the NDA, Plaintiff has suffered, and will continue to suffer irreparable harm and cannot be fully redressed through damages alone.  An injunction is necessary to provide SFT complete relief.

132.    As a direct, proximate and foreseeable result of Allnorth Americas's breaches, Plaintiff has also suffered monetary harm.

133.    By reason of the foregoing, SFT has been damaged in an amount not less than $2,000,000 for the Liquidated Damages, interest that has accrued thereon, other monetary damages, SFT's reasonable attorneys' fees and costs in an amount to be determined and injunctive relief.

COMPLAINT - 28

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

**FOURTH CLAIM FOR RELIEF**

**(BREACH OF CONTRACT – LICENSE AGREEMENT:**

**AGAINST DEFENDANTS RED LEAF FIBRE AND RED LEAF PULP)**

134.   SFT realleges and incorporates by reference each of the allegations contained in paragraphs 1-86 as if fully set forth herein.

135.   On July 1, 2018, SFT and Red Leaf Fibre entered into a valid and enforceable License Agreement wherein Red Leaf Fibre agreed to refrain from disclosing, furnishing, or making accessible to anyone or use in any way any confidential, proprietary or secret knowledge or information of SFT that Red Leaf Fibre acquired in connection with the License Agreement. Ex. 2.

136.   On or about July 25, 2019, Red Leaf Fibre incorporated Red Leaf Pulp and, thereafter, Red Leaf Pulp acted as Red Leaf Fibre's successor in interest to all rights and obligations under the License Agreement.

137.   The License Agreement makes clear that SFT was the owner of the Licensed Property including the Technology, Process Flow and Information and any improvements that Red Leaf Fibre conceived, discovered or implemented.  Ex. 2, §§ 2.3 and 2.9.  The License Agreement further provided that SFT has the exclusive rights to license, assign, sell and transfer all intellectual property associated with the Licensed Product except for a narrow territorial limitation for licenses issued to any third-party. *Id*., § 2.1.

138.   The License Agreement, provides that Red Leaf Fibre will pay SFT a non-refundable License Fee in the amount of $2,000,000. Ex. 2, § 4.1.  Red Leaf Fibre had the option of payment the License Fee in installments. *Id*.  The third installment of the License Fee in the amount of $1,500,000 was due on July 1, 2021. *Id*. § 4.1(d).  Red Leaf Fibre and/or its successor Red Leaf Pulp acknowledged that failure to pay any installment of the License Fee shall constitute a material breach of the License Agreement. *Id*. § 4.1.  Red Leaf Fibre and or its successor, Red Leaf Pulp has breached the License Agreement by failing and refusing to pay the License Fee.

COMPLAINT - 29

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

139. Red Leaf Fibre covenanted not to "take any action or assert any interest therein inconsistent with Licensor's exclusive ownership thereof" and agreed that violation of that covenant would constitute an event of default under the License Agreement. Ex. 2, §§ 8.3(b) and 8.4.

140. Upon information and belief, SFT alleges that Red Leaf Fibre and/or its successor, Red Leaf Pulp breached the License Agreement by gathering the confidential SFT information identified throughout this Complaint and using it as its own.

141. As a direct and proximate result of the breaches alleged herein, Red Leaf Fibre and/or Red Leaf Pulp has used and disclosed highly-sensitive, valuable, confidential information and intellectual property, and has allowed such use and disclosure.

142. As a direct and proximate result of these breaches, SFT has suffered injury and harm, and Red Leaf Fibre and/or Red Leaf Pulp have been unjustly enrichment, in amounts accordingly to proof, as to be determined.

143. As a direct and proximate result of the breaches alleged herein, and as agreed-upon in the License Agreement, SFT has suffered, and will continue to suffer irreparable harm and cannot be fully redressed through damages alone. An injunction is necessary to provide SFT complete relief.

144. As a direct, proximate and foreseeable result of the breaches alleged herein, Plaintiff has suffered and continues to suffer substantial losses and damages in an amount to be proven at trial.

145. As a result of the breaches alleged herein alleged, Plaintiff is entitled to an award of reasonable attorneys' fees pursuant to the License Agreement.

COMPLAINT - 30

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

**PRAYER FOR RELIEF**

**WHEREFORE**, SFT respectfully prays that the Court grant the following relief:

A.    The entry of judgment in favor of SFT and against Defendants;

B.    A preliminary and permanent injunction prohibiting Defendants, their respective officers, agents, servants, employees and/or all persons acting in concert or participation with them, or any of them, from engaging in further acts of misappropriation of SFT's Trade Secrets;

C.    A finding that Defendants have misappropriated SFT's Trade Secrets;

D.    A finding that Allnorth Americas breached a valid and enforceable NDA including covenant not to compete;

E.    For liquidated damages against Allnorth Americas as a result of its breach of the NDA;

F.    For general and consequential damages as a result of Defendants' tortious actions;

G.    For exemplary and punitive damages against Darby Kreitz;

H.    For an award of pre-judgment and post-judgment interest as provided by law;

I.    For attorneys' fees and costs of the suit as provided under the NDA and License Agreement;

J.    For any other orders necessary to accomplish complete justice between the parties; and

K.    For such other and further relief as this Court or a jury may deem just and proper.

COMPLAINT - 31

BUCHALTER
1420 5TH AVENUE, SUITE 3100
SEATTLE, WASHINGTON 98101
TELEPHONE: 206.319.7052

BN 49382775v8

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.

Dated:    June 13, 2022                    BUCHALTER


By: */s/ Bradley P. Thoreson*
    *Bradley P. Thoreson, WSBA* #18190
    bthoreson@buchalter,com



By: */s/ Jeffrey R. Kaatz*
    Jeffrey R. Kaatz, WSBA #49709
    jkaatz@buchalter,com

    1420 Fifth Ave., Ste 3100
    Seattle, WA 98101-1337
    Telephone: (206) 319-7052


    Roger L. Scott (To Be Admitted Pro Hac
    Vice)
    Buchalter
    18400 Von Karman Ave., Ste 800
    Irvine, CA 92612-0514
    Telephone: 949-760-1121
    rscott@buchalter.com

    J. Rick Tachè (To Be Admitted Pro Hac Vice)
    Buchalter
    18400 Von Karman Ave., Ste 800
    Irvine, CA 92612-0514
    Telephone: 949-760-1121
    rtache@buchalter.com

    *Attorneys for Plaintiff*
    SUSTAINABLE FIBER TECHNOLOGIES,
    LLC, a Nevada limited liability company

COMPLAINT - 32

BN 49382775v8

# Exhibit 1

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("Agreement") is made and entered into as of [date] ("Effective Date") between Sustainable Fiber Technology, LLC, with a mailing address of 101 Convention Center Dr., Suite 850 Las Vegas, NV ("Company") and *Allnorth Americas* [recipient corporate name], with a mailing address of *1700-1100Melville Vancouver* ("Recipient"). Company and [other Party's name] may be referred to individually as ("Party") and collectively as the ("Parties.") In connection with the Relationship (as defined below), each Party ("Disclosing Party") has disclosed or may further disclose to the other Party ("Receiving Party") Confidential Information (as defined below) pursuant to the terms and conditions of this Agreement.

1.  <u>Purpose</u>. The Parties wish to explore a business opportunity of mutual interest ("**Relationship**") and in connection with this opportunity, each Party may disclose to the other certain confidential and proprietary technical and business information that the Disclosing Party desires the Receiving Party to treat as confidential.

2.  "<u>Confidential Information</u>" means any information disclosed to Receiving Party by Disclosing Party, directly or indirectly, in writing, orally, or by inspection of tangible objects (including documents, prototypes, samples, and Company's business or equipment). Confidential Information will include the items set forth in any Appendix attached to this Agreement. Confidential Information may also include information disclosed to Company by third parties. Notwithstanding the above, the following information shall not be subject to the limitations on disclosure set forth in <u>Section 3</u>. Any information that Receiving Party can prove: (i) was in the public domain at the time it was disclosed or has entered the public domain through no fault of Receiving Party; (ii) was known to Receiving Party, without restriction, at the time of disclosure, as demonstrated by files in existence at the time of disclosure; (iii) is disclosed with the prior written approval of Disclosing Party; (iv) was independently developed by Receiving Party without any use of or guidance from the Confidential Information of Disclosing Party and by persons who have not been exposed to the Confidential Information, as demonstrated by files created at the time of such independent development; (v) becomes known to Receiving Party, without restriction, from a source other than Disclosing Party without a violation of Disclosing Party's rights; or (vi) is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that Receiving Party shall provide prompt notice of such court order or requirement to Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent or restrict such disclosure.

3.  <u>Non-use and Nondisclosure</u>. Receiving Party agrees that it will not use Disclosing Party's Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the Parties. The Parties will not reverse engineer, disassemble, or decompile any products, chemicals, devices, or other tangible objects that embody the other Parties' Confidential Information and that are provided to them in accordance with this Agreement.

4.  <u>Maintenance of Confidentiality</u>. Receiving Party agrees not to disclose the Confidential Information of Disclosing Party to any third party except: by written consent of Disclosing Party; or to those officers and/or employees of Receiving Party who are required to have the Confidential Information in order to evaluate or engage in discussions concerning the Relationship. Prior to any disclosure of Confidential Information, Receiving Party will have any authorized officers and/or employees sign a non-use and nondisclosure agreement that is substantially similar in content to this Agreement. Without limiting the foregoing, Receiving Party will keep separate the Confidential Information from all documents and other records of Receiving Party, and keep a written record of all persons with access to and all copies made of the Confidential Information. Receiving Party will not make any copies of Confidential Information unless approved in advance in writing by the Disclosing Party. Receiving Party will reproduce Disclosing Party's proprietary rights notices on all approved copies. Receiving Party will immediately notify Disclosing Party in the event of any unauthorized use or disclosure of any Confidential Information.

5.  <u>No Obligation</u>. Nothing in this Agreement will obligate Company or Recipient to proceed with any transaction between them, and each Party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement

concerning the business opportunity. However, if Company and Recipient elect to proceed with the Relationship, they agree to execute an agreement outlining their respective rights and responsibilities that shall include confidentiality terms and disclaimers similar to those contained herein.

6.  <u>No Warranty</u>. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS." NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED, OR OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS, OR PERFORMANCE OF ITS CONFIDENTIAL INFORMATION.

7.  <u>Return of Materials</u>. All documents, products, and other tangible objects containing or representing Confidential Information and all copies of them will be and remain the property of Disclosing Party. Upon Disclosing Party's request, Receiving Party will (a) promptly deliver to Disclosing Party all Confidential Information, without retaining any copies, and (b) promptly destroy analyses, studies, and other documents or products prepared based on the Confidential Information, without retaining copies.

8.  <u>Ownership</u>. Receiving Party acknowledges and agrees that Disclosing Party owns all rights (including inventions, invention disclosures, patents, patent applications, trademarks, trademark applications, trade secrets, copyrights, technical know-how, software, source code, documentation, and all other intellectual property rights) in and to Disclosing Party's Confidential Information and all information and materials incorporating, referring to, based on, or derived from such information. Receiving Party agrees not to assert any ownership interest or property right of any type in or to any of Disclosing Party's Confidential Information, and hereby assigns, transfers, and conveys to Disclosing Party all right, title, and interest Receiving Party may have (now or in the future) in and to the Confidential Information of Disclosing Party.

9.  <u>Trade Secret</u>. Without limiting <u>Section 2</u>, Recipient acknowledges that all information relating to the process and operating conditions, process controls and diagrams, equipment design, specifications, and layouts, chemical formulations, specifications, including substitute chemicals, methods of mixing, and supply sources, and methodologies, procedures, and processes, including documentation for all of the above, developed or owned by Company to produce commercial grade pulp from non-wood fibers; are Company's valuable trade secrets, constituting confidential and proprietary property of Company (collectively "**Company Property**"); that such information derives independent economic value from not generally being known to and by not readily being ascertainable by others, and that Company has taken steps that are reasonable under the circumstances to maintain the confidentiality of such information. Recipient agrees to protect the Company Property as a trade secret, and in furtherance of this commitment, Recipient agrees to use the highest degree of care that Recipient would utilize to protect its most valuable property, which shall be no less than reasonable care. Recipient agrees that it will not disclose Company Property to any third party and that any use or disclosure except as expressly authorized by Company in writing will constitute breach and misappropriation of Company's trade secret rights in the Company Property. Recipient acknowledges and agrees that breach of this Section will subject Company to potential liability to third parties and may reduce the value of Company's business and its ability to license products and services. Accordingly, Recipient agrees that in the event of any breach of this <u>Section 9</u>, Recipient shall pay Company Liquidated Damages pursuant to <u>Section 16</u>. Recipient further agrees that if, for any reason, a court or other body with jurisdiction to determine the trade secret status of such information declares that any portion thereof is not subject to protection as a trade secret, such information shall nevertheless remain subject to

SEA_DOCS:956436.1

the limitations on use and disclosure of Confidential Information contained in this Agreement.

10. Recommendations. Recipient acknowledges that during the term of this Agreement, Recipient may make recommendations, suggestions or provide information to Company regarding the operation of Company's business. Recipient agrees that all recommendations, suggestions, or information it may make or provide to Company regarding the Confidential Information and/or Company's existing or future business, products or services, are provided without charge or royalty of any kind, are Company Property, and may be used by Company without limitation or payment of any kind to Recipient. Recipient covenants and agrees not to assert any ownership interest in Company or Company's Confidential Information, including without limitation, the Company Property.

11. No License. Receiving Party acknowledges and agrees that nothing in this Agreement is intended to grant any rights to Receiving Party under any patent, copyright, or other intellectual property right of Disclosing Party, nor will this Agreement grant Receiving Party any rights in or to the Confidential Information, except as expressly set forth in this Agreement.

12. Term. This Agreement will survive until all Disclosing Party's Confidential Information becomes publicly known and made generally available through no action or inaction of Receiving Party.

13. Remedies. Receiving Party acknowledges that any breach or threatened breach of this Agreement would cause irreparable harm to Disclosing Party, and in addition to any other remedies at law or in equity that Disclosing Party may have, Disclosing Party is entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance. In any action to enforce this Agreement, including, as applicable, gaining injunctive relief, Disclosing Party shall be entitled to recover, in addition to all other relief, its reasonable attorneys' fees, costs, and expenses incurred in such enforcement action.

14. Indemnification. Receiving Party agrees to indemnify and hold harmless Disclosing Party from any damage, loss, cost, or liability of any kind (including reasonable attorney fees) arising or resulting from any unauthorized use or disclosure of Disclosing Party's Confidential Information by Receiving Party or any of its employees.

15. Non-Circumvention. During the term of this Agreement and for one year thereafter ("Restricted Period") Recipient agrees that it will not, without Company's prior written consent, (a) acquire or attempt to acquire any part, component, feature or element of any of Company's products or services directly from any Supplier; or (b) engage or attempt to engage, directly or with others, any Supplier to perform or supply goods or services to or for the benefit of Recipient if doing so could reasonably be expected to interfere with Company's business or Supplier's delivery of products or services to Company; or (c) take advantage of any business opportunity which it knows or should know Company may or is likely to consider. For purposes of

this Section, "Supplier" means any contractor, consultant, or supplier ("**Supplier**") that provides products or services to Company.

16. Liquidated Damages. Recipient agrees that if it is found to be in breach of Section 9 and/or Section 15, which would necessarily violate Recipient's obligations under Section 8, by a court of competent jurisdiction, Recipient will be obligated to pay to Company as liquidated damages and not as a penalty the amount of two million ($2,000,000) dollars, in addition to Recipient's obligation to indemnify Company under Section 14.

17. Non-Competition. During the term of this Agreement and for seven (7) years thereafter, Recipient will not directly or indirectly, for itself or any third party other than Company: (a) perform services for a business in connection with the development, manufacture, marketing, or sale of any non wood fiber products and/or services that compete with Company ("**Competing Products**") anywhere in the world where Company conducts business; (b) solicit sales of any Competing Product from any of Company's customers; (c) engage in any activity that would cause any third-party to cease its business relationship with Company; (d) solicit or encourage any employee or contractor to terminate employment or cease providing services to Company. The covenants in this Section will be construed as separate covenants, and where deemed to exceed limitations permitted by law, will be reformed to the maximum extent permitted. Recipient acknowledges and agree that the limitations herein are reasonable and necessary to protect the Confidential Information, Company property and goodwill of company.

18. Miscellaneous. This Agreement will bind and inure to the benefit of the Parties and their successors and assigns. Company and Recipient are independent contractors, and nothing contained in this Agreement shall be construed to constitute the Company and Recipient as partners, co-owners, or otherwise as participants in a joint or common undertaking. This Agreement will be governed by the laws of the state of Washington, without reference to conflict of laws principles. This document contains the entire agreement between the Parties with respect to the subject matter of this Agreement. Any failure to enforce any provision of this Agreement will not constitute a waiver of that provision or of any other provision. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both Parties. In the event that any provisions contained herein shall be declared invalid, illegal or unenforceable by a court of competent jurisdiction, this Agreement with respect to the remaining provisions shall continue in full force and effect and all rights and remedies accrued under the enforceable provisions shall survive any such declaration, and any non-enforceable provision shall be replaced by a provision which, being valid, comes closest to the intention underlying the invalid provisions. All notices hereunder shall be sent to the Parties at the addresses set forth above, or to such other addresses or contacts as the Parties may specify in writing. This Agreement may be executed in two or more counterparts, each of which is deemed to be an original, but all of which constitute the same agreement.

**Company and Recipient, by its respective authorized officer, each enters into this Agreement as of the Effective Date. By signing below, the authorized officer of Company and Recipient agrees that s/he has read and fully understands the terms of this Agreement.**

SUSTAINABLE FIBER TECHNOLOGY, LLC.

By: _____

Name: _MARK LEWIN_

Title: _LTU_

RECIPIENT:

By: _Allnorth Americas Inc_

Name: _Darby Kreitz_

Title: _CES_

Appendix

The Nondisclosure Agreement signed between the parties includes all Confidential Information (as therein defined), including the following:

All information provided by Company to Recipient describing the methods, procedures, processes, chemical formulations, and specifications, including chemicals, substitute chemicals, additives, methods of mixing, supply sources, and documentation relating to the certain proprietary methods, procedures, and processes developed by Company for the processing and use of chemical additives to produce pulp, lignin, and hemicellulose from cereal straws and agricultural residuals and to otherwise convert straw into market grade pulp.

GSB:7118358.6 [18630.00300]

DRAFT

# Exhibit 2

## LICENSE AGREEMENT

This License Agreement ("**Agreement**") between **Sustainable Fiber Technologies, LLC**, a Nevada limited liability company with its primary office located at 101 Convention Center Dr., Suite 850, Las Vegas, Nevada ("**Licensor**") and Red Leaf Fibre Ltd., a limited liability company organized under the laws of British Columbia, Canada with its primary office located at 206-3200 Richter Street, Kelowna, BC V1W 5K9 ("**Licensee**"), is effective as of July 1, 2018 ("**Effective Date**"). Licensor and Licensee may individually be referred to as a "**Party**" and collectively as the "**Parties**," and such includes any affiliates and/or subsidiaries of the Parties (as applicable).

A.    Licensor has developed a proprietary process for manufacturing pulp from non-wood fiber sources.

B.    Licensee seeks to license the processes developed by Licensor for use in manufacturing pulp from wheat, flax, and other non-wood feedstock.

C.    Licensor is willing to license its proprietary processes to Licensee on the terms set forth herein and Licensee is willing to comply with the terms of this Agreement as a condition to such license.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises contained herein, Licensor and Licensee agree as follows.

**1.    Definitions**

The following terms shall have the meanings set forth below:

"**Additional Facility Notice**" means a written notice delivered by Licensee to Licensor to request the addition of an Additional Licensed Facility to the License. Such notice shall include (a) the location of the proposed Additional Licensed Facility, (b) the Feedstock and expected size and capacity of the facility, (c) proposed owner and operator of the facility and its (their) relationship to Licensee, and (d) such other information as Licensor may require.

"**Additional Licensed Facility**" means a facility to make pulp, lignin and hemi cellulose products in the Territory using Licensed Property that is added to this Agreement after the Effective Date pursuant to an Additional Licensed Facility Amendment. Each Additional Licensed Facility shall be located in the Territory and have the same features, design, and function and use the same biomass and Technology as that of the Initial Licensed Facility. Any changes between an Additional Licensed Facility and the Initial Licensed Facility shall require mutual agreement between the Parties and the license for such facilities may be subject to additional terms and conditions.

"**Additional Licensed Facility Amendment**" means an amendment to this Agreement in the form of Exhibit B signed by both Parties which adds an Additional Licensed Facility to this Agreement as provided in Article 3.

"**Additional Licensed Facility Fee**" means the License Fee due for each Additional Licensed Facility. The Additional Licensed Facility Fee is Five Hundred Thousand Dollars US ($500,000) and is in addition to the Royalty and Fees Licensee is required to pay Licensor under Sections 3.3, 4.1, 4.2, 4.5, 4.7 and/or 5.2.

"**Affiliate(s)**" means any entity Controlling, Controlled by or under common Control with a Party. An entity shall be deemed an Affiliate only so long as such Control exists.

"**Associated Product Information**" means the Constituent Chemicals and the processes, procedures, chemical formulations, specifications, including substitute chemicals, methods of mixing, and supply sources for the Associated Products.

"**Associated Products**" means the chemicals, additives, and other products formulated by Licensor for use in connection with the Technology, for the limited purpose of producing pulp, lignin, and hemi cellulose from Permitted Biomass, as developed by Licensor or a third party under Licensor's direction using Licensor's Process Flow and Information.

"**Authorized Contractors**" means contractors authorized by Licensor to access and use the Licensed Property for the sole purpose of providing engineering and other products or services to Licensee in connection with Licensee's design, construction and operation of the Licensed Facility, as provided in Article 10.

"**Break Ground**" means the commencement of construction of the Initial Licensed Facility as permitted by law, after the plans and financing for the facility have been completed and all permits and approvals for the facility are issued.

"**Business Day**" means any day on which banks are not legally authorized or required to close in New York City.

"**Confidential Information**" means any confidential, nonpublic, or proprietary information which (a) is designated by the disclosing Party as confidential or proprietary; (b) would reasonably be viewed as confidential; (c) would reasonably be viewed as having value to a competitor of the disclosing Party; or (d) the disclosing Party is under an obligation to a third party to keep confidential. Confidential Information includes information disclosed by the disclosing Party in oral communications if designated as such at the time of disclosure and documented in writing to the receiving Party within five (5) calendar days after the disclosure. Consistent with this definition, Licensor Confidential Information shall include all information relating to the Licensor Property, including without limitation all analyses and test results relating to any of them and the terms of this Agreement.

"**Co-Product**" means any incidental or secondary product other than cellulose pulp resulting from any authorized use of the Licensed Property, including, without limitation, lignin, hemicellulose, and sugars.

"**Co-Product Price**" means the price set forth in Exhibit D at which Licensee agrees to sell Co-Product to Licensor.

"**Constituent Chemicals**" means the chemicals and additives used by Licensor in the formulation of the Associated Products.

"**Consulting Services**" means the services available from Licensor in support of the operation of a Licensed Facility in production. Licensee may request Licensor provide Consulting Services at any time after Successful Start-up. If mutually agreed, Licensor will provide Consulting Services to Licensee according to a separate written consulting agreement substantially in the form of Exhibit J.

"**Contract Supplier**" means a person or entity which Licensor has authorized to manufacture Associated Products and who is contractually obligated to supply the Associated Products to Licensee or its Affiliates upon Licensor's instructions to do so.

"**Control**" means: (a) ownership of more than fifty percent (50%) of the outstanding shares representing the right to vote for members of the board of directors or other managing officers of an entity; (b) for an entity that does not have outstanding shares, ownership of more than fifty percent (50%) of the ownership interest representing the right to make decisions for such entity; or (c) effective control over the entity's decision-making by virtue of any contractual or other arrangement.

"**Customer(s)**" means an individual or entity (other than Licensor or Licensee or any of their Affiliates) that purchases the Licensed Products.

"**Derivative Works**" means any work prepared by either Party, alone or jointly, that is based upon or uses any part of Licensor's Intellectual Property Rights.

"**Event of Force Majeure**" means an event or circumstance, not reasonably within the control of a Party, which restrains or delays the performance by a Party of its obligations under the Contract and, which by the exercise of due diligence and planning, the Party was, or is, unable to prevent or overcome. Notwithstanding the generality of the foregoing, an Event of Force Majeure shall not include lack of finances or inability to perform because of a Party's financial condition.

"**Feedstock**" means the biomass for the Licensed Facility specified in Exhibit G "Performance Specifications Assumptions and Dependencies."

"**Fees**" means, collectively, the License Fee, Additional Licensed Facility Fee, and Service Fees. Fees do not include the Royalties Licensee is required to pay Licensor under Section 4.3 or amounts due for Associated Products under Exhibit C.

"**Implementation Services**" means the services to be provided by Licensor to Licensee in connection with the training and development of standard operating procedures for the Initial Licensed Facility, as described in Exhibit E.

"**Implementation Services Fee**" means the fees Licensee is required to pay to Licensor for Implementation Services under Section 4.2, as set forth in Exhibit E.

"**Improvement(s)**" means any change or modification to the Licensed Property, or a portion thereof, whether developed by Licensor or Licensee, alone or jointly, during the Term. Improvements do not include Licensee Developments.

"**Intellectual Property Rights**" means all worldwide intellectual property rights including copyrights, trademarks, service marks, trade secrets, know-how, inventions, patents, patent applications, moral rights, and all other proprietary rights, whether registered or unregistered.

"**Initial Licensed Facility**" means the first Licensed Facility in the Territory, which shall begin commercial production of Licensed Product not later than forty-two (42) months after Effective Date.

Confidential License Agreement                - 3 -

"**Law(s)**" means, collectively, all valid applicable federal, provincial and municipal and other local laws, regulations and orders, decisions and rules of regulatory bodies, or any judgment, decree, or order, to which either Party or both of them is subject.

"**License Fee**" means the fee to be paid by Licensee to Licensor for the License as provided in Section 4.1. The License Fee is Two Million Dollars US ($2,000,000.00).

"**Licensed Facility**" means the Initial Licensed Facility and any Additional Licensed Facility licensed to use the Licensed Property in the Territory under this Agreement.

"**Licensed Products**" means the pulp, lignin and hemi cellulose products produced by Licensee from Permitted Biomass using Licensed Property.

"**Licensed Products Sold**" means the earlier of the date on which (a) Licensed Products are shipped to a buyer, (b) Licensee receives all or any portion of the payment for the Licensed Products, or (c) title and risk of loss to the Licensed Products has transferred from Licensee to the buyer.

"**Licensed Products Consumed**" means all Licensed Products produced or manufactured by Licensee that are used by the Licensee in its operations or in the production of any other products.

"**Licensed Property**" means Technology, Process Flow and Information, and Improvements, as provided to or authorized for use by Licensee under Section 2.1.

"**Licensee Developments**" means works reduced to practice by Licensee which do not make any use of Licensor Property and are developed by Licensee without any contribution by Licensor to prepare Permitted Biomass for processing or other activity (a) upstream of the Stage 1 pretreatment tank or (b) that is downstream of (i) producing bales of wet lap pulp, (ii) pulp pumped to a high density storage chest, or (iii) filter pressate or other material pumped to a Co-Product storage tank.   Licensee Developments do not include any works or inventions which make any use of or are derived from Licensor Property or are developed by Licensee with any contribution from Licensor, all of which shall be treated as Improvements.

"**Licensor Property**" means the Technology, Associated Products, Process Flow and Information, Associated Product Information, Improvements, Inventions and all Derivative Works thereof, together with the Licensor Confidential Information and all Intellectual Property Rights therein.

"**Marketable Materials**" means products manufactured using the Licensed Products.

"**Mechanical Completion**" means erection of the Licensed Facility, system testing and pre-commissioning testing activities have been successfully completed to the satisfaction of Licensee and Licensor, acting reasonably.

"**Performance Specification**" means the operational and performance specifications for the Technology at the Initial Licensed Facility as set forth in Exhibit G, as may be modified by agreement of the Parties.

"**Permitted Biomass**" means any available biomass except Restricted Biomass.

"**Personnel**" means, with respect to a Party, such Party's or its Affiliates' employees, contractors, sub-contractors of any tier, suppliers, agents, representatives, invitees and any other individuals, entity's or

organizations directed by such Party in the performance of its obligations hereunder.  For avoidance of doubt, Licensee Personnel includes Allnorth and Andritz and their respective employees, contractors, sub-contractors of any tier, suppliers, agents, representatives, invitees and any other individuals, performing services for Licensee in connection with the Licensed Facilities.

**"Prime Rate"** means the prime rate of interest for commercial loans to its preferred customers as published at the main branch of the Royal Bank of Canada at Vancouver, British Columbia.

**"Process Flow and Information"** means information describing the methods, procedures, processes, and documentation designated as such in Schedule 1 to Exhibit A relating to the Technology and the Associated Products used to convert Permitted Biomass into market grade pulp, and chemicals.  Process Flow and Information does not include Associated Product Information.

**"Project Services"** means the services to be provided by Licensor to Licensee in support of planning and development of the Initial Licensed Facility.

**"Project Services Fee"** means the hourly fees that Licensee is required to pay to Licensor for Project Services under Section 4.10.  As of the Effective Date, the hourly rate for Project Services is Two Hundred Dollars US per hour ($200 per/hour).

**"Purchase Order"** means an agreement, signed by Licensor, for the sale of Associated Products by Licensor to Licensee in the form of Schedule 2 to Exhibit C and in accordance with and subject to the terms and conditions set forth in Schedule 1 to Exhibit C, and at the pricing specified therein.

**"Restricted Biomass"** means plants of the following genera: Saccharum, Agave sp, and Asparagaceae and the plant designed as Energy Sorghum.

**"Royalty"** means the amounts Licensee is required to pay to Licensor on the sale of the Licensed Products Sold and Licensed Products Consumed in accordance with Section 4.3 and as specified in Exhibit D.

**"Secure Zone"** means the area within the Licensed Facility (a) including and downstream of the Stage 1 pretreatment tank or (b) that is upstream of (i) producing bales of wet lap pulp, (ii) pulp pumped to a high density storage chest, or (iii) filter pressate or other material pumped to a Co-Product storage tank.

**"Service Fees"** means the fees due for Implementation Services, Project Services, and Consulting Services provided by Licensor under this Agreement or under separate agreement between the Parties.

**"Services"** means the Project Services, Implementation Services, and Consulting Services as may be provided by Licensor to Licensee under this Agreement or under a separate agreement for such Services.

**"Start-up Testing"** means testing conducted by Licensor at the Initial Licensed Facility under the operating conditions and using the Feedstock and procedures set forth in Exhibit G for the purpose of confirming Successful Start-up.

**"Subsidiary"** means, with respect to any Party, an entity that is directly or indirectly Controlled by such Party.

"**Successful Start-up**" means the ability of the Initial Licensed Facility to produce Licensed Products from the designated source materials meeting the Performance Specification, measured as provided in Exhibit G.

"**Technology**" means the certain proprietary methods, procedures, and processes developed by Licensor for processing and use of chemical additives for the limited purpose of pulping Permitted Biomass for lignin or lignin products.

"**Territorial Exclusive**" means the exclusive right granted to the Licensee to use the Licensed Property in the Territory as provided in Section 2.1. The Territorial Exclusive will begin on the date of the delivery of the payment due under Section 4.1(a) and terminate upon the earlier of (a) termination or expiration of this Agreement, (b) Licensee's failure to pay the License Fee in full within thirty-six (36) months after the Effective Date, (c) Licensee's failure to Break Ground on the Initial Licensed Facility with an output of at least two hundred tons per day (200 TPD) within forty-two (42) months from the Effective Date, or (d) Licensee's failure to begin commercial operation of the Initial Licensed Facility on or before sixty (60) months from the Effective Date.

"**Territory**" means the entirety of the Province of Saskatchewan in Canada. The Territory may be expanded to include the Province of Manitoba as provided in Section 3.6.

### 2. License and Ownership

2.1     License. Subject to Licensee's compliance with all of its obligations under this Agreement, including without limitation all payment and other obligations in Article 4, Licensor hereby grants to Licensee, an irrevocable (subject to Sections 4.1, 4.7 and 7.4), perpetual, non-sub-licensable, non-assignable (subject to Section 15.5) license to use the Licensed Property for the sole purpose of manufacturing Licensed Products from the Initial Licensed Facility (and from any Additional Licensed Facilities authorized hereunder) in the Territory during the Term (the "**License**"). For clarity, the License does not include a license to make Marketable Materials for resale. Notwithstanding the preceding, Licensor agrees that any license it hereafter grants to any third party for use of the Technology during the period of the Territorial Exclusive shall prohibit such third-party from using the Technology to manufacture Licensed Products from Permitted Biomass in the Territory. Licensee acknowledges that the License is not absolute and is subject to restrictions, as set forth herein, and Licensor's reserved rights.

2.2     Delivery. Provided this Agreement has not been earlier terminated and Licensee has paid all fees then due (including the License Fee due under Section 4.1(b)), Licensor will deliver to Licensee the Process and Flow Information deliverables as set forth in Exhibit A.

2.3     Ownership of Licensed Products. Licensor hereby acknowledges Licensee's ownership of all tangible Licensed Products manufactured by Licensee under the License. Except for the License, Licensee acquires no rights, title or interest in the Licensed Property, including as may be embodied in the Licensed Products. Licensee acknowledges and agrees that Licensor owns all rights, including all Intellectual Property Rights, in and or to the Licensor Property. If and to the extent Licensee may obtain any rights in any part of the Licensor Property by operation of law or otherwise, Licensee hereby irrevocably and unconditionally assigns all such rights to Licensor. Licensee covenants and agrees not to challenge or assert any rights inconsistent with Licensor's exclusive ownership of all or any part of the Licensor Property.

2.4    Reservation of Rights. Licensor reserves all rights not expressly granted to the Licensee in Section 2.1. Except as expressly provided in Sections 2.8 and 2.11, no additional rights (including any implied patent licenses, covenants, releases, or other rights) are granted by this License or Licensor through implication, exhaustion, estoppel, or otherwise.

2.5    Patent Applications. Licensee shall not, directly or through any other person, file for patent protection for any process, machine, manufacture process, composition of matter, or design that is substantially equivalent to or would limit Licensor's right to make, use, and sell the Technology or otherwise exploit the Licensor Property throughout the World. Under no circumstances shall Licensee manufacture any products that infringe Licensor's Intellectual Property Rights.

2.6    Reverse Engineering. Licensee covenants and agrees that it will not, directly or through any other person or entity (a) make any use of the Licensed Property to develop or attempt to develop any technology that competes with the Technology or (b) attempt to find or otherwise determine the identity or composition or formulation of the Associated Products or obtain any physical data regarding the Associated Products or any Associated Products Information that would be useful in determining the identity of the Constituent Chemicals or the composition or formulation of the Associated Products. Licensee may however develop any physical property, chemical kinetic or thermodynamic information or data that it deems necessary for the safe, efficient or optimal operation and maintenance of the Licensed Facility; provided Licensee holds all data that may be used to discover or reproduce the Process Flow and Information under use, access and security restrictions as provided in Section 2.7 and Article 11.

2.7    Trade Secret. Licensee acknowledges that the Technology used in making Licensed Products within the Secure Zone, the Process Flow and Information, and the Constituent Chemicals used in and formulation of processes and procedures used to make the Associated Products ("Trade Secrets"), constitute and contain Licensor proprietary, trade secret, and Confidential Information. Licensee covenants and agrees to protect the same as a trade secret, including but not limited to: (a) limiting access and knowledge of such information to those of its Personnel with a "need to know" the same in order for Licensee to exercise the License in accordance with its terms; and (b) obtaining written acknowledgment of trade secret status and a covenant from all Personnel to whom Licensee permits access to or knowledge of the Trade Secrets that such Personnel shall maintain the same as a trade secret, including to comply with the terms contained in Article 11, and will not make any use of the Trade Secrets except as expressly permitted under this Agreement.  Licensee shall be liable to Licensor and in breach of this Agreement if any Personnel use or disclose the Licensor Trade Secrets or other Confidential Information in any manner other than as expressly authorized under this Agreement.

2.8    Licensor Improvements. During the Term, provided Licensee is not in material breach of any provision of this Agreement, Licensor agrees to provide Licensee with timely notice of and access to any and all Improvements to the Licensed Property owned by, licensed to, or otherwise in the control of Licensor.

2.9    Licensee Improvements.  If Licensee shall conceive, discover, or implement any Improvements, alone or with others, during the Term or thereafter, Licensee shall promptly disclose the same to Licensor and provide Licensor with all information Licensor shall reasonably request to evaluate such Improvements for use as part of the Technology. Licensee acknowledges and agrees that all such Improvements shall be owned by Licensor and hereby transfers, assigns and conveys all rights therein, including all Intellectual Property Rights, to Licensor.  Licensee agrees to execute all documents and take such other acts as Licensor may reasonably request, at Licensor's expense, to document and secure

Licensor's ownership of such Improvements. If Licensor is unable for any reason to secure Licensee's signature on any such documents, Licensee hereby irrevocably designates and appoints Licensor and its duly authorized officers and agents as Licensee's limited agent and attorney in fact to execute and file any documents and to do all other lawfully permitted acts for the limited purpose of securing Licensor's rights in such Improvements, with the same legal force and effect as if executed by Licensee.

2.10    Non-Circumvention. Licensee acknowledges that the materials and information provided to Licensee under Sections 2.2, 2.7 and 11.1, including the identities of Licensor contractors and suppliers ("Contractors"), constitutes Licensor Confidential Information. Licensee covenants and agrees not to make any use thereof except as expressly permitted in Sections 2.1 and 2.7 or, as to Contractors, as permitted in Section 11.8. Without in any way limiting the foregoing or Licensee's obligations under Article 11, Licensee covenants and agrees not to directly or indirectly, (a) purchase or solicit to purchase products or services referenced in the materials provided under Section 2.2 or identified to Licensee in Article 11, from any Contractors in connection with design, development, or operation of a facility using any part of the Licensed Property without Licensor's prior written approval or for any purpose prohibited under Sections 2.6 or 2.7 or (b) solicit or encourage any of such Contractors to terminate, discontinue, or reduce its business with Licensor. For clarity, nothing in this Section 2.10 shall limit Licensee's ability to engage Contractors for any purpose unrelated to the Technology or the License granted herein.

2.11    Inventions. Licensee acknowledges that Licensor may seek and/or obtain patent protection for inventions relating to the Licensed Property in use at the Initial Licensed Facility ("Inventions"). Notwithstanding anything else herein to the contrary, Licensor shall not have any obligation to disclose such Inventions to Licensee prior to the date of the issuance of any patent thereon if, in Licensor's sole judgment, such disclosure may adversely affect Licensor's patent rights or interests. Unless the License for the Licensed Facility has been earlier terminated, Licensor agrees that, upon the issuance of the earlier of a Canadian or United States patent(s) to Licensor for such Inventions from a Canadian or United States patent application(s) filed prior to the effective date of the License, the License granted for each Licensed Facility operating under the License shall include the right to use the Inventions designed to improve the performance of the Licensed Property in use therein as described in such patents for the purposes described in Section 2.1 and Licensor will agree to amend the License accordingly. The provisions of this Section 2.11 shall not apply to any developments, discoveries or inventions discovered or reduced to practice by Licensor that are not designed to improve the performance of the initial Licensed Facility but may be otherwise useful in the production of pulp from non-wood fiber materials ("New Developments"). However, provided the License for the initial Licensed Facility has not been earlier terminated, Licensor agrees to make such New Developments available to Licensee for use at the Additional Facilities on terms that are substantially the same as those under which Licensor licenses them to other licensees of the Licensed Property.

2.12    Licensee Developments. Licensor acknowledges that Licensee shall own all rights in the Licensee Developments. Licensee assumes all risk associated with the use of Licensee Developments with the Licensed Property and in connection with the Licensed Facilities. Licensee acknowledges that Licensee shall be solely responsible for any delay or failure to achieve Successful Start-up due in whole or in part to any Licensee Developments.

2.13    Review and Inspection. Licensee shall provide Licensor with access to the Licensed Facility upon request so that Licensor may review Licensee's operations and confirm Licensee's compliance with the terms of the License, including without limitation the requirements of Sections 2.1, 2.6, 2.7 and 2.9 and Article 11. Licensor shall notify Licensee in writing of any material failure to comply with the above

provisions. Licensee shall promptly correct any such failure(s) and implement measures satisfactory to Licensor to avoid future failures.

**3.    Additional Facilities**

3.1    Adding Additional Facilities. Provided Licensee has paid Licensor the entire License Fee under Section 4.1, Licensee may add one or more Additional Licensed Facilities to the License by delivering an Additional Facility Notice to Licensor; provided, however that no Additional Licensed Facilities may be added if, prior to Licensor's receipt of such notice, this Agreement or any Additional Licensed Facility Amendment has been terminated or Licensee has received liquidated damages under Section 6.6(b).

3.2    Additional Licensed Facility Amendment. Each Additional Licensed Facility Amendment shall be effective upon the last to occur of the following: (a) execution of the Additional Licensed Facility Amendment by both Parties; (b) Licensee's payment of the Additional Licensed Facility Fee; and (c) Licensee's payment of any additional Fees or other amounts due upon the effective date of the Additional Licensed Facility Amendment. For avoidance of doubt, unless otherwise provided in the Additional Licensed Facility Amendment, the Start-up Provisions of this Agreement apply only to the Initial Licensed Facility and do not apply to the Additional Licensed Facilities.

3.3    Additional Facility License Fee. Unless otherwise agreed in the applicable Additional Licensed Facility Amendment, Licensee shall pay Licensor the Additional Licensed Facility Fee for each Additional Licensed Facility upon execution of the related Additional Licensed Facility Amendment. The Additional Licensed Facility Fee does not include any amounts for services required to modify or adapt any of the Process Flow and Information or Specifications for the Additional Licensed Facility or to incorporate any Improvements, Inventions, New Developments, or Licensee Developments in the Additional Licensed Facility. Nor does the Additional Licensed Facility Fee include any Implementation Services, Project Services, or any other services that may be provided by Licensor in connection with the Additional Licensed Facility, all of which shall be paid separately as provided in the applicable Additional Licensed Facility Amendment.

3.4    Status. Upon the effective date of the applicable Additional Licensed Facility Amendment, Licensee shall be permitted to use the Licensed Property licensed to Licensee for the Initial Licensed Facility and under any Additional Licensed Facility Amendment as well any Subsequent Licensed Property specifically included in the applicable Additional Licensed Facility Amendment on the same terms and in the same manner as applicable to the Licensed Property under Section 2.1. Once an Additional Licensed Facility is added to this Agreement, it shall be considered a Licensed Facility subject to the terms hereof applicable to such facility as set forth in the Additional Licensed Facility Amendment by which it was added to this Agreement.

3.5    Assumption of Risk. Licensee acknowledges that the requirements of each Licensed Facility may differ and that Process Flow and Information and Associated Products applicable to one Licensed Facility may not apply to another Licensed Facility. Licensee understands that Licensor makes no warranties with respect to the application or use of Process Flow and Information or Associated Products at Additional Licensed Facilities and assumes all risk associated with their modification or re-use.

3.6    Expansion of Territorial Exclusive. During the period that the Territorial Exclusive is in effect ("**Expansion Period**"), Licensee shall have the right to expand the territory covered by the Territorial Exclusive to include the Province of Manitoba ("**Manitoba**") as set forth in Section 3.6(a) and (b), provided,

however that Licensee shall have no rights under this Section 3.6 if Licensee has received liquidated damages under Section 6.6(b).

(a)    At any time during the Expansion Period prior to Licensee's receipt of an Option Notice under Section 3.6(b), Licensee may expand the Territorial Exclusive to include Manitoba by (i) delivering an Additional Facility Notice for one or more Additional Licensed Facilities proposed to be located therein ("Expansion Notice") and (ii) paying Licensor the unpaid portion, if any, of the License Fee due under Section 4.1(b). Unless otherwise agreed in writing, the Parties shall execute an Additional Licensed Facility Amendment for each facility identified in the Expansion Notice and pay Licensor the applicable license fee for each such facility within forty-five (45) days after Licensor's receipt of the Expansion Notice. Thereafter, for so long as the Territorial Exclusive is in effect, Licensee may add Additional Licensed Facilities in Manitoba in the same manner and on the same terms as applicable to such facilities in the Province of Saskatchewan; provided, however, that the license granted for all such facilities shall become non-exclusive if Licensee does not commence construction of the first facility licensed under this Section 3.6(a) within twenty (20) months after Licensor's receipt of Licensee's Expansion Notice. The license fee for the first facility licensed to use the Licensed Property in Manitoba shall be Two Million Dollars US ($2,000,000 USD) and shall be Five Hundred Thousand Dollars US ($500,000 USD) for each additional facility. For avoidance of doubt, except for the license fee due for the first facility in Manitoba, each facility licensed to use the Licensed Property in Manitoba shall be licensed on the same terms as Additional Licensed Facilities in the Province of Saskatchewan.

(b)    If Licensor receives a bona fide offer from a third party to license the Licensed Property for the manufacture of Licensed Products in Manitoba ("Offer") during any period that Licensee is authorized to issue an Expansion Notice under Section 3.6(a), Licensor shall provide Licensee with written notice thereof. Within ten (10) days' after receiving notice of the Offer, Licensee shall notify Licensor in writing if Licensee desires to enter into an exclusive license to use the Licensed Property in Manitoba and, if so, shall pay Licensor the unpaid portion, if any, of the License Fee due under Section 4.1(b). If Licensee desires to proceed with the license and delivers the notice and payment required herein, Licensor agrees not to enter into a license, exclusive or non-exclusive, under the Offer without providing Licensee at least forty-five (45) days to enter into an exclusive license with Licensor for such rights, such license to be on terms that are the same or no less restrictive than those under the Offer. If Licensee does not deliver the above notice and pay the associated license fee or Licensee and Licensor do not execute an exclusive license within such 45-day period, Licensor shall be free to license the Licensed Property to such third party on terms substantially as those under the Offer and, upon execution of such license, Licensee shall have no further rights under this Section 3.6.

For avoidance of doubt, Licensee shall have no rights to use the Licensed Property in Manitoba except as expressly provided in this Section 3.6.

## 4.    Fees and Royalties

4.1    License Fee. Licensee agrees to pay Licensor the non-refundable License Fee set forth in Exhibit D in US dollars as partial consideration for the License. The License Fee is due on the Effective Date, however, Licensee may pay the License Fee in installments as follows:

(a)    $250,000  by 31st of January 2019; and

(b)    $250,000 by 31st of January 2020, and

(c)    $1,500,000 on the earlier of (i) receipt of financing for the construction of the Licensed Facility or (ii) thirty-six (36) months from the Effective Date.

Licensee acknowledges that any failure to pay any installment of the License Fee above shall constitute a material breach of this Agreement and that upon receiving written notice thereof from Licensor, all unpaid amounts shall become immediately due and payable. If Licensee shall fail to pay such accelerated amounts within thirty (30) days after such notice, Licensor may, in addition to all other remedies available, terminate this Agreement upon written notice to Licensee. Except as expressly provided in Section 7.4, upon termination of the Agreement, the License for the Initial Licensed Facility and all Additional Licensed Facilities shall terminate.

4.2    Service Fee. In addition to the License Fee, Licensee agrees to pay Licensor the Project Services Fee and Implementation Services Fee, which shall compensate Licensor for (a) Project Services provided by Licensor under Section 4.10 and (b) and Implementation Services provided by Licensor in connection with implementation of the Technology at the Initial Licensed Facility which exceed those set forth in Exhibit E. Any services or expenses in addition to those under Section 4.10 or Exhibit E shall be paid by Licensee as mutually agreed upon by the Parties. Licensee shall pay Licensor all Service Fees within thirty (30) days of the date of Licensor's invoice for such services.

4.3    Royalty. In addition to the Fees and amounts due under Article 4, Licensee shall pay to Licensor a Royalty for Licensed Products Sold and Licensed Products Consumed as specified in Exhibit D. Commencing on Successful Start-up and within thirty (30) days after the end of each calendar quarter thereafter, Licensee shall provide Licensor with a royalty report in the form of Schedule 1 to Exhibit D indicating the tonnage of Licensed Products Sold (both Pulp only and non-Pulp) and Licensed Products Consumed in the previous calendar quarter and submit the corresponding Royalty for the same ("Royalty Report(s)"). The Royalty Report shall include, in addition to the summary information, data from which Licensor may confirm the totals set forth in the Royalty Report. The Licensor shall have the right, not more often than once in any calendar year and during regular business hours, to have an independent certified public accountant acceptable to Licensee examine the books of the Licensee to verify the Royalty Reports and Royalty due Licensor pursuant to this Agreement. The cost of such examination shall be borne by Licensor, unless such examination determines that Licensee has underpaid the Royalty due hereunder by more than five (5%) percent; in which event, Licensee shall within thirty (30) days' pay the cost of such examination plus any underpayment of the Royalty and the applicable Late Fee from the date the Royalty was originally due.

4.4    Disputed Royalty Report. If Licensor in good faith disputes any Royalty Report or Adjusted Report (defined below) amounts, Licensor shall provide written notice of the dispute to Licensee within fifteen (15) days after receipt of the Royalty Report or Adjusted Report. Such notice must identify the disputed amount and reasons therefore. A "disputed report" is one for which Licensor has given Licensee written notice, adequately supported by bona fide explanation and documentation. The Parties shall work together in good faith to resolve and reconcile the applicable records and disputed report, provided all such disputed invoiced amounts must be resolved within thirty (30) days of the written notice to Licensee. Upon resolution of the dispute, Licensee shall resubmit an adjusted Royalty Report ("Adjusted Report") and pay any underpayment due plus the applicable Late Fee from the date the Royalty was originally due. If Licensee in any instance mistakenly overpays Royalties due, Licensee may submit an Adjusted Report and shall be entitled to a credit against future Royalties for the amount overpaid.

4.5     Payment Terms; Fees. Except as otherwise provided herein, Licensee shall pay Licensor the Fees specified in Licensor's invoices submitted hereunder on a net thirty (30) day basis from the date of Licensee's receipt of the invoice. If Licensee disputes any amount shown on Licensor's invoices then Licensee shall (a) provide Licensor with written notice thereof detailing the basis for the dispute, such notice to be delivered to Licensor within fifteen (15) business days after delivery of the invoice to Licensee and (b) pay the undisputed portion of the invoice as provided above. Failure to provide written notice to Licensor as above shall constitute Licensee's acceptance of the invoice and a waiver of any objection to the Fees invoiced therein. If Licensee disputes any part of an invoice within the time specified above, the Parties shall devote good faith efforts to resolve the dispute which may include, at the option of either Party a meeting in Seattle, Washington as provided in Section 14.2. If the Parties are unable to resolve the dispute within forty-five (45) days after the date of Licensee's notice, Licensor may, at its option and without any liability, suspend all services under this Agreement pending resolution of the dispute under Article 14. If Licensee fails to pay the undisputed amounts of Licensor's invoices when due, Licensee shall pay Licensor a Late Fee on the overdue amounts.

4.6     Taxes. Any taxes applicable to the Fees or Royalties payable to Licensor under this Agreement shall be borne by the Party required to do so by Law. In particular, Licensee will not bear any tax imposed on Licensor's income. If required by Law, Licensee will deduct the amount of such withholding tax from the Fees and Royalties payable to Licensor and will promptly provide to Licensor the appropriate documentation evidencing payment of such tax so that Licensor can credit such withholding tax against its United States federal income tax liability. Each Party will take all reasonable actions necessary to ensure that any taxes withheld are minimized to the extent possible under Law.

4.7     Late Fee. Failure to pay any License Fee or Royalty as and when due shall constitute a material breach of this Agreement, entitling Licensor to the remedies provided in Section 7.2. Any part of the Fees or Royalty that is not paid when due is subject to a late fee calculated at the Prime Rate plus five (5%) percent from the date payment was due until the amount due has been paid in full ("Late Fee").

4.8     Pricing. Licensor agrees that during the Term it shall not charge Licensee an hourly rate for Services, a royalty rate for Licensed Products and Co-Products, or a price per pound for Associated Products that exceeds the prices charged for the same to any other third party licensing the Licensed Property under comparable terms and conditions. Licensee may, through an independent auditor approved by Licensor and at Licensee's sole cost and expense, review Licensor books and records relating to Licensor pricing in order to confirm Licensor's compliance with the requirements of this Section 4.8; provided, however, (a) such audit shall take place no more than once per calendar year at such times and under such circumstances that will not interfere with Licensor's normal business operations, (b) the auditor shall sign a non-disclosure agreement in favor of Licensor as a condition of access to such records, and (c) the auditor shall only disclose to Licensee the ultimate result of such audit, i.e. whether the prices charged to Licensee meet the requirements of this Section 4.8. If the results of such audit indicate that Licensor has charged Licensee higher rates than it has charged another comparable licensee in violation of this Section 4.8, Licensor will adjust the rates going forward and allow Licensee to deduct any over charged amounts from its Royalty payments due hereunder.

4.9     Royalty Adjustment. If, during the Territorial Exclusive, (a) the Associated Product Information or the trade secret process enters the public domain through no fault of Licensee or any Licensee Affiliate who have a duty to maintain the trade secret status of such information and (b) as a result thereof, an unauthorized third party successfully manufactures and uses the Associated Products to manufacture and sell Licensed Products which meet the requirements set forth in Exhibit G, then the Royalty the Licensee

Confidential License Agreement                    - 12 -

is required to pay shall be reduced to 50% of the amount otherwise due. Further, in such event, Licensor agrees that Licensee's obligations under Article 4 to solely source its supply of Associated Products from Licensor shall expire and be of further no force and effect, although Licensee may continue to purchase Associated Products from Licensor on the terms set forth in Exhibit C. If Licensee decides to purchase Associated Products from suppliers other than Licensor, then the Licensee assumes all risks associated with any such purchases of Associated Products and releases and agrees that Licensor shall have no responsibility or liability of any kind for any Associated Products so purchased or Licensee's use or inability to use them in or with the Technology.

4.10    Project Services. From the Effective Date until Licensee certifies Mechanical Completion of the Initial Licensed Facility, Licensor will provide Licensee with Project Services, as may be mutually agreed in writing.

## 5.    Purchase of Associated Products

5.1    Forecast. Licensee covenants and agrees that (a) it shall buy its entire requirements of the Associated Products from Licensor and (b) it shall not make any use of the Associated Products, Process Flow and Information, or Licensed Products in violation of Sections 2.1, 2.6 or 2.7 or to manufacture the Associated Products (directly or indirectly). Within thirty (30) days of the Effective Date and thereafter on or before January 1 of each year during the Term, Licensee shall provide Licensor with an estimated annual forecast by month of its monthly purchases of Associated Products in the form of Exhibit C. Licensee shall provide updates thereto from time to time when Licensee reasonably foresees material changes in the likely volume of its orders of Associated Products. Licensor is not obligated to fill any Licensee Purchase Order over the quantities in the monthly forecast but may do so in its sole discretion

5.2    Pricing and Minimum Order Requirements. During the Term, Licensor agrees to sell Associated Products to Licensee (or authorize a third party licensee to do so) in quantities as agreed in a Purchase Order signed by Licensor in accordance with the forecast and the process and terms in Exhibit C. Licensor agrees that the pricing for Associated Products shall on a cost plus basis as described in Exhibit C and that Licensor shall not charge Licensee more per pound of Associated Products than it charges other licensees for comparable products. Licensee may use the Associated Products solely in connection with the Technology in accordance with the License.

5.3    Acceptance of and Revisions to Purchase Orders. Licensee shall initiate all purchases of the Associated Products by transmitting a Purchase Order to Licensor. All Purchase Orders are subject to Licensor's approval and shall not be deemed accepted except when signed by Licensor. Licensor will review each Purchase Order submitted by Licensee and within two (2) business days of Licensor's receipt thereof, either (a) accept it by returning it to Licensee signed by Licensor or (b) reject it by providing Licensee with written notice of rejection stating the grounds for rejection including, where applicable, the reasons the Purchase Order is incomplete or fails to conform in any respect with this Agreement and/or Exhibit C.

5.4    Availability of Associated Product. Licensor agrees to maintain production facilities and/or contractual arrangements with its Contract Suppliers sufficient to enable Licensor to satisfy Licensee's requirements for such Associated Products as set forth in Licensee's forecast projections. Licensor will ensure, through its agreements that (a) the Contract Suppliers sell the Associated Products to Licensee on the same terms and prices as they are sold by Licensor if Licensee is required to purchase them directly from the Supplier after release of the Escrow Items under the Escrow Agreement and (b) Licensee is a

Confidential License Agreement                     - 13 -

named third party beneficiary to such agreements with the right to enforce the terms thereof after the release of the Escrow Items. Licensee assumes all risk associated with its purchase of Associated Products from third parties and releases Licensor from all claims and liability associated with Licensee's use thereof. Licensee acknowledges and agrees that purchase from an approved Contract Supplier or its receipt of the Deposit as provided in Section 5.6 constitutes Licensee's sole and exclusive remedy for any occurrence set forth in this Section 5.4.

5.5    Discontinuance of Associated Products. Licensor reserves the right to discontinue an Associated Product so long as it provides an equivalent substitute or that such discontinuance will not have an adverse impact on Licensee's operation of the Licensed Facility and its production of Licensed Products.

5.6    Escrow. In furtherance of Licensor's obligations under Sections 5.4 and 5.5, the Parties have executed the Escrow Agreement attached as Exhibit K hereto with the escrow agent listed therein. Licensee agrees that the Escrow Agreement shall govern the terms under which it may access and use the Escrow Items and that, except as provided therein, Licensee shall not have any right to seek or gain access to or make use of the Escrow Items. Licensee further acknowledges and agrees that it only acquires a limited right to use the Escrow Items for the purpose of purchasing or manufacturing the Associated Products for its own use in connection with the manufacture of Licensed Products under this Agreement. Licensee acknowledges that: (i) the Escrow Items and the information contained therein are the proprietary, confidential trade secret property of Licensor; (ii) that Licensor retains all title and ownership in the Escrow Items and any modifications, enhancements, updates or derivative works thereof; and (iii) that Licensee's use of the Escrow Items shall be strictly limited as provided in this Section 5.6 and shall, in addition, be subject to the limitations and requirements of this Agreement applicable to Licensee's use of the Licensed Property. For avoidance of doubt, Licensee may not use the Escrow Items to manufacture Associated Products for re-sale or for use in any manner other than as provided in Section 2.1.

5.7    Authorized Use. Licensee may use the Associated Products solely with the Technology solely as authorized under Section 2.1. No other use of the Associated Products is permitted.

5.8    Quality Control. Licensee shall promptly review the Associated Products upon delivery and shall, within ten (10) days of receipt of the Associated Products, notify Licensor in writing if any delivery fails to meet the applicable Performance Specifications for the Associated Products. Licensor shall review Licensee's notice to confirm whether the Associated Products meet the Performance Specifications and, to the extent they do not as provided in Licensee's notice, Licensor shall replace the defective Associated Products at its sole cost.

6.    **Start-up Testing**

6.1    Notice to Proceed. Unless otherwise agreed in writing, Start-up Testing for the Initial Licensed Facility shall begin on the earlier of (a) thirty (30) months after Licensee receives financing for the construction of the Initial Licensed Facility and (b) fifteen (15) days after Licensee certifies in writing to Licensor that all the Start-up Testing requirements in Exhibit G have been satisfied and the Initial Licensed Facility has achieved Mechanical Completion ("**Start Date**"). If the Start Date is delayed for any reason, the Parties agree to cooperate in scheduling a mutually agreed time for Start-up Testing; provided, however, that if such delay is due to any reason other than Licensor's delay in delivering the Process Flow and Information deliverables, Licensor shall have no obligation to pay liquidated damages under Section 6.6.

6.2     Performance Specifications. The performance specification set out in Section 2 of Exhibit G shall constitute the minimum Performance Specification and the Parties shall establish the remainder of the Performance Specifications by mutual agreement, including the requirements for the Feedstock to be used in Start-up Testing, the operating conditions which the Initial Licensed Facility must meet for Start-up Testing, and the procedures to be used by Licensor in conducting the Start-up Test, all of which shall be set forth in Exhibit G. Licensor will provide Licensee with requirements for sample Feedstock to be used in establishing the above requirements and Licensee shall be responsible for sourcing and delivering the same for testing to Licensor's facility in Dayton, Washington in accordance with Licensor's requirements. Licensee shall pay all costs and expenses associated with sourcing and delivering the initial sample Feedstock to Licensor and any subsequent samples required by Licensor.

6.3     Start-up Testing. Licensor will begin Start-up Testing on the Start Date in accordance with Exhibit G. If the initial Start-up Test does not achieve the Performance Specifications, Licensor may implement adjustments to the process and equipment used in the Initial Licensed Facility as needed to do so and repeat the test up to three (3) times over a period not to exceed one hundred twenty (120) days from the Start Date or such other period as the Parties may mutually agree in writing ("**Test Period**"). The Test Period shall be extended by any period of time that a Force Majeure persists pursuant to an Event of Force Majeure. Any Test-run abandoned for reasons not attributable to Licensor shall not be included in this total. In the event Licensor requires repeated Test-runs, the Test Period shall be extended for a further ninety (90) days from the date of completion of the initial Test-run or longer if the Parties agree to the extension

6.4     Successful Start-up. Licensor shall make measurements during Start-up Testing according to test procedures specified in Exhibit G and shall record the measurements in a logbook that is open for inspection by Licensee. Licensor shall report the progress of Start-up Testing to Licensee periodically and notify Licensee in writing when the test results meet or exceed the Performance Specifications, which notice shall include the measurements collected by Licensor demonstrating Successful Start-up. Licensor shall be deemed to have achieved Successful Start-up ten (10) days after delivery of such notice to Licensee, unless Licensee objects in writing specifying the basis for objection. Following receipt of such notice, the Parties shall meet and confer to resolve any issues presented by Licensee and, if unable to do so within twenty (20) days, either Party may resort to Dispute Resolution under Article 14 during which period Licensor may suspend all Services under this Agreement without liability of any kind to Licensee. Following Successful Start-up, Licensee shall be solely responsible for the operation of the Licensed Facility and Licensor shall have no further obligation or responsibility for the performance of the Licensed Facility to the Performance Specifications.

6.5     Suspension of Start-up Testing; Modifications. If Licensor is unable to achieve the Performance Specifications after three (3) repeated attempts, Licensor shall suspend testing and shall examine the Initial Licensed Facility together with Licensee and Licensee's Authorized Contractor, if so requested by Licensee, in order to determine the reason(s) for failure to achieve the Performance Specification. Licensor shall have up to three (3) months to complete its review, during which period Licensee shall provide Licensor with unfettered access to the Initial Licensed Facility. Upon completion of its review Licensor shall deliver a written report to Licensee specifying the results of the review and identifying measures (if any) required to achieve Performance Specifications. If such measures involve modifications, additions or replacements to the Initial Licensed Facility (collectively, "**Modifications**"), Licensor shall provide Licensee with such information as Licensee may reasonably require to implement the same. The cost of such review effort shall be borne (a) by Licensor to the extent that the reason for the failure to

meet the Performance Specifications is one for which Licensor is solely responsible, and (b) by Licensee in all other situations.

6.6    Modifications and Retesting.  If the results of the investigation performed under Section 6.5 indicate Modifications are needed to achieve the Performance Specifications, Licensee shall, unless otherwise agreed, implement the Modifications according to mutually agreed schedule.  The costs of replacing any hardware which might be specified as part of any Modification and any installation costs thereof hardware shall be borne (a) by Licensor to the extent that the reason for the Modification is one for which Licensor is solely responsible, and (b) by Licensee in all other situations.  Upon completion of such Modifications as confirmed by Licensor, the Parties shall resume Start-up Testing as provided above. If, after such Modifications, Licensor is unable to achieve the Performance Specifications after two (2) separate attempts then, unless otherwise agreed, Licensee shall waive the Performance Specification in exchange for: (a) a thirty-seven and one-half percent (37.5%) reduction in the Pulp Royalty payments due for the Initial Licensed Facility, such reduction to be taken from each Pulp Royalty payment until the total reduction equals 37.5% of the License Fee paid to Licensor, and (b) where the failure to achieve the Performance Specifications is an insurable event covered by the policies required to be maintained by Licensor pursuant to Article 12, the maximum value of the applicable insurance maintained by Licensor pursuant to Article 12.  The Parties agree that the foregoing remedies constitutes Licensee's sole and exclusive remedy for failure to achieve the Performance Specifications and Successful Start-up and shall represent a final settlement of Licensor's liability under this Article 6.  Any cost incurred by Licensor under this Section 6.6 (b) shall be applied to reduce the aggregate liability of Licensor in Section 8.7.

6.7    Licensee Responsibilities.  During Start-up Testing Licensee shall be responsible for the operation of the Initial Licensed Facility and for the supply of all necessary Feedstock, utilities, equipment, analysis and manpower. The Parties shall at all times reasonably co-operate with each other in the timely conduct of the Start-up Test.

6.8    Licensor Assistance.  Whenever Licensor is relieved of its liability pursuant to payment of liquidated damages under Section 6.6 (b), Licensor shall nevertheless assist Licensee, if so requested, in the conduct of testing, analysis and remedial modifications at a later stage, but in no event later than thirty-six (36) months from the date of Mechanical Completion. The provision by Licensor of process experts in the event of that assistance shall be at Licensee's expense in accordance with Section 6.5.

6.9    Licensor's Relief from Liability.  Licensor shall be relieved of its liability under this Article 6 if:

(a)    Licensee has achieved Successful Start-up;

(b)    Start-up Testing is not carried out within the Test Period for any reason for which Licensor is not responsible, except that Licensee shall be entitled to a reasonable extension of the Test Period as a result of Licensee performing Modifications to the Initial Licensed Facility pursuant to Section 6.5;

(c)    The Start-up Testing conditions of Exhibit G cannot be met in the Initial Licensed Facility, or within the Test Period;

(d)    Licensee does not implement in the Licensed Facility the measures as advised by Licensor under Section 6.5 or Exhibits E or G;

(e)    The reason for the failure to meet the Performance Specifications is one for which Licensor is not responsible;

(f)    Licensee waives its right to the demonstration of the Performance Specification or begins commercial operation of the Initial Licensed Facility or accepts the results of testing in writing, notwithstanding that the test results do not meet the Performance Specifications; or

(g)    Licensee has reduced Pulp Royalty Payments under Sections 4.9 or 6.6.

6.10    Licensee Intervention. Nothing in this Article 6 shall impair the overriding authority of Licensee to intervene at any time during a Start-up Testing, in the interests of safety of the Initial Licensed Facility or the overall operating conditions thereof prevailing at the time, to direct immediate abandonment or discontinuance of any Start-up Testing planned or in progress. Licensee shall be solely responsible for all costs of such delay, including costs incurred by Licensor, and any delay due to abandonment, suspension or discontinuance of Start-up Testing shall be counted for purposes of Section 5.1.

7.    **Term and Termination**

7.1    General. The term of this Agreement ("**Term**") shall commence as of the Effective Date and shall continue in perpetuity unless otherwise terminated in accordance with Section 4.1 or 7.2 below.

7.2    Termination for Default. Notwithstanding any other provision to the contrary, either Party may terminate this Agreement upon written notice if the other Party ("**Defaulting Party**") fails to perform any of its material obligations under this Agreement and does not cure the same within thirty (30) business days after receiving written notice to do so from the non-defaulting Party. In addition, Licensor may terminate this Agreement upon written notice if: (a) Licensee fails to pay the entire License Fee as specified in Section 4.1 or fails to Break Ground for the Initial Licensed Facility within either (i) forty-eight (48) months of the Effective Date, or (ii) fifty-four (54) months of the Effective Date provided that Licensee pays a fee to Licensor within forty-eight (48) months of the Effective Date equal to 50% of the estimated annual Royalty that would be due to Licensor if the Licensed Facility were fully operational and producing Licensed Products at its designed production capacity; (b) Licensee fails to certify Mechanical Completion of Initial Licensed Facility by the date specified in Section 6.1, respectively; (c) Licensee ceases to carry on its business; (d) a receiver or similar officer is appointed for Licensee and is not discharged within one hundred twenty (120) days; (e) Licensee is adjudicated bankrupt, or makes an assignment for the benefit of its creditors or another arrangement of similar import; (f) if proceedings under bankruptcy or insolvency laws are commenced by or against Licensee and are not dismissed within one hundred twenty (120) days; or (g) Licensee makes any use of the Licensed Property other than as permitted under this Agreement or breaches any of its obligations under Sections 2.1, 2.5, 2.6, 2.7, 2.10, 4.1, 4.3 or 5.7 or Articles 11 - 13 of this Agreement.

7.3    Effect of Termination. Except as expressly provided in Section 7.4, the License shall terminate immediately upon termination of this Agreement and Licensee shall (a) cease all use of the Technology, (b) pay to Licensor all amounts then due hereunder, and (c) pay to Licensor the Royalty for all Licensed Products that are in inventory for which Licensee has not already paid Licensor the Royalty.

7.4    Continued Use After Termination. Except in the case that this Agreement is terminated by Licensor for Licensee's breach of Sections 2.1, 2.5, 2.6, 2.7, 2.10, 4.1, 4.3 or 5.7 or Articles 12 or 13, in the event of the termination of this Agreement for any other reason the License shall survive and Licensee shall be permitted to continue to use the Licensed Property (including without limitation Associated Products) covered by the License as of the effective date of termination, solely at the Licensed Facilities for which Licensee has paid Licensor the License Fee, such use at all times to be subject to limitations on

use of the Licensed Property herein and Licensee's continued payment of Royalties and other amounts due hereunder as provided herein. If Licensee shall fail to perform any of its obligations under the above referenced Sections and not cure such default within ten (10) days' after receiving written notice to do so from Licensor, all Licensee's surviving rights under the License shall terminate immediately without further notice or action by Licensor. For avoidance of doubt, although Licensee may continue use of the Licensed Property after termination as provided above, Licensee shall not have any right to add Additional Licensed Facilities after termination nor shall Licensee have any right to use any Improvements, Inventions, Derivative Works or other Licensor Intellectual Property discovered, developed or reduced to practices after termination.

7.5    Survival. Subject to Section 7.4 above, the following Sections shall survive termination of this Agreement: Articles 1, 5 and 12 - 15 and Sections 2.3 - 2.7, 2.10, 4.1 – 4.7, 8.3, 8.4, 8.6 -8.8, 9.1, 9.4, 10.1, 10.5, 10.6 and 11.4 - 11.7.

## 8.    Warranties

8.1    Licensor Warranties. Licensor warrants and represents to Licensee as of the Effective Date that:

(a)    Licensor is a Nevada limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Nevada and has the full power, right, and authority to enter into this Agreement and to perform all of its obligations hereunder;

(b)    The execution, delivery, and performance of this Agreement by Licensor (i) has been duly and properly authorized by all necessary company actions; (ii) does not violate or conflict with the organizational documents of Licensor or any agreement to which Licensor or its properties are bound, including without limitation any other license agreement; and (iii) this Agreement constitutes the valid and binding obligation of Licensor enforceable in accordance with its terms; and

(c)    There is no litigation or governmental or administrative action, suit, proceeding, or investigation (domestic or foreign) pending or, to Licensor's knowledge, threatened against Licensor relating to Licensor's ownership of the Technology or the use of the Associated Products in the manufacture of Licensed Products.

The warranties, representations and covenants of Licensor above are made to Licensee only and may not be transferred by Licensee to or asserted by any other person or entity, with the exception that such warranties, representations, and covenants shall transfer in connection with any authorized assignment by Licensee of all of Licensee's right, title, and interest in and under this Agreement, if such assignment is one permitted by this Agreement.

8.2    Licensee Warranties. Licensee warrants and represents as of the Effective Date that:

(a)    Licensee is a limited liability company, duly organized, validly existing, and in good standing under the laws of British Columbia and has the full power, right, and authority to enter into this Agreement and to perform all of its obligations hereunder;

(b)    The execution, delivery, and performance of this Agreement by Licensee (i) has been duly and properly authorized by all necessary corporate or company actions; (ii) does not violate or conflict with the organizational documents of Licensee or any agreement to which Licensee or its properties are

bound; and (iii) this Agreement constitutes the valid and binding obligation of Licensee enforceable in accordance with its terms; and

(c)    Licensee currently has in place and shall maintain for the Term security and confidentiality measures sufficient to protect the Licensor Confidential Information.  Upon reasonable request and from time to time Licensee shall provide Licensor with access to and the ability to audit the measures Licensee has implemented to protect Licensor Property against inadvertent and unauthorized disclosure or use.

8.3    Licensee Covenants. Licensee covenants that during the Term:

(a)    Licensee will comply with all limitations on the use of the Licensor Property contained in this Agreement;

(b)    Licensee shall not, directly or indirectly, challenge Licensor's exclusive ownership of the Licensor Property or take any act or assert any interest therein inconsistent with Licensor's exclusive ownership thereof; and

(c)    Licensee at all times shall comply with all applicable Laws in Licensee's handling, use, and disposal of Licensor Property and in its manufacture and sale of the Licensed Products.

8.4    Conditions to License.  Licensee understands and agrees that any breach of the warranties, representations, and covenants set forth in Sections 8.2, 8.3 and/or 8.6 shall constitute an event of default giving rise to termination of this Agreement and other remedies available to Licensor at law and equity.

8.5    DISCLAIMER OF WARRANTIES. EXCEPT AS EXPRESSLY PROVIDED IN SECTION 8.1, LICENSOR DISCLAIMS ANY AND ALL REPRESENTATIONS AND IMPLIED WARRANTIES REGARDING THE SERVICES, LICENSED PROPERTY OR ASSOCIATED PRODUCTS, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR SUITABILITY FOR ITS INTENDED PURPOSE.

8.6    Responsibility for Licensed Products. Licensee has reviewed and evaluated the Technology and the Associated Products to confirm their applicability and fitness to Licensee's business and requirements and has determined to license the Technology and enter into this Agreement based on its own review thereof. Licensee assumes all risks arising from its use of the Technology and Associated Products and hereby irrevocably and unconditionally releases and discharges Licensor from any and all Losses and Claims (as defined below), or other liability associated with or arising therefrom. Licensee shall be solely responsible for the quality, performance, and other characteristics of Licensed Products.

8.7    LIMITATION OF DAMAGES. EXCEPT AS PROVIDED BELOW, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR INDIRECT DAMAGES ARISING OUT OF OR RELATED TO THE LICENSE OR THIS AGREEMENT (INCLUDING ANY LOSS OF REVENUE, PROFIT, OR USE) ("LOSSES") EVEN IF THE PARTIES HAVE BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES AND EVEN IF THE REMEDIES SET FORTH HEREIN SHALL FAIL OF THEIR ESSENTIAL PURPOSE. WITHOUT LIMITING THE PRECEDING, (A) LICENSOR'S AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE ACTUAL AMOUNT OF THE LICENSE FEES AND ROYALTIES PAID BY LICENSEE HEREUNDER AND (B) LICENSEE'S AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE TOTAL OF THE LICENSEE FEES, ROYALTIES, AND FEES PAID OR DUE UNDER THIS AGREEMENT. THE LIMITATIONS HEREIN SHALL NOT APPLY TO LIMIT A PARTY'S LIABILITY WITH RESPECT TO CLAIMS AND LOSSES SUBJECT TO INDEMNITY UNDER ARTICLE 9, OR ANY BREACH OF SECTIONS 2.1, 2.3, 2.5 – 2.7, 2.10 OR 11.8 OR ANY

OBLIGATIONS UNDER ARTICLE 13, OR FOR GROSS NEGLIGENCE OR WILLFUL OR INTENTIONAL MISCONDUCT OR VIOLATION OF LAWS.

8.8     Exceptions. The limitations in Section 8.7 shall not apply to limit Licensor's remedies or Licensee's liability for any damages or loss resulting from Licensee's direct or indirect failure to fully comply with all of the terms of Sections 2.7 or 11 in a manner that results in or contributes in any way to (a) all or a portion of the Licensed Property no longer qualifying as a trade secret under 19.108 RCW or (b) a third party's (i) manufacture of Marketable Materials or other pulp products from non-wood fiber sources (including Bagasse) using the Licensed Property or (ii) license of any part of the Licensed Property to others without the consent of licensor. For avoidance of doubt, for such damages Licensor shall be entitled to recover incidental, special, consequential, exemplary and indirect damages from such violation, including without limitation lost profits, lost royalties, lost sales, and lost business value. The remedy set forth in this Section 8.8 is in addition to all other remedies Licensor may have at Law, in equity or under this Agreement, including termination under Article 7, indemnity under Section 9.1, and for injunctive relief under Section 11.5.

## 9.     Release and Indemnity

9.1     Licensee Indemnity. LICENSEE HEREBY RELEASES AND AGREES TO DEFEND, INDEMNIFY, AND HOLD HARMLESS LICENSOR AND LICENSOR'S AGENTS AND AFFILIATES (THE "LICENSOR INDEMNITEES") FROM ALL PENALTIES, FINES, JUDGMENTS, AWARDS, CLAIMS, LIABILITIES, AND DEMANDS (COLLECTIVELY, "CLAIMS"), FOR (A) INJURY OR DEATH TO ANY PERSON OR (B) LOSS OR DAMAGE TO PROPERTY BELONGING TO ANY THIRD PERSON OR (C) BREACH OF LICENSOR'S OBLIGATIONS TO THIRD PARTIES ARISING OR ALLEGED TO ARISE IN ANY MANNER FROM LICENSEE'S BREACH OF THIS AGREEMENT, GROSS NEGLIGENCE, OR INTENTIONAL MISUSE OF THE LICENSOR PROPERTY OR LICENSEE'S MANUFACTURE, USE, AND SALE OF ANY LICENSED PRODUCTS OR SERVICES MADE OR SUPPLIED USING THE SAME (INCLUDING WITHOUT LIMITATION, ENVIRONMENTAL DAMAGE, AND CLAIMS, SUITS OR JUDGMENTS UNDER THE FEDERAL EMPLOYER'S LIABILITY ACT, CLAIMS FOR STRICT LIABILITY, THE OCCUPATIONAL HEALTH AND SAFETY ACT, THE RESOURCE CONSERVATION AND RECOVERY ACT, AND ANY SIMILAR STATE OR FEDERAL STATUTE, WHENEVER SO CLAIMED), AND FROM ANY COSTS OR EXPENSES (INCLUDING ATTORNEYS' FEES) INCURRED BY LICENSOR ON ACCOUNT OF ANY SUCH CLAIMS.  FOR AVOIDANCE OF DOUBT, THE INDEMNITY SET FORTH IN THIS SECTION 9.1 SHALL INCLUDE ANY AMOUNTS LICENSOR IS REQUIRED TO PAY TO ANY THIRD PARTY AS A RESULT OF ANY LICENSEE ACTIVITY GIVING RISE TO LIQUIDATED DAMAGES UNDER SECTION 13.  LICENSEE SHALL HAVE NO RESPONSIBILITIES UNDER THIS SECTION 9.1 TO THE EXTENT THAT CLAIMS, DAMAGES, DUTIES, OBLIGATIONS, COSTS, EXPENSES AND LOSSES, INCLUDING BUT NOT LIMITED TO LEGAL FEES ON A SOLICITOR AND OWN CLIENT BASIS, ARE DUE SOLELY TO LICENSOR'S NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR BREACH OF APPLICABLE LAWS.

9.2     Licensor Indemnity.  Licensor hereby agrees to defend, indemnify, and hold harmless Licensee and Licensee's Affiliates, and all of their respective shareholders, members, partners, directors, managers, officers, or employees (the "Licensee Indemnitees"), against any Claims asserted against them by an unrelated third party based on (a) Licensor's breach of the warranties set forth in Section 8.1 or (b) Licensor's infringement or misappropriation of any patent, copyright, trademark, trade secret or other intellectual property or confidential information rights of such third party (an "Infringement Claim"), and to indemnify the Licensee Parties in respect to any Losses by paying any final judgment awarded against Licensee by a court or arbitrator with jurisdiction over such Claims. Licensor shall have no obligation under this Section 9.2 with respect to any Losses or Claims subject to indemnity under Section 9.1 or with respect to any claim of infringement to the extent such claim results from Licensee's use of the Licensed Property

in a manner other than as authorized under this Agreement, any modification of the Licensed Property by any person or entity other than Licensor or without Licensor's consent, any combination of the Licensed Property with other technology, any products manufactured by Licensee using the Licensed Property, Licensor's compliance with Licensee's written instructions, Licensee's failure to implement changes to the Licensed Property provided by Licensor which would make use thereof non-infringing, or Licensee's continued use of the Licensed Property after receiving written notice from Licensor to suspend use thereof.  The provisions of this Section 9.2 and Section 9.3 constitute Licensor's sole obligation and Licensee's sole and exclusive remedy in connection with claims of infringement and third party claims based on a breach of Licensor's warranties.

9.3     Mitigation. In addition to its indemnification obligations hereunder, if Licensee's use of any of the Technology is or may be enjoined due to an Infringement Claim, Licensor will, at its expense, promptly either (a) secure for Licensee the right to continue using such Technology or equivalent as contemplated hereunder, (b) modify the Technology so that it becomes non-infringing but remains equivalent  to the original in function, or (c) if neither (i) nor (ii) is commercially feasible after reasonable efforts by Licensor, then Licensor shall promptly refund of the License Fee and all Royalties paid to Licensor during the twelve (12) months immediately prior to the act giving rise to the Claim.

9.4     Procedure. In the event any claim is made or suit subject to indemnification under Sections 9.1 or 9.2, is brought against Licensee, Licensor, Licensee Indemnitees, or Licensor Indemnitees, such Party will promptly (and in any event within five (5) business days) after receipt of notice of any such claim, suit or proceeding, notify the indemnifying Party, of the commencement thereof. Any failure by the indemnified Party to do so shall relieve the indemnifying Party from liability only to the extent that such failure materially and adversely affects the ability of the indemnifying Party to defend its interests in such claim, action or proceeding. The indemnifying Party (at its own expense) shall have the right and shall be given the opportunity to assume and control the defense of such claim, suit or proceeding with counsel of their choice reasonably satisfactory to the indemnified Party so long as (a) the indemnifying Party notifies the indemnified Party in writing within twenty (20) days after the indemnified Party has given notice of the claim that the indemnifying Party will defend the indemnified Party as required under this Agreement, (b) the indemnifying Party conducts the defense of such claim actively and diligently, and (c) the indemnified Party promptly provides the indemnifying Party and its counsel with all documents and other information relating to the claim and defense thereof as may be reasonably requested by them; provided that the indemnified Party and its counsel (at the indemnified Party's expense) may participate in (but not control the conduct of) all matters pertaining to the defense or settlement of such claim, suit or proceeding. Subject to Section 9.5 below, whether or not a Party elects to assume such defense, the other Party shall not make any settlement with respect to any such claim, suit, or proceeding without the prior written consent of the other Party, not to be unreasonably withheld or delayed. Consent to the settlement of any such claim, suit, or proceeding by the indemnified Party shall be required and shall not be unreasonably withheld or delayed, but such consent shall not be required if (or to the extent that) such settlement only requires the payment of a monetary amount by the indemnifying Party and includes a full release of claims by the claimant and the indemnifying Party and does not include a statement as to or admission of fault, culpability, or failure to act by or on behalf of the indemnified Party.

9.5     Assumption of Defense.  In the event the indemnifying Party elects not to conduct the defense of a claim subject to indemnity under this Agreement or any of the conditions set forth in Section 9.4(a)–(c) are not satisfied, the indemnified Party may assume the defense thereof and shall be entitled to proceed in the same manner as the original indemnifying Party above, except that the original indemnifying Party (a) will promptly and periodically reimburse it for the costs of defending such claims (including reasonable

attorneys' fees and expenses), and (b) will remain responsible for any Losses subject to indemnification by the original indemnifying Party.

**10.    Contractors/Suppliers**

10.1    Licensee Responsibility.  Licensee shall be solely responsible for constructing, equipping, and operating the Initial Licensed Facility and any Additional Licensed Facilities using the Technology and for obtaining all permits, licenses and other permissions necessary to do so.  Licensee understands that effective use of the Technology requires specialized engineering, equipment and additional chemicals and, accordingly, agrees to engage the services of contractors familiar with the Technology for such purposes.

10.2    Engineering Consulting.  In connection with planning and development of the initial Licensed Facility, Licensee shall engage Allnorth Consultants Limited or such other contractors ("**Engineering Consultant**") authorized by Licensor to have access to the Process Flow Diagrams included with the Process Flow and Information, provided such authorization is not unreasonably withheld or delayed, for the purposes of providing the engineering consultation involved in planning, acquiring, installing, commissioning, and initially operating the process equipment and mechanical systems associated with the Technology in the Initial Licensed Facility and any Subsequent Licensed Facility, provided however, that such services are offered by Engineering Consultant at a reasonable market cost and on a timely basis, in the estimation of Licensee, acting reasonably.

10.3    Equipment.  Licensee shall acquire, install, and employ certain capital process equipment, to the extent such equipment is uniquely tailored for use with the Technology, for the purpose of executing the Technology in the Initial Licensed Facility and Additional Licensed Facilities as supplied by Andritz Group ("**Andritz**"), provided however that such equipment and/or services are offered by Andritz to Licensee at a reasonable market cost and on a timely basis, in the estimation of Licensee, acting reasonably.

10.4    Supplemental Chemicals.  Licensee shall acquire the chemicals required for the purpose of using the Technology in the Licensed Facility from Solvay Chemical/Canada ("**Solvay**") as listed in Exhibit F ("**Supplemental Chemicals**"), provided however, that such chemicals are uniquely tailored for use with the Technology, comply with applicable FDA and EPA regulations for safety, and are supplied by Solvay at a reasonable market cost and on a timely basis, in the estimation of Licensee, acting reasonably.

10.5    Warranties.  Licensor makes no warranties, express or implied, with respect to any equipment, products or services supplied by Engineering Consultant, Andritz or Solvay or other Contractors. Warranties if any, with respect to such services and products shall be provided to Licensee by such Contractors.

10.6    Use of Alternate Suppliers.  Licensee acknowledges that Licensor has developed the Performance Specifications from simulations conducted or to be conducted at Licensor's Dayton, Washington test facility using raw materials supplied by Licensee; products and services supplied by Engineering Consultant, Andritz and Solvay; Associated Products; and the Assumptions and Dependencies set forth in Exhibit G.  Licensee shall be solely responsible for and assumes all risk from any changes Licensee makes or requires be made to any of the above.

## 11.   Confidentiality

11.1   General. The mere existence of this Agreement, its title, the identification of the Parties and the Licensed Products are not confidential. However, the specific terms and conditions of this Agreement (including the amount of any Fees and any other amounts payable to Licensor under this Agreement) are confidential and shall not be disclosed by either Party except: (a) as may be required by applicable Law; (b) as may be required by judicial or governmental order (provided that for both (a) and (b), the disclosing Party either gives the other Party reasonable notice to enable it to seek a protective order or uses reasonable measures to seek an appropriate protective order itself); (c) by written consent of the other Party and only under terms of confidentiality; or (d) as expressly permitted under Section 11.2.

11.2   Access Limits. The receiving Party agrees to hold the disclosing Party's Confidential Information in confidence and use reasonable care to avoid damage, theft, espionage, inadvertent disclosure, or unpermitted use of the Confidential Information. Without limiting the foregoing, the receiving Party shall hold the disclosing Party's Confidential Information under access and use restrictions at least as protective as those it applies to its own most valuable Confidential Information. The receiving Party shall not disclose to or permit any of its Personnel (or those of its Affiliates) to access the disclosing Party's Confidential Information except on a need-to-know basis and then, only to those employees who are under written obligations of confidentiality to the disclosing Party on terms no less stringent than required herein.  The receiving Party acknowledges that is responsible for any breach of those obligations by its Personnel employees, and Affiliates.  The receiving Party shall promptly notify disclosing Party of any unauthorized disclosure, use or possession of any Confidential Information of disclosing Party of which receiving Party becomes aware, and Licensor shall promptly notify Licensee of any unauthorized disclosure, use or possession of any Licensor Property as a result of its own acts or omissions, those of its other licensees or any third party.

11.3   Exceptions.   The limitations on disclosure set forth in Section 11.2, shall not apply to: (a) information which is or becomes available to the public, other than as a result of disclosure by the receiving Party or its Affiliates or Personnel; (b) information which the receiving Party can prove was, at the time of disclosure, already in the possession of the receiving Party on a non-confidential and lawful basis; (c) information that the receiving Party can demonstrate was independently developed by it or for it and that was not obtained, in whole or in part, from the receiving Party or developed using any of the disclosing Party's Confidential Information; or (d) information that is rightfully received by the receiving Party from a third party, without the receiving Party's knowledge of a breach of a confidentiality agreement or other obligation of secrecy by such third party. This Section 11.3 does not apply to the Trade Secrets and nothing in this Article 11 shall be applied to limit Licensor's rights or Licensee's obligations with respect to the Trade Secrets, including its obligations under Sections 2.7 and/or 13.1.

11.4   Limited Use.   Further, Licensee represents and warrants that it will not use any Licensor Confidential Information except as required to exercise its rights under the License. Without limiting the foregoing, Licensee covenants and agrees not to disclose the Licensor's Confidential Information or make any use of it for the benefit of any third party and acknowledges that any other use is wrongful and may cause irreparable harm to Licensor.  The limitations, obligations, and remedies in this Article 11 are in addition to, and not in lieu of, those in Articles 2 and 13.

11.5   Injunctive Relief. The Parties acknowledge and agree that violation of this Article 11 or a violation of Section 2.7 or the License terms would cause irreparable harm not adequately compensable by monetary damages. In addition to other relief, it is agreed that preliminary and permanent injunctive relief

Confidential License Agreement                              - 23 -

shall be available to the Parties without necessity of posting bond to prevent any actual or threatened violation of such provisions.

11.6    Return of Confidential Information.  If this Agreement is terminated for any reason, the receiving Party must arrange either the return of the disclosing Party's Confidential Information or certify the destruction, under oath, of any of the disclosing Party's Confidential Information in its possession; provided, however that the receiving Party is entitled to maintain one copy of any item of Confidential Information with its legal counsel to ensure compliance with this Agreement, which copy shall be held in conformance with the terms of this Article 11.

11.7    Compliance with DTSA.  Nothing in this Agreement is intended to prevent disclosure of Confidential Information to a court, administrative agency, or other governmental authorities as required by Law. Pursuant to the Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

11.8    Disclosure to Contractors.  Notwithstanding Section 11.2, Licensee may disclose on a "Need to Know" basis Licensor Property to contractors and engineers approved by Licensor ("Authorized Contractors") and engaged by Licensee to perform services in connection with the design and construction of a facility to use the Technology; provided (a) Licensee has entered into a written agreement with such Authorized Contractor which includes the provisions set forth in Exhibit H and other terms as Licensor may reasonably require to protect the confidentiality of the Licensor Property ("Contractor Terms"); (b) Licensee enforces the terms of such agreement; and (c) such agreement names Licensor as an intended third party beneficiary for purposes of enforcing the Contractor Terms.  Prior to making any such disclosure to an Authorized Contractor, Licensee shall provide a copy of such agreement to Licensor.  Licensee shall promptly notify Licensor of any changes to Licensee's agreement with an Authorized Contractor and any breach thereof by Authorized Contractor.  Licensee shall be jointly and severally liable to Licensor for any act or omission of an Authorized Contractor that results in the unauthorized use or disclosure of any Licensed Property disclosed to the Authorized Contractor by Licensee hereunder.  For avoidance of doubt, any act omission of an Authorized Contractor which would violate Sections 2.7 or Article 11 if taken or omitted by Licensee shall be considered a violation by Licensee.

12.    Insurance

12.1    Licensee and Licensor Insurance.

(a)    Licensor shall, at its sole cost and expense, maintain insurance coverage throughout the Terms substantially, but no less, than as provided in Schedule 1 to Exhibit I (Licensor Insurance).

(b)    Licensee shall, at its sole cost and expense, obtain and maintain policies of insurance from a reputable carrier(s) with a current Best's Guide Rating of A- and Class VII or better, and authorized to do business in the Territory and with minimum coverages, terms and requirements set forth in Exhibit I to this Agreement. Such insurance shall include coverage for (a) injury to or death of persons, personal injury and property damage liability for which Licensee is legally liable; (b) pollution coverage; and (c) contractual liability.  Upon request by Licensor, Licensee shall furnish to Licensor an acceptable certificate(s) of insurance from an authorized representative evidencing the required coverage, endorsements, and

amendments. Should any of the above policies be cancelled prior to the expiration date, Licensee shall provide Licensor notice thereof, including all notices the carrier provides in accordance to the policy provisions. Licensee will be responsible for providing Licensor at least thirty (30) days' notice prior to such cancellation or non-renewal.

## 13.   Disclosure Damages

13.1   Disclosure of Trade Secrets. In the event Licensee, directly or indirectly, violates the terms of Sections 2.7 or 11 such that (a) all or a portion of the Process Flow and Information or any part of the Associated Product Information no longer qualifies as a trade secret under 19.108 RCW; (b) any third party is enabled to learn the formulation of the Associated Products or Licensee or any third party is able to manufacture or make use of the Associated Products without Licensor's consent; or (c) any other licensee of the Technology claims that the Process Flow and Information or Associated Product Information is no longer a trade secret and seeks an adjustment in the amount or suspends its payment of royalties to Licensor or otherwise to modify or terminate its license with Licensor, Licensee shall be obligated to pay to Licensor, as liquidated damages, an amount equal to the lesser of (a) limits of insurance required to be carried by Licensee per Exhibit I, regardless of whether insurance is recoverable by Licensor or Licensee, and (b) $4,000,000 plus $1,000,000 for each license agreement under which Licensor has licensed the Technology to unrelated third parties ("**Liquidated Damages**"), which amount shall be in addition to Licensee's obligations under Article 11. Licensee and Licensor agree that the Liquidated Damages are not intended to be penalties, and are reasonable, as it would be difficult or impossible to determine actual damages if the formulation of the Associated Products becomes known or ceases to be a trade secret. Except for termination and Licensor's rights under Article 9, Liquidated Damages is Licensor's sole remedy for a breach of Section 2.7 or Article 11 which results in a disclosure of the formulation for Associated Products.

## 14.   Dispute Resolution

14.1   Disputes. Claims, disputes, or other matters in question between the Parties arising out of or relating to this Agreement or breach or termination thereof ("**Dispute**") shall be subject to the dispute resolution procedures set forth in this Article 14.

14.2   Notice; Meet and Confer. A Party having a Dispute shall advise the other Party in writing of the details of the Dispute ("**Dispute Notice**"), with sufficient detail and backup information to permit the other Party to evaluate the Dispute. Within thirty (30) calendar days after delivery of a Dispute Notice, the respective chief executive officers of each Party shall meet in Seattle, Washington in a good faith effort to resolve or settle the Dispute.

14.3   Mediation. If the meeting required under Section 14.2 fails to resolve the Dispute, the Parties covenant that they will participate in mediation in good faith in accordance with the Commercial Mediation Rules of the American Arbitration Association currently in effect. Unless otherwise agreed, such mediation shall take place before a mutually agreed mediator in Seattle, Washington within sixty (60) calendar days after the Dispute Notice. Each Party will be responsible for its own costs of the face to face meeting and any mediation.

14.4   Arbitration. A Party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the initial mediation session or at a time following forty-five (45) calendar days from the date of filing the written request for mediation, whichever

occurs first (**"Earliest Initiation Date"**).  The mediation may continue after the commencement of arbitration if the Parties so desire.

14.5    Procedure.  The Parties agree that the Commercial Arbitration Rules of the American Arbitration Association (the **"AAA"**) shall apply, except for the rule that the arbitration must be administered by the AAA and as otherwise provided herein.  To select an arbitrator, each Party agrees to submit a list of up to five (5) arbitrators to the other Party within ten (10) calendar days of the notice of arbitration.  If the Parties are unable to agree to an arbitrator within fourteen (14) calendar days of the date that the lists are submitted, two arbitrators (one from each Party's list) shall designate an arbitrator.

14.6    Arbitration Location.  Any arbitration hereunder will be held in Seattle, Washington and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.  THE PARTIES HEREBY ACKNOWLEDGE, UNDERSTAND, AND AGREE THAT, BY AGREEING TO SUBMIT SUCH DISPUTES AND/OR CLAIMS TO ARBITRATION, EACH PARTY WAIVES THE RIGHT TO HAVE THE DISPUTE(S) OR CLAIM(S) HEARD IN A COURT OF LAW BY A JUDGE OR JURY.  Notwithstanding the foregoing, nothing herein will in any way limit either Party's rights or remedies, all of which are reserved and may be alleged in the arbitration process.

14.7    Arbitration Decision.  At the conclusion of the arbitration, such arbitrator will render a written decision setting forth the arbitrator's findings of fact and law, including the specific legal principles applied by the arbitrator to each claim and defense.  Each Party will have the right to submit discovery and take depositions of parties and non-parties in accordance with the Federal Rules of Civil Procedure.  Any dispute regarding discovery, or the relevance or scope thereof, will be determined by the arbitrator, which determination will be conclusive.  All forum fees and expenses, including the arbitrators' fees, will be advanced equally by the Parties, provided, however, that the failure of a Party to timely pay its portion of any arbitration fees will entitle the other party to a default award (if non-paying Party is the respondent) or dismissal with prejudice (if non-paying Party is the claimant).

14.8    Costs.  Each Party will pay its own costs and expense of the arbitration, except that the prevailing Party will be entitled to an award of payment of its attorneys' fees as provided in Section 14.9 and reimbursement of the arbitration fees and costs.

14.9    Attorneys' Fees.  In any arbitration arising out of or related to this Agreement, the arbitrator(s) shall award to the prevailing Party, if any, the costs and attorneys' fees reasonably incurred by the prevailing Party in connection with the arbitration.  If the arbitrator(s) determine a Party to be the prevailing Party under circumstances where the prevailing Party prevailed on some but not all of the claims and counterclaims, the arbitrator(s) may award the prevailing Party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing Party in connection with the arbitration.

14.10    Limitations Period.  All applicable statutes of limitation and defenses based upon the passage of time shall be tolled until fifteen (15) calendar days after the Earliest Initiation Date.  The Parties will take such action, if any, required to effectuate such tolling.

14.11    Other Remedies.  Nothing contained in this Article 14 is intended to, nor shall it, limit either Party's right to (a) obtain, in court, injunctive relief and/or other equitable remedies against any actual or threatened conduct that may cause it irreparable and/or similar harm, and/or (b) carry out any of its rights pursuant to this Agreement, including, for example, and without limitation, terminating this Agreement in accordance with Article 7 when, and if, applicable.

**15.   Miscellaneous**

15.1   Entire Agreement, Modifications and Waiver. This Agreement constitutes the entire agreement between the Parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, whether written or oral.  This Agreement shall not be modified except by a written agreement signed by an authorized representative of the Party against whom such modification is sought to be enforced. Failure by either Party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that provision.

15.2   Invalid Clauses. If any term of this Agreement is found by a court of competent jurisdiction to be in whole or in part unenforceable, then the remainder of this Agreement shall continue in effect so long as the Agreement still expresses the intent of the Parties.

15.3   Notices. Unless otherwise specified or otherwise updated in writing by the respective Party, any notices given under this Agreement shall be delivered either by messenger or overnight delivery service, or sent by facsimile or email with a confirmation sent via certified or registered mail, postage prepaid and return receipt requested, and shall be deemed to have been given on the day when received by the Party to whom the notice is given.

Any notices to Licensor shall be addressed to:

Attn: Chief Executive Officer Sustainable Fiber Technologies, LLC
Address: 1489 Warm Springs Rd., Suite 110 Henderson, NV 89014

With a copy to:

Garvey Schubert Barer
Attn:  Mr. Scott Warner
1191 Second Avenue, 18th Floor
Seattle, Washington 91801
Facsimile No.: 206-464-0125

Any notices to Licensee shall be addressed to:

Attn: Mr. Darby Kreitz
Red Leaf Fibre Ltd.
Address: 206-3200 Richter Street, Kelowna, BC V1W 5K9
Email: darby@allnorth.com

With a copy which shall not constitute notice to:

Lawson Lundell LLP
Attn:  Mr. David Allard
Suite 1600 Cathedral Place
925 West Georgia Street
Vancouver, British Columbia
Canada V6C 3L2
Facsimile No.: 604-669-1620

15.4    Jurisdiction, Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington, U.S.A. without regard to its conflict of law rules. Any action to enforce this Agreement must be brought in the state or federal courts located in Seattle, Washington, U.S.A. The United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement, the construction and enforcement of this Agreement or any disputes arising out of or relating to this Agreement or the subject matters of this Agreement. Licensee waives any objection based on venue or forum non conveniens with respect to any Claim arising under the Agreement or in any way connected to or related to or incidental to the dealings of the Licensor and Licensee in respect of the Agreement or any related transactions, in each case whether now existing or hereafter arising and whether in contract, tort, equity or otherwise.

15.5    Assignment. Neither Party may assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, and any attempted assignment contrary to these requirements shall be void. Notwithstanding the foregoing, in the case of an assignment by a Party to a successor to all or substantially all of that Party's business and assets, or to an Affiliate, the other Party's consent shall not be withheld provided that (a) the assignee agrees in writing to be bound by all of the terms and conditions of this Agreement; (b) there are no fees currently due and outstanding under this Agreement; and (c) the other Party is not or has not been in litigation with the assignee.

15.6    No Third Party Beneficiaries. This Agreement is for the benefit of, and shall be enforceable by, the Parties only. No action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or the licenses or covenants provided herein.

15.7    Insolvency. The Parties agree that the Licensed Technology, Process Flow and Information, Associated Products, Improvements, and Derivative Works are "intellectual property" as defined in 11 U.S.C Section 101(56) and that this Agreement is governed by 11 U.S.C Section 365(n) or a comparable bankruptcy law of any other jurisdiction. The Parties further agree that, in the event of rejection of this Agreement by Licensor, its successor or trustee under 11 U.S.C Section 365(a) or a comparable bankruptcy law of any other jurisdiction or in the event of an interruption as described in Section 5.5 herein that extends beyond the approved forecast period, Licensee may terminate this Agreement for cause under 11 U.S.C. Section 365(n)(1)(A) or retain its rights under 11 U.S.C. Section 365(n)(1)(B).

15.8    Counterparts and Facsimile. This Agreement may be executed on facsimile copies or in counterparts, each counterpart of which shall be deemed an original and all of which together shall constitute one and the same Agreement. For purposes hereof, an email or facsimile copy of this Agreement, including the executed signature pages hereto, shall be deemed to be an original. Notwithstanding the foregoing, each Party shall deliver original executed copies of this Agreement to the other Party as soon as practicable following execution thereof.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be made and executed by duly authorized officers.

SUSTAINABLE FIBER TECHNOLOGIES, LLC

By:

Name:   MARK LEWIS

Title:   CEO

Date Signed:   JAN 22, 2019

Red Leaf Fibre Ltd.

By:

Name:   Darby Kreitz

Title:   CEO

Date Signed:   22 Jan 2019

## Table of Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Deliverables and Delivery Schedule |
| Schedule 1 to Exhibit A | Process Information |
| Exhibit B | Additional Facility Amendment |
| Exhibit C | Associated Products Pricing and Initial Annual Forecast |
| Schedule 1 to Exhibit C | Master Purchase Agreement |
| Schedule 2 to Exhibit C | Purchase Order |
| Exhibit D | License Fee and Royalty |
| Schedule 1 to Exhibit D | Royalty Report |
| Exhibit E | Implementation Services |
| Exhibit F | Supplemental Chemicals |
| Exhibit G | Performance Specifications Assumptions and Dependencies |
| Schedule 1 to Exhibit G | Updated Performance Specifications |
| Exhibit H | Contractor Terms |
| Exhibit I | Insurance Requirements |
| Schedule 1 to Exhibit I | Licensor Insurance |
| Exhibit J | Consulting Services Agreement |
| Schedule 1 to Exhibit J | Services & Compensation |
| Exhibit K | Form of Escrow Agreement |
| Schedule 1 to Exhibit K | Escrow Fees |
| | |

## EXHIBIT A

## DELIVERABLES AND DELIVERY SCHEDULE

### 1.    Delivery:

Licensor shall deliver the Process Flow and Information (as described in the applicable Schedule1 attached hereto) for the Initial Licensed Facility on or before the dates set forth below, except certain deliverables contained therein which shall have the specific due dates set forth in the applicable attached Schedules.

| Deliverable | Delivery Date |
|---|---|
| Process Flow and Information | The later of payment of the License Fee under 4.1(b) and 240 days after Effective Date |
| | |

### 2.    Review and Acceptance:

Licensor shall notify Licensee when the Process Flow and Information (or portion thereof) are complete and ready for review and shall provide the same to Licensee to confirm their compliance with the requirements of **Schedule 1**. Within twenty (20) business days after delivery, Licensee shall either notify Licensor in writing that the Process Flow and Information delivered satisfies the requirements of **Schedule 1** and is accepted by Licensee or provide Licensor with written notice of deficiency, specifying in detail the manner in which the materials fail to meet such requirements and the steps Licensor must take to bring them into conformance.   If Licensee does not provide Licensor with a written notice of deficiency within the time period specified above or makes any used of such materials the development or operation of the Initial Licensed Facility, that part of the Process Flow and Information submitted for review shall be deemed accepted.  If Licensee identifies any deficiencies in the Process Flow and Information submitted, Licensor may, at its option, elect to revise and re-submit them for review and approval or if Licensor does not agree with Licensee's determination of deficiency, Licensor may terminate this Agreement upon written notice to Licensee and pay to Licensee an amount equal to fifty percent (50%) of the License Fee paid to Licensor as of the date of termination, and after such payment Licensee shall have no further rights and Licensor shall have no further obligations to Licensee under this Agreement.

Confidential License Agreement – Exhibit A

28591.141018.PWM.15297654.8

28591.141016.PWM.15297654.8

Schedule 1 to Exhibit A

Process Information

**EXHIBIT B**

**ADDITIONAL FACILITY AMENDMENT**

Additional Facility Amendment No. __ to the License Agreement

This Additional Facility Amendment No. __ (**"Amendment No. __"**) is entered into as of _____, 201__ (**"Effective Date"**) by and between Sustainable Fiber Technologies, LLC, a Nevada limited liability company with its primary office located at 101 Convention Center Dr., Suite 850, Las Vegas, Nevada 89109 (**"Licensor"**), and Red Leaf Fibre Ltd, _____ with its primary office located at 206-3200 Richter Street, Kelowna, BC V1W 5K9 (**"Licensee"**). Licensor and Licensee may be referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties"**.

**Recitals**

The Parties entered in a License Agreement (**"License Agreement"**) dated November __, 2018, under which Licensor granted Licensee certain rights to use Licensor's proprietary process known as the Phoenix Process® to produce market grade pulp from sources other than wood or recycled fiber at Licensee's facility _____(**"Initial Licensed Facility"**);

Under the terms of the License Agreement, Licensee is permitted to add **"Additional Licensed Facilities"** to the License Agreement pursuant to an Additional Facility Amendment to the License Agreement, in the form below.

Licensee desires to add the facility listed below to the License Agreement and submits this Amendment No. __ to Licensor for its approval as provided under the License Agreement.

NOW, THEREFORE, in consideration of the mutual promises and benefits set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Agreement**

1.      **Defined Terms.** Terms which are used in this Amendment No. __ with initial capital letters but not otherwise defined herein shall have the definitions given to them in the License Agreement.

2.      **Excluded Terms.** All of the terms of the License Agreement shall apply to the use of the Licensed Materials at the Additional Licensed Facility, except the following: Article 6, Sections 8.1, 9.2, 9.3, and Exhibits D, E and F. For avoidance of doubt, unless otherwise provided in Section 4 below, Licensor (a) shall have no obligation for Start-up Testing for the Additional Licensed Facility, (b) makes no warranties with respect to the use of the Licensed Property at the Additional Licensed Facility, (c) will provide no Project or Implementation Services with respect to the Additional Licensed Facility, (d) shall have no obligations under Article 9 of the License Agreement with respect to the Additional Licensed Facility.

3.      **Identification of Additional Licensed Facility.** Licensee represents and warrants that the below information regarding the Additional Licensed Facility is true, accurate and complete:

* Name of facility: _____

Confidential License Agreement – Exhibit B

29591.141018.PWM.15287654.8

- Location/address of Facility: _____

  _____

- Estimated Start Date for the facility: _____

- **Estimated Target Production for the** facility: _____

- **Feedstock to be** used at the facility: _____

  _____

- **Marketable** Materials to be produced at the facility: _____

  _____

- **Initial Annual** Forecast of Associated Products to be purchased by the facility: _____

  _____

- **Name and address of the owner of the facility (if different from Licensee):** _____

  _____

- **Name and address of operator of the facility (if different than the owner):** _____

  _____

- **If the owner or operator of the facility is not Licensee, describe the legal relationship between each and between them and Licensee:** _____

  _____

- **List a contact name, title, address, phone and email for the owner and operator of the facility:** __

  _____

**4.    Additional Terms.** The Parties agree that the following terms are in addition to those in the License Agreement: _____

_____

The above "Additional Terms "shall not be effective unless initialed by Licensor.

**5.    Effective Date.** This Amendment No. ___ shall be effective upon the earlier of Licensor's execution or ten (10) Business Days after Licensor's receipt, unless Licensor objects in writing as provided in Section 2.3 of the License Agreement.  On the Effective Date, the Additional Licensed Facility listed above shall be considered a Licensed Facility for purposes of the License Agreement.

Confidential License Agreement – Exhibit B

29591.141018.PWM.15297654.8

6.    **Conflicts.** In the event of a conflict between the License Agreement and this Amendment No.___, the terms of this Amendment shall control.

**SUSTAINABLE FIBER TECHNOLOGIES, LLC**          **RED LEAF FIBRE LTD**

By: _____          By: _____

Title: _____          Title: _____

Date: _____          Date: _____

Confidential License Agreement – Exhibit B

29591.141018.PWM.15297654.8

## EXHIBIT C

### ASSOCIATED PRODUCTS PRICING AND INITIAL ANNUAL FORECAST

Minimum Order Requirements:

Licensee's Monthly Forecast:

| Product Name | Tonnage | Date Due |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Initial Pricing (if Minimum Order Requirements **are** met):

| Product Name | Price |
|---|---|
| PPP-03 | $2.40 per pound in two tote quantity minimum |
|  |  |
|  |  |
|  |  |

Initial Pricing (if Minimum Order Requirements **not** met):

| Product Name | Price |
|---|---|
| PPP-03 | $2.88 per pound for less than two tote quantity |
|  |  |
|  |  |
|  |  |

All Initial Pricing above excludes packaging and/or shipping container costs which are the responsibility of Licensee and is based on "FOB – SFT's manufacturing facility" shipping terms. All other shipping

arrangements requested by Licensee other than FOB — SFT's manufacturing facility shall be the responsibility of Licensee.

In addition, all Initial Pricing above shall be effective from the Effective Date and for 34 months thereafter. Beginning 34 months after the Effective Date, Licensor may, upon at least ninety (90) days' prior written notice, adjust the price for the Associated Products in accordance with the following:

(a)     The price for the Associated Products may be adjusted by the following equation
$2.40 (base rate) * (((PPI – 275 [= base PPI]) / 275) + (((WTI – 60 [= base WTI]) / 60) * 0.5))
Example 1: $2.40 * (((283 – 275) / 275) + (((70 – 60) / 60) * 0.5)) = $0.27 increase
Example 2: $2.40 * (((283 – 275) / 275) + (((40 - 60) / 60) * 0.5)) = ($0.33) decrease
Applicable PPI Index is the 3-month average index of PCU 325211325211 ("Plastics Materials & Resins Manufacturing") immediately preceding the date of written notice of the price increase while WTI represents the 3-month average index of wholesale crude oil prices as per the West Texas Index also immediately preceding the date of written notice of the price increase;

(b)     Licensor may not adjust the price more than once during each calendar year during the Term;

(c)     The maximum price increase or decrease will be 25% per year, and no price adjustments will be made if the resulting increase or decrease according to the formula in Section (a), above, is less than or equal to 3%; and

(c)     All price adjustments shall apply only to Purchase Orders for Associated Products approved by Licensor after the effective date of the price adjustment.

**Schedule 1 to Exhibit C**

**Master Purchase Agreement**

This Master Purchase Agreement ("**MPA**") is made between Sustainable Fiber Technologies, LLC a Nevada limited liability company ("**SFT**") and the Purchaser listed below ("**Purchaser**") as of the Effective Date set forth below pursuant to the terms of the License and Supply Agreement between the Parties dated _____ (the "**Agreement**"), which is incorporated herein by this reference. By Purchaser's signature below, Purchaser agrees to be bound by the terms and conditions set forth herein, including the general terms and conditions set forth below ("**Terms**") and any Schedules attached hereto, which are incorporated in full by this reference. In the event of a conflict between the terms of this MPA and the Agreement, the terms of the Agreement shall govern with respect to purchases of the Products covered by this MPA.

| Purchaser Information | |
|---|---|
| Name | |
| State of Incorporation | |
| Contact Person | |
| Address | |
| Phone | |
| Fax | |
| E-mail | |
| SFT Information | |
| Address | |
| Contact Person | |
| Address | |
| Phone | |
| Fax | |
| E-mail | |
| MPA Information | |
| MPA Number | |
| Effective Date | |

Sustainable Fiber Technologies, LLC                    Purchaser

By:_____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

Confidential License And Supply Agreement – Schedule 1 to Exhibit C

## General Terms and Conditions

1. **Products.** As used herein, the term "**Products**" shall mean collectively, the SFT products listed in a Purchase Order in the form attached as Schedule 1 accepted by SFT. The purchase and delivery of the Products will be governed only by the Terms and any different or additional terms are deemed void and of no effect unless the additional terms are specifically agreed upon by authorized representatives of the Parties in writing executed by both Parties.

2. **Payment.** Unless otherwise set forth in a Purchase Order, the price for the Products ("**Purchase Price**") and all other amounts due under a Purchase Order will be due within thirty (30) days following shipment. SFT shall not be required to fulfill any Purchase Order if payment under any prior Purchase Order is past due. All amounts not paid when due are subject to a late fee of eighteen percent (18%) per annum or the maximum rate permitted by law, whichever is less.

3. **Taxes.** Purchaser shall pay all taxes, all import and export duties and tariffs, and any and all other similar charges imposed by any taxing authority on the sale, shipment, importation, ownership or use of Products, but Purchaser shall not be responsible for payment of any business and occupation taxes or income taxes payable by SFT.

4. **Changes.** SFT may charge Purchaser for increased costs resulting from Purchaser's changes to any Purchase Order accepted by SFT including changes in delivery schedule, Products, quantities, materials, or services.

5. **Delivery Location.** Unless otherwise specified in the Purchase Order, all sales of Products shall be Free Carrier (FCA) at the destination "**Location**" set forth in a Purchase Order accepted by SFT (the "**Location**"). Purchaser may request in any Purchase Order to specify that delivery is to be Free Carrier at the place of manufacture and shipment.

6. **Partial Shipment.** SFT reserves the right to make shipment in lots. Upon shipment of each lot, SFT may immediately invoice an amount representing the appropriate portion of the unpaid price due for such shipment.

7. **Inspection; Acceptance.** Purchaser shall notify SFT in writing of any discrepancies between the delivery and a Purchase Order within ten (10) days of the date of receipt. If Purchaser fails to give such notice in the case of any patent non-conformity, the Products shall be deemed to conform to the Purchase Order, in which case the Purchaser shall be deemed to have accepted the same and irrevocably waives any claims that the Products are non-conforming.

8. **Risk of Loss.** All title, risk of loss and/or damage to the Products shall pass to Purchaser upon delivery to the Location. If title passes to Purchaser before SFT receives payment in full, SFT will retain a purchase money security interest in each item of Products equal to the amount due therefor. SFT may file at any time a copy of a Purchase Order with appropriate state authorities as a financing statement in order to perfect SFT's security interest under the Uniform Commercial Code ("**UCC**"). Purchaser agrees to execute from time to time, any UCC financing statements or other documents considered by SFT to be necessary to perfect or protect its security interest in the Products not yet paid for. Until Products covered by a Purchase Order are fully paid for, such Products shall remain at the Location, where SFT may inspect them at any reasonable time, and Purchaser agrees not to move them without the prior written consent of SFT.

9. **Cancellation by SFT.** SFT reserves the right to suspend or cancel fulfillment of any Purchase Order, if and for so long as: (a) payment is past due with respect to any Purchase Order; (b) Purchaser fails to meet reasonable credit or financial requirements established by SFT, including any limitations on allowable credit, with respect to Purchase Orders from

Purchaser; or (c) otherwise fails to comply with a material provision of this MPA or the Agreement.

10. **Cancellation by Purchaser.** Purchaser may cancel a Purchase Order within ten (10) days after acceptance by SFT and thereafter only with SFT's prior written approval. However, in any case, Purchaser shall have no right to cancel all or any portion of a Purchase Order unless it promptly pays SFT for all costs already incurred by SFT, including the price of any Products or services required to fill the Purchase Order already committed to by SFT as well as a reasonable allowance for overhead and profit.

11. **Ownership.** Purchaser acknowledges and agrees that, as between SFT and Purchaser, SFT is the sole and exclusive owner of all intellectual property embodied in or disclosed by the Product. Nothing in this MPA shall be interpreted or construed to limit any rights or remedies SFT may have under copyright, patent, trademark, trade secret or other applicable laws. Purchaser agrees not to remove or obscure any patent, trademark, copyright or other proprietary notices incorporated on or in the Product.

12. **Covenant.** Purchaser hereby covenants not to challenge SFT's rights in the Products or in any copyright, patent, trade name, trademark, trade device, logo, symbol or code and the goodwill associated therewith, or directly or indirectly, assert any rights inconsistent with SFT's ownership of or license to any of the foregoing.

13. **Authorized Use.** Purchaser covenants that it is purchasing the Products for use in the Territory in which Purchaser is licensed to use the SFT Technology, as set forth in the Agreement. For avoidance of doubt, Purchaser acknowledges that any other purported use or the resale of the Products is prohibited and will constitute a material breach hereof.

14. **DISCLAIMER WARRANTIES.** EXCEPT AS SET FORTH IN ARTICLE 8.1 OF THE AGREEMENT, SFT MAKES NO WARRANTIES WHATSOEVER TO PURCHASER OR ANY CUSTOMERS OF PURCHASER WITH RESPECT THE PRODUCTS, AND SPECIFICALLY DISCLAIMS ALL WARRANTIES, WHETHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

15. **Exclusive Remedy.** Purchaser's sole and exclusive remedy for any delivery of non-conforming or damaged Products is to notify SFT as provided in Section 7 of this MPA and, if feasible, to return the Product according to SFT's RMA process as set forth at: Schedule 2 to this MPA. SFT will promptly either (1) make commercially reasonable arrangements to deliver to the Location at SFT's expense replacement Products that are not damaged and that are conforming, or (2) provide a refund of the price paid for the damaged or non-conforming Products, plus all taxes, insurance and shipping charges incurred by Purchaser in connection with the purchase thereof. SFT shall bear all transport, insurance, and all risk of loss in transporting the non-conforming Product to and from the Location. If SFT determines that any returned Product is not non-conforming, the Product will be returned to Purchaser and Purchaser shall pay all costs of handling, inspecting, testing and transporting such Product to and from the Location.

16. **Limitation of Liability.** SFT'S SOLE LIABILITY ON ACCOUNT OF ANY DAMAGED OR NON-CONFORMING PRODUCT SUPPLIED UNDER ANY PURCHASE ORDER SHALL BE AS SET FORTH IN SECTION 15 OF THIS MPA. AS PROVIDED IN SECTION 7 OF THIS MPA. SFT SHALL HAVE NO OTHER LIABILITY UNDER ANY PURCHASE ORDER OR FOR THE PRODUCT FOR DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION FOR PUNITIVE OR EXEMPLARY DAMAGES OR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, OR SPECIAL DAMAGES (INCLUDING WITHOUT

LIMITATION DAMAGES FOR LOSS OF USE, PROFITS, REVENUE OR BUSINESS). THIS LIMITATION SHALL APPLY REGARDLESS OF WHETHER SUCH DAMAGES ARE SOUGHT BASED ON BREACH OF CONTRACT, BREACH OR WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

17. **INTENTIONALLY OMITTED.**

18. **Compliance with Laws.** SFT and Purchaser each shall comply at its expense with all applicable laws, rules, and regulations applicable to it and shall be responsible for the filing of all reports and notices and the payment of all taxes, custom duties, and other assessments required thereby of it. Purchaser shall, at its sole cost and expense, obtain all licenses and permits necessary to import Products into the Territory and shall, at all times, comply with all laws applicable to use, distribution, and disposal of Products.

19. **Governing Law; Venue.** This MPA and each Purchase Order shall be deemed to have been executed and entered into in the State of Washington and shall be governed, construed, performed and enforced in accordance with the internal laws of the State of Washington, excluding its conflict of law principles, and such laws shall be applied and controlling in any arbitration conducted pursuant to Section 21 of this MPA. The Parties agree to exclude in its entirety, the application of the United Nations Convention on Contract for the International Sale of Goods. Any dispute arising out of any Purchase Order shall be in the state and federal courts located in Seattle, Washington. Each Party expressly submits to the personal jurisdiction of such courts and knowingly and irrevocably waives any objection to such venue based on forum nonconveniens.

20. **Attorneys' Fees.** If Purchaser fails to pay any sums owing to SFT under this MPA, Purchaser shall reimburse SFT for all collection costs and expenses, including without limitation reasonable attorneys' fees, incurred by SFT in collecting such sums.

21. **Dispute Resolution.** Any controversy or claim arising out of or relating to this MPA or any Purchase Order, or the breach thereof, shall be settled by binding arbitration in Seattle, Washington, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in a court having jurisdiction thereof. Any damages awarded therein shall be U.S. Dollars. The prevailing Party in such arbitration shall be entitled to receive, in addition to any other relief provided, reimbursement of its actual attorneys' fees and costs incurred in preparing for, presenting and enforcing the arbitration. Any award rendered in such arbitration shall be final and binding and may be entered and enforced as a judgment with any court having jurisdiction over any of the Parties hereto. Either party shall have the right in the first instance to obtain in a judicial proceeding such temporary or preliminary injunctive or other equitable relief as may be necessary to prevent any actual or threatened breach by the other party, but thereafter any such judicial proceeding shall be stayed pending the entry of an award in the parties' arbitration.

22. **Successors and Assigns.** The Parties shall not assign any of their rights, obligations, or privileges (by merger, consolidation, change of control, operation of law or otherwise) hereunder except as otherwise provided for by the Agreement. The Terms and any Purchase Order shall inure to the benefit of and be binding upon the respective permitted successors and assigns of each of the parties.

23. **Waiver.** No waiver of any of the provisions of this MPA or any Purchase Order shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly so provided.

24. **Force Majeure.** SFT shall not be liable to Purchaser for any loss, damage, delay, or failure to deliver or perform to the extent such failure is attributable to unforeseeable causes beyond SFT's reasonable control including acts of God, fire, flood, accident, explosion, earthquake, boycotts, embargoes, strikes, labor difficulties, extraordinary act by a governmental authority, terrorism, or widespread unavailability of supplies, materials, services, or transportation.

25. **Construction and Headings.** This MPA shall be deemed to be drafted jointly by the Parties, and no ambiguity is to be construed against one Party over the other. The captions and headings used in this MPA are inserted for convenience only and do not form part of this MPA or affect the meaning or interpretation of this MPA. Whenever the words "include," "includes," or "including" are used in this MPA or any Purchase Order, they are deemed to be followed by the words "without limitation."

26. **Notices.** All notices required or permitted under this MPA or any Purchase Order shall be in writing and shall be deemed effective upon delivery personally, by overnight delivery with proof of receipt, or upon deposit in the United States Post Office, by certified mail, postage prepaid, addressed to the other Party at the address above, or at such other address or addresses as either Party shall designate to the other in writing.

27. **Survival.** Upon expiration or termination or fulfillment of this MPA, the provisions of Sections 8 and 11–29 of this MPA shall survive in perpetuity unless otherwise agreed by the Parties in writing.

28. **Conflicts.** No order, amendment thereof, addition or complement thereto shall be binding on either party unless expressly accepted in writing by such party. If any of the terms and conditions of this MPA conflict with those of the Agreement, the terms and conditions of the Agreement shall be controlling.

29. **Counterparts.** This MPA and any subsequent Purchase Order may be executed in two or more counterparts, each of which shall be deemed an original and all of which together will constitute the same agreement, whether or not each Party executes each separate counterpart. An electronic or facsimile signature shall be deemed equivalent to an original signature.

**Schedule 2 to Exhibit C**

**Purchase Order**

**Purchase Order No. _____**

This purchase order ("**Purchase Order**"), dated _____, is made between Sustainable Fiber Technologies, LLC a Nevada limited liability company ("**SFT**") and the Purchaser listed below ("**Purchaser**"), subject to the Master Purchase Agreement referenced above and the General Terms and Conditions stated therein (the "**Terms**"). By Purchaser's signature below, Purchaser agrees to be bound by the Terms.

| QUANTITY | PRODUCT NO. | DESCRIPTION | UNIT COST* | EXTENDED COST | DELIVERY DATE*** |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| Ship-To Location: | | | Subtotal |  |  |
| Deliver to be made FCA (check one): | | |  |  |  |
| ___ Ship to Location | | |  |  |  |
| ___ Place of Manufacture | | |  |  |  |
| Finalized upon shipment | | |  |  |  |
| Shipping and Insurance | | |  |  |  |
| Taxes | | |  |  |  |
|  |  | | Total** |  |  |

\* Prices are subject to change in accordance with the terms set forth in Exhibit C. All packaging and/or shipping container costs along with any shipping arrangements requested by Licensee other than FOB – SFT's manufacturing facility shall be the responsibility of Licensee. All prices are set forth in U.S. Dollars.

\*\* All payments must be made by credit card or electronic (wire, ACH or similar) transfer.

\*\*\* Delivery dates more than 30 days following the date of this Purchase Order are firm. SFT shall make diligent, good faith efforts to deliver by any specified delivery date that is less than 30 days following the date of SFT's receipt of this Purchase Order, but does not guarantee delivery by such date (but does guarantee delivery within 30 days following the date of SFT's receipt of this Purchase Order.

Confidential License And Supply Agreement – Schedule 2 to Exhibit C

29591.141018.PWM.15297654.8

Purchaser may order additional Products by submitting additional Purchase Orders to SFT in the form of this Schedule 2 ("**Purchase Order**"). All Purchase Orders are subject to the Terms, unless otherwise specifically agreed by SFT in writing.

This Purchase Order is not binding on SFT until signed by an authorized representative of SFT.

**PURCHASER'S AUTHORIZATION:**

| |
|---|
| BY (SIGNATURE):     TITLE:   DATE: |

**SFT'S ACCEPTANCE:**

| |
|---|
| SUSTAINABLE FIBER TECHNOLOGY, LLC<br><br>BY (SIGNATURE):      TITLE:   DATE: |

Confidential License And Supply Agreement – Schedule 2 to Exhibit C

29591.141018.PWM.15297854.8

**EXHIBIT D**

**LICENSE FEE AND ROYALTY**

**1.1**    **License Fee.** Licensee agrees to pay Licensor License Fee of $2,000,000 for the Initial Licensed Facility.

**2.1**    **Licensed Products Sold (Pulp only) Royalty and Licensed Products Consumed (Pulp only) Royalty**

| Quarterly Average (ADST per day of Pulp) | Royalty Rate (per ADST, in USD) |
|---|---|
| ≤ 300 ADST | $15.00 |
| > 300 ADST/day and ≤ 1000 ADST | $10.00 |
| > 1000 ADST/day and ≤ 2000 ADST | $8.00 |
| > 2000 ADST/day | $7.00 |

**2.2**    **Licensed Products Sold (Co-Product only) Royalty**

| Quarterly Average Price (per ODSTT) | Royalty Rate (per ODST, in USD) |
|---|---|
| ≤$100 ODST | $5.00 |
| >$100 and ≤ $200 ODST/ | $10.00 |
| >$200 ODST | $15.00 |
|  |  |

Pulp Licensed Products Sold and Pulp Licensed Products Consumed quantities for calculating Royalty shall be measured on the total weight of bales of wet lap pulp produced, adjusted to a 10% moisture equivalent basis, plus a calculated value of pulp being pumped to a high density storage chest to provide pulp to the molded pulp facility, such calculation based upon accumulated flows of pulp and an average measured consistency of that pulp being pumped to the high density storage chest, adjusted to a 10% moisture basis. The Royalty shall be calculated by multiplying the applicable Royalty Rate by the quantity of Licensed Products sold or consumed, as applicable.

Quarterly Minimum: Average above 300 ADST per day of Licensed Products Sold (Pulp only) and Licensed Products Consumed (Pulp only), combined average over all pulp facilities located in geographic area that is Territory Exclusive, such average calculated excluding any days on which pulp production was reduced or pulp quality was diminished and resulted in lower sales of Marketable Materials to customers as a result of: (i) activities associated with Licensor Improvements, (ii) research or product testing periods as mutually agreed in advance by the Parties.

**Schedule 1 to Exhibit D**

**Royalty Report**

**ROYALTY REPORT**

_____

_____

Licensee: _____

Report for the Royalty Period Beginning/Ending:_____

Send completed form to Sustainable Fiber Technologies

| Product Name | Tonnage | Royalty Rate* | Royalty Due |
|---|---|---|---|
| Licensed Products Sold (Pulp only) | | | |
| | | | |
| Licensed Products Consumed (all products) | | | |
| Licensed Products Sold (non-Pulp) | | | |
| | | | |

*As per Exhibit D.

**TOTAL AMOUNT DUE:  $_____**

The undersigned, by signing his/her name below, hereby certifies that he/she is duly authorized by Licensee to complete this Royalty Report, that the title listed below is his/her true and correct title, that this report is complete and correct, and that Licensee is in compliance with the Royalty Report reporting requirements of the Agreement.

_____    Signature

_____    Printed Name

_____    Title

_____    Date

Confidential License Agreement – Schedule 1 to Exhibit D

28591.141018.PWM.15297654.8

## EXHIBIT E

## IMPLEMENTATION SERVICES

Licensor will provide the Services set forth below, according to the terms set forth herein.

**Licensor Responsibilities**

Services:

Testing and Technical Support Services:

- Technical support during commissioning, start up, and testing of the Initial Licensed Facility, including testing for conformance to the Performance Specification (as per **Exhibit G**). It is expected that the above activities will span approximately 2 months following mechanical completion of the Initial Licensed Facility.

- Technical support and coordination as reasonably necessary to the Contractors retained by Licensee to perform engineering, procurement, construction and commissioning of the Initial Licensed Facility. Support will include, review of the detailed process engineering, equipment selection, and control systems proposed by the third party firms. Licensee shall be responsible for final approval of detailed process engineering, equipment selection, and control systems. It is expected that the above activities will span approximately 18-20 months, following the beginning of the Development Period.

Training Services and Documentation:

- Training for the engineering, operating, and laboratory and quality assurance staff on process flow, operating conditions, control parameters and systems, equipment operation, and quality control and assurance. The training will also address start up and shutdown of the facility, operation at different load levels; and operation during upset conditions.

- Assistance in developing operating procedures and standards, specifically on matters related to process and pulp quality control and assurance.

Allocated Hours: Licensor will provide up to 1000 hours of Testing and Technical Support Services and up to 80 hours of services as Training and Documentation. The expectation is that the specified hours will be sufficient to achieve Successful Start-up. If Licensee requires any Services beyond the allocated hours, Licensor will provide them on an as available basis, subject to its standard consulting fees.

Status Reports: Licensor will prepare and submit to Licensee periodic status reports regarding the Services, describing the Services delivered, the progress from the prior report and toward completion, any outstanding performance issues or factors that may interfere with the timely completion of the Services, and other matters as Licensor may deem appropriate. Licensee shall review such reports and notify Licensor in writing within five (5) business days after delivery of any errors in the status reports and Licensor and Licensee shall then work together to resolve the same. All status reports shall be deemed correct and complete unless Licensee notifies Licensor of any error within such 5-day period.

Confidential License Agreement -- Exhibit E

28591.141018.PWM.15297654.8

Standards: Licensor will perform the Services in a thorough and professional manner as reasonably required to meet the Performance Specification. Licensee's approval of or consent to designs, specifications, or drawings shall constitute acceptance thereof.

Compliance with Laws: Licensor will perform and complete the Services in a manner that complies with all applicable laws, regulations, ordinances, and codes, including, but not limited to, all those relating to labor, employment, safety, and the environment.

Loss Prevention, Safety, and Security: When and to the extent that Licensor is on Licensee's property, Licensor will comply, and will cause each of its employees to comply with (a) Licensee's safety rules and regulations including, but not limited to, the wearing of protective equipment, such as approved hardhats, safety glasses, steel-toed leather boots, and respirators, and (b) Licensee's security requirements and will take, and will cause each of its Agents to take, reasonable precautions for the prevention of accidents, fire, theft, vandalism, injury, or other damage on or to any property owned by, leased to, or otherwise under the control of Licensee. Licensor acknowledges that it has received and reviewed copies of Licensee's safety rules and regulations and security requirements, and that it understands the obligations described by each. Licensor will deliver to Licensee, within five (5) days after Licensee's request, one or more periodic certifications as to compliance with Licensee's safety rules and regulations and security requirements, and will cooperate with Licensee in the administration of each.

Subcontractors: Licensor may not engage any person or entity as a subcontractor for all or any part of the Services without Licensee's prior written consent. Any approved subcontractor must: (a) comply with the terms and conditions of this Agreement to the extent applicable to the Services performed by the subcontractor; (b) acknowledge and agree that it may look only to Licensor for payment for labor and materials provided in connection with the Services; and (c) waive any and all claims for payment against Licensee. Licensor is and will remain liable for any and all Services performed by, and any and all omissions of, its subcontractors to the same degree that Licensor is liable for its own performance and omissions.

Non-Solicitation: During the term of this Agreement and for a period of one year thereafter, Licensor will not, except with the prior written approval of Licensee, solicit the employment of any employee of Licensor or its Affiliates with whom Licensor or any Agent thereof has had contact in connection with the performance of the Services.

Documentation: Licensor will provide documentation for all Services provided to Licensee, including, but not limited to training manuals, operating procedures, and troubleshooting information. All such documentation shall be subject to use and disclosure restrictions as provided in Article 11 of the Agreement.

Expenses; Payment: Licensor will submit invoices to Licensee for any pre-approved out-of-pocket expenses. Licensee will pay invoices within thirty (30) days after receipt of an invoice.

**Licensee Responsibilities**

Review: License shall review all Licensed Deliverables and Services provided by or through Licensor under this Agreement. Licensee shall notify Licensor in writing if any such Deliverables or Services fail to conform to the requirements of this Agreement, such notice to be delivered to Licensor within ten (10) days' after Licensor's delivery of the Deliverables or Services, as applicable. Failure to deliver such notice shall

Confidential License Agreement – Exhibit E

29591.141018.PWM.15297854.8

constitute approval of the applicable Deliverable or Service and acknowledgement that the same conforms to the requirements of this Agreement.

Timely Performance and Delivery: Licensee acknowledges that Licensor will rely upon the accuracy and timely delivery of information by Licensee and its agents and the timely performance of their respective duties in connection with the design, construction and operation of the Initial Licensed Facility. Licensee acknowledges that Licensor's performance may be delayed if Licensee or its agents fail to timely respond to Licensor requests or perform its responsibilities under the Agreement.

Recruitment of Personnel: During the term of this Agreement and for a period of one year thereafter, Licensee, will not, except with the prior written approval of Licensor, solicit the employment of any employee of Licensor with whom Licensee or any Agent thereof has had contact in connection with the performance of the Services.

Compliance with Laws: Licensee will perform its obligations under this Agreement and in connection with the design, construction and operation of the Initial Production Facility in a manner that complies with all applicable laws, regulations, ordinances, and codes, including, but not limited to, all those relating to labor, employment, safety, and the environment.

## EXHIBIT F

### SUPPLEMENTAL CHEMICALS

Sodium Hydroxide

Peroxide

Peracetic Acid

**EXHIBIT G**

### PERFORMANCE SPECIFICATIONS FOR INITIAL LICENSED FACILITY
### ASSUMPTIONS AND DEPENDENCIES

1.    Feedstock Specification.    The specifications for Feedstock to achieve the Performance Specification:

- Wheat Straw
- Less than one year since harvest
- 95% of the biomass is retained by a Number 10 Mesh US Sieve with less than 1% of the remaining particles greater than 6 inches, measured in accordance with ASABE Standard S424.1[1]
- Less than 5.0% ash measured in accordance with NREL/TP-510-42622[2]

Following receipt of Licensee's certification under Section 6.1 of the Agreement, Licensor will perform a pilot test to confirm that the Initial Licensed Facility meets all of the Start-Up Testing Requirements and that all of the assumptions and dependences set forth herein are satisfied.   Based on the results of such test, the Parties shall review the Biomass Specification values set forth above, Performance Specifications and Usage Rates for Associated Products and Supplemental Chemicals (each below).   Upon mutual agreement, the Parties may adjust such values and, upon agreement, any changes to such values shall be attached hereto as **Schedule 1** of this **Exhibit G** and shall replace the corresponding specifications and requirements set forth below. If the Parties are unable to reach mutual agreement on changes to any of the above after the Pilot Tests, the values set forth herein shall apply.

2.    Performance Specification.  The Preliminary Performance Specification for Marketable Materials processed from raw material input meeting the Biomass Specification, at an average daily throughput rate of 400 ADMT per day, with a minimum uptime of twenty-two (22) hours per day:

| Bleached Wheat Straw | |
|---|---|
| Yield | 50 % |
| Canadian Standard Freeness | 400 ml |
| Burst Index KPa*m^2/g | 1.0 |
| Tear Index mN*m^2/g | 4.0 |
| Tensile Index Nm/g | 20 |
| Brightness | 78 |

---

[1] ASABE Standards. ANSI/ASAE S424.1. "Method of Determining and Expressing Particle Size of Chopped Forage Materials by Screening." American Society of Agricultural and Biological Engineers, St. Joseph, MI, 791-794. 2011 (R2017).

[2] Sluiter, A., B. Hames, R. Ruiz, C. Scarlata, J. Sluiter, and D. Templeton. "Determination of Ash in Biomass." Laboratory Analytical Procedure (LAP), Issued 7/17/2005, Technical Report NRDL/TP-510542622, National Renewable Energy Laboratory, Golden, CO. January 2008.

3.    Requirements for Start-up Testing. Licensee shall certify the following with respect to the Initial Licensed Facility as a perquisite to Start-up Testing:

(a)    The Initial Licensed Facility has been engineered and constructed in material accordance with good engineering practice as reviewed and approved by Licensee and Licensor;

(b)    The Initial Licensed Facility is free from material mechanical defects;

(c)    The Initial Licensed Facility has been started up in accordance Process Design Documents within ninety (90) days after the date of Mechanical Completion unless otherwise agreed by the Parties;

(d)    The Initial Licensed Facility is being operated under design conditions by sufficient, qualified personnel in accordance with the "Performance Test Procedures" below;

(e)    The Initial Licensed Facility employs the Feedstock(s) which meet the Feedstock Requirements in sufficient quantity as specified above for the Start-up Test; and

(f)    The Initial Licensed Facility is adequately and consistently supplied with all utilities required for normal operation, as described in Appendix A Deliverables and Delivery Schedule.

4.    Performance Test Procedures:  The Start-up Test shall be conducted as follows:

All sample consistencies will be calculated using Tappi Method T 240 Consistency (Concentration) of Pulp Suspensions. Flow will be totalized from the flow meter data (control/historian system).

Freeness testing samples will be taken from the most recently produced bale of bleached pulp.    The freeness is calculated using Tappi Method T 227 Freeness of Pulp Canadian Standard Method.  It should be noted that Tappi T 227 states:

*Failure to disintegrate a sample at the correct consistency (1.20%), as well as disintegrating a sample for too long a time, will change values significantly of any pulp, especially bleached pulp (hardwoods are most sensitive). Any pulp should be disintegrated just until no fiber bundles remain. It is recommended that samples be disintegrated one minute and then visually examined by diluting a sample portion of the pulp sample to see that no fiber bundles are present, repeating the process until only individual fibers remain.*

Tensile Testing samples will be taken from the most recently produced bale of bleached pulp. Testing of tensile will be completed using TAPPI T 205 Forming Handsheets for Physical Testing of Pulp and Burst and Tear will be run in accordance to TAPPI T 220 Physical Testing of Pulp Handsheets.

Brightness Testing samples will be taken from the most recently produced bale of bleached pulp). The brightness will be calculated using TAPPI T 218 Forming Test Sheets of Brightness Testing and TAPPI T 525 Diffuse Brightness of Pulp.

Confidential License Agreement – Exhibit G

29591.141018.PWM.15297654.8

**EXHIBIT H**

**CONTRACTOR TERMS**

**1.00   CONFIDENTIAL AND PROPRIETARY INFORMATION**

a.       As a result of Contractor's engagement under the Contract Documents, Contractor will obtain knowledge of, and access to, proprietary and confidential information of Client and its Affiliates related to Client's biomass pulping operations, including without limitation  Client inventions, discoveries, trade secrets, know-how, technical information, systems, processes, methods, designs, manufacturing practices, specifications, models, formulae, prototypes, samples, laboratory and clinical testing results, compounds, financial and marketing information, business plans, the identity of Client's customers and suppliers, the identity of products under development by Client, (collectively, the "**Client Information**"). Contractor will also be exposed to information which was acquired and/or licensed by Client from Sustainable Fiber Technologies, LLC ("**SFT**") involving technology used to produce pulp from non-wood fiber sources ("**Licensed Technology**").   Contractor acknowledges that the Licensed Technology, all modifications or improvements to it (including any made by Contractor or Client) ("**Improvements**") and all information related thereto are the confidential, proprietary trade secret property of SFT (collectively "**SFT Property**") and Contractor hereby assigns, transfers and conveys the same to SFT and agrees to execute all such documents as are reasonably necessary to secure ownership therein in SFT.   For avoidance of doubt, Client Information does not include any SFT Property.

b.       Contractor agrees that (i) Client Information disclosed to Contractor by Client constitutes valuable, special and unique assets of Client developed at significant expense which are the exclusive property of Client; (ii) the restrictions on disclosure and use of Client Information and SFT Property set forth below are reasonable and necessary to protect Client and its Affiliates and are not unreasonably restrictive of any personal rights, and (iii) Client would not enter into the Contract Documents without the assurance that all Client Information will be used for the exclusive benefit of Client.

c.       Contractor further agrees that, except as provided in subparagraphs (d) and (e) below or under Section 1(b), it shall not, at any time, either during or subsequent to the term of the Contract Documents (i) use the Client Information, except in the performance of the Services or (ii) disclose to any person any of the Client  Information without the prior written consent of Client, except to responsible officers and employees of Client and its Affiliates and other responsible persons who are in a contractual or fiduciary relationship with Client and who have a need for such information for purposes in the best interests of Client. Contractor also agrees not to use any SFT Property disclosed to it under this Agreement for any purpose except to assist Client in the production of pulp from biomass as permitted under this Agreement or to disclose any the same to any other person; provided, however, that Contractor may disclose such information to SFT and use it for SFT's benefit and as otherwise authorized by SFT.

d.       The restrictions on use and disclosure set forth in subparagraph (c) above shall not apply to any Client Information which: (i) at the time of disclosure can be demonstrated to be already known to Contractor as evidenced by written documents in Contractor's possession; (ii) SFT Property; (iii) at the time of disclosure or subsequent thereto is generally available to the public other than by an act or omission on the part of Contractor; (iv) is acquired from or made available by a third person that is not bound by a confidentiality agreement with or other obligation of secrecy to Client or another person; (v) is required to be disclosed pursuant to an order of a court or governmental authority, provided that

Confidential License Agreement – Exhibit H

29591.141018.PWM.15297854.8

Contractor gives Client prompt written notice of any such requirement (if permitted by law) so that Client may seek a protective order or other appropriate remedy.

e.      Upon the termination of Contractor's engagement by Client, Contractor shall promptly deliver to Client along with the Deliverables all Client Information in its possession or under its control, including any included in any drawings, manuals, letters, notes, notebooks, reports and copies thereof.

f.      Subject to the Ownership of Documents section below, nothing herein will be interpreted or construed to limit Contractor from (i) using its own proprietary or confidential information to perform work for its other customers; or (ii) using any Client Property licensed to SFT to provide services to or for SFT, as permitted under such license.

## 2.00    OWNERSHIP OF DOCUMENTS

a.      Except for SFT Property, all drawings, specifications, models and copies thereof provided to Contractor by Client and used in the Services are the property of Client.  They are not to be used by Contractor on other work and must be returned to Client's Representative on completion of the Services.

b.      Client agrees that the drawings, specifications and other items which Client requires Contractor to prepare or provide pursuant to the Contract Documents are Instruments of Service for the execution of the Services and the copyright for such shall remain the property of SFT; provided, however, that if specific documents are identified as "Client-Owned Deliverables" in a Work Order, such documents shall be owned by Client.  Provided Client has paid all fees due hereunder, Contractor grants Owner a nonexclusive license to use the Instruments of Service for constructing, maintaining, and altering the Project.

c.      Contractor agrees that all original tracings, other drawings and sketches and copies of calculations, design data, electronic files and databases, and specifications produced by Contractor as Client-Owned Deliverables for which Contractor has been paid in full by Client, shall become the property of Client; provided, however, that nothing herein shall constitute a transfer of rights to Client in (a) any SFT Property contained or reflected in such Deliverables or (b) any Contractor proprietary or confidential information used to perform the Services.  Provided Client has paid all fees due hereunder, Contractor agrees to deliver Client-Owned Deliverables to Client as the Services are completed or upon termination of the relevant Work Order, whichever occurs earlier.

## 3.00    NON-CIRCUMVENTION

Contractor acknowledges that the materials and information provided by Client and/or by SFT relating to the design, processes, and operation of Client's pulp mill using SFT Property includes the identity and description of services available from various SFT suppliers and contractors and other SFT Confidential Information.  Contractor agrees not to make any use thereof except as expressly authorized in Section 1(c) above. Without in any way limiting the foregoing, Contractor covenants and agrees not to directly or indirectly, (a) purchase or solicit to purchase products or services from any suppliers or contractors disclosed in such materials for use in any Client pulp mill, without SFT's prior written approval or (b) solicit or encourage any of such contractors or suppliers to terminate, discontinue, or reduce its business with SFT.

## 4.00    REVERSE ENGINEERING

Contractor covenants and agrees that it will not attempt to find or otherwise determine the identity or composition or obtain any physical data regarding any of the Associated Products that would be useful in the determination of its identity or composition or in any part of the SFT Property that is not readily observable or disclosed in the Client Information.

## 5.00    PATENT

Contractor shall not, directly or through any other person, file for patent protection for any process, machine, manufacture, process, composition of matter, or design that is substantially equivalent to or would limit SFT's right to make, use, and sell the Technology or otherwise exploit the SFT Property throughout the World. Under no circumstances shall Licensee manufacture any products that infringe SFT's Intellectual Property Rights.

## 6.00    TRADE SECRET

Contractor acknowledges that the SFT Property constitutes and contains Licensor proprietary, trade secret, and Confidential Information. Contractor covenants and agrees to protect the same as a trade secret, including but not limited to: (a) limiting access and knowledge of SFT Property; and (b) obtaining written acknowledgment of trade secret status and a covenant from all persons to whom they provide access to or knowledge of the same that such persons shall maintain the same as a trade secret, including to comply with the limitations on use and disclosure thereof established by SFT.

## 7.00    RE-ENGINEERING

Contractor covenants and agrees not to make any changes to any designs or process flows developed by SFT or to make any use of any information disclosed as part of Contractor's engagement to develop a process competitive to the SFT Process.

Confidential License Agreement – Exhibit H

29591.141018.PWM.15297654.4

**EXHIBIT I**

**INSURANCE REQUIREMENTS**

Licensee shall obtain and maintain during the term the License the following insurance policies with coverage limits as specified herein:

a.  Worker's Compensation Insurance as required by applicable law;

b.  Automobile Liability Insurance covering non-owned auto, bodily injury and third party liability with a combined single limit of Two Million U.S. Dollars ($2,000,000); and

c.  Professional Liability (errors and omissions) Insurance coverage with limits of not less than Two Million U.S. Dollars ($2,000,000) per occurrence and in the aggregate, on a claims made basis.

d.  Directors and officers Insurance, including Side C coverage, with limits of not less than Four Million U.S. Dollars ($4,000,000).

Additionally, Licensee shall separately maintain the following policy limits with respect to Commercial General Liability Insurance (including Contractual Liability Coverage) covering bodily injury and third party property damage, contract liability: Ten Million dollars ($10,000,000) per occurrence and in the aggregate on a claims made basis with Licensor named as an additional insured.

Licensee's insurance policies shall also contain the following endorsements or language, which shall be indicated on the certificate of insurance: (a) waiver of subrogation acceptable to Licensor, (b) additional insured endorsement in favor of and acceptable to Licensor, (c) separation of insureds, (d) the policy shall be primary and non-contributing with respect to any insurance carried by Licensor.  No endorsements limiting coverage as respects to obligations under the Agreement may be added on the policy after the effective date of this Agreement without Licensor's written approval.

Confidential License Agreement – Exhibit I

29591.141016.PWM.15297654.4

Schedule 1 to Exhibit I

Licensor Insurance

Licensor shall obtain and maintain during the term the License the following insurance policies with coverage limits as specified herein:

a.  Worker's Compensation Insurance as required by applicable law;

b.  Automobile Liability Insurance covering non-owned auto, bodily injury and third party liability with a combined single limit of Two Million U.S. Dollars ($2,000,000); and

c.  Professional Liability (errors and omissions) Insurance coverage with limits of not less than Five Hundred Thousand U.S. Dollars ($500,000) per occurrence and in the aggregate, on a claims made basis.

d.  Directors and officers Insurance, including Side C coverage, with limits of not less than One Million U.S. Dollars ($1,000,000).

Additionally, Licensor shall separately maintain the following policy limits with respect to Commercial General Liability Insurance (including Contractual Liability Coverage) covering bodily injury and third party property damage, contract liability: Two Million dollars ($2,000,000) per occurrence and in the aggregate on a claims made basis with Licensor named as an additional insured.

Licensor's insurance policies shall also contain the following endorsements or language, which shall be indicated on the certificate of insurance: (a) waiver of subrogation acceptable to Licensee, (b) additional insured endorsement in favor of and acceptable to Licensee, (c) separation of insureds, (d) the policy shall be primary and non-contributing with respect to any insurance carried by Licensee. No endorsements limiting coverage as respects to obligations under the Agreement may be added on the policy after the effective date of this Agreement without Licensee's written approval.

**EXHIBIT J**

**CONSULTING SERVICES AGREEMENT**

This Consulting Services Agreement (this **"Agreement"**) is made and entered into as of _____ (**"Effective Date"**) between Red Leaf Fibre Ltd, a _____ with its primary office located at 206-3200 Richter Street, Kelowna, BC V1W 5K9 (**"Licensee"**), and Sustainable Fiber Technologies, LLC, a Nevada limited liability company with its primary office located at 101 Convention Center Dr., Suite 850, Las Vegas, Nevada 89109 (**"Licensor"**), each individually a **"Party"** and collectively the **"Parties"**.

Licensor has entered into a license agreement with Licensee dated _____ (**"License Agreement"**), under which Licensor granted Licensee certain limited rights to use Technology covered by the License Agreement at the Licensed Facility; and

Licensee desires, pursuant to the terms of the License agreement, to engage Licensor to provide technical, engineering and other services in connection with the operation of the License Facility.

In consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

## 1. SERVICES AND COMPENSATION

**1.1** Services. Subject to the terms and conditions of this Agreement, Licensor will perform for Licensee the services (**"Services"**) described in **Schedule 1** hereto during the term of this Agreement. Any Services other than those set forth on **Schedule 1** shall be agreed in writing by Licensee and Licensor.

**1.2** Compensation. As consideration for Licensor's performance of the Services, Licensee will pay Licensor the compensation set forth in **Schedule 1**.

## 2. TERM AND TERMINATION

**2.1** Term. Unless extended by written agreement, this Agreement commences on the Effective Date and will continue until the earlier of (a) the second anniversary of the Effective Date hereof, (b) termination of the License Agreement, or (c) termination as provided below.

**2.2** Termination. Either Party may terminate this Agreement upon written notice if the other Party breaches any provision of this Agreement and fails to cure such breach within 30-days after receiving notice to do so from the non-breaching Party. Upon termination for any reason, Licensee shall pay Licensor all amounts due hereunder including all expenses as provide in Exhibit A.

**2.3** Survival. Upon termination, all rights and duties of the Parties toward each other cease except that:

(a) Within 30 days of the effective date of termination Licensee shall pay Licensor all amounts due for work performed or in process prior to the effective date of

termination plus "Reimbursable Expenses" incurred prior to termination and "Committed Expenses", each as described in **Schedule 1**, and

(b) Sections 2 through 9 survive termination of this Agreement.

**2.4** Return of Materials. Upon the termination of this Agreement or upon the Owner's earlier request, each Party will deliver to the Owner all of the Owner's property and Confidential Information (as defined in Section 3.1) that is in the Party's possession or control. For purposes of this Agreement, the **"Owner"** means the **"Discloser"** for Confidential Information and the Party that is defined as the owner of intellectual property rights under Section 4.

## 3. CONFIDENTIALITY.

**3.1** Definition. **"Confidential Information"** has the meaning set forth in Article 11 of the License Agreement. The Parties acknowledge that the limitations on use and disclosure of a Party's Confidential Information under this Agreement are as set forth in Article 11 of the Agreement.

**3.2** License. Licensee hereby grants Licensor a non-exclusive, royalty-free, world-wide, perpetual, irrevocable license to use the Licensee Confidential Information for the purposes of the Services described in **Schedule 1**.

## 4. OWNERSHIP

Confidential License Agreement – Exhibit J

29591.141018.PWM.15297654.4

4.1 Ownership.    Each Party shall own its own Confidential Information, (b) all Intellectual Property Rights it owned prior to the Effective Date ("**Pre-Existing Property**"). All other Intellectual Property Rights shall be owned as provided in Exhibit A and the License Agreement.

4.2 Assignment; Disclaimer.  Each Party hereby disclaims any interest it may have in the other Party's property, as defined in Section 4.1, and hereby assigns, transfers and conveys all rights it may have therein to such other Party

## 5.  WARRANTIES

5.1 Mutual Warranties.  The warranties given by each Party under the License Agreement are incorporated herein.  NO OTHER WARRANTIES ARE GIVEN AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED ARE HEREBY DISCLAIMED.

5.2 Disclaimer.  EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION 5, NEITHER PARTY MAKES ANY WARRANTIES TO THE TO OTHER.   LICENSOR SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

## 6.  INDEPENDENT LICENSOR; BENEFITS

6.1 Independent Contractor.  It is the express intention of the Parties that Licensor performs the Services as an Independent Licensor.  Nothing in this Agreement will in any way be construed to constitute Licensor as an agent, employee or representative of Licensee.   Without limiting the generality of the foregoing, Licensor is not authorized to bind Licensee to any liability or obligation or to represent that Licensor has any authority.  Licensor is obligated to report as income all compensation received by Licensor under this Agreement and to pay all taxes thereon.  Licensor will indemnify and hold Licensee harmless to the extent of any obligation imposed on Licensee to pay in withholding taxes or similar items resulting from a determination that Licensor is not an independent contractor.

6.2 Benefits.    Licensor acknowledges that Licensor's employees will not receive benefits from Licensee either as a contractor or employee.

## 7.  LIMITATION OF LIABILITY

LICENSOR MAKES NO WARRANTY WITH RESPECT TO THE SERVICES.  LICENSOR'S SOLE LIABILITY ON ACCOUNT OF ANY NON-CONFORMING SERVICES SHALL BE TO RE-PERFORM OR REFUND TO LICENSEE THE AMOUNTS RECEIVED BY LICENSOR FROM LICENSEE FOR THE NON-CONFORMING SERVICES. LICENSOR SHALL HAVE NO OTHER LIABILITY UNDER THIS AGREEMENT RELATING TO THE SERVICES FOR DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION FOR PUNITIVE OR EXEMPLARY DAMAGES OR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, OR SPECIAL DAMAGES (INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF USE, PROFITS, REVENUE OR BUSINESS). THIS LIMITATION SHALL APPLY REGARDLESS OF WHETHER SUCH DAMAGES ARE SOUGHT BASED ON BREACH OF CONTRACT, BREACH OR WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

## 8.  DISPUTES

All disputes arising under this Agreement shall be resolved as provided in the License Agreement.

## 9.  MISCELLANEOUS

9.1 Incorporation by Reference.  All of the terms of Article 15 of the License Agreement are incorporated herein by this reference.

9.2 Integration.  This Agreement and all exhibits contain the entire agreement of the Parties with respect to the subject matter of this Agreement and supersede all previous communications, representations, understandings and agreements, either oral or written, between the Parties with respect to said subject matter. No terms, provisions or conditions of any purchase order, acknowledgement or other business form that either Party may use in connection with the transactions contemplated by this Agreement will have any effect on the rights, duties or obligations of the Parties under or otherwise modify, this Agreement, regardless of any failure of a receiving Party to object to these terms, provisions or conditions.  This Agreement may not be amended, except by a writing signed by both Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be made and executed by duly authorized officers.

**RED LEAF FIBRE LTD**

Name: _____

Title: _____

Signature: _____

Address for Notice: _____

_____

**SUSTAINABLE FIBER TECHNOLOGIES LLC**

Name: _____

Title: _____

Signature: _____

Address for Notice: _____

_____

Confidential License Agreement – Exhibit J

29591.141018.PWM.15297854.4

**Schedule 1 to Exhibit J**

**Services and Compensation**

Services and Compensation

1.    Consulting Services.  Consulting Services to be provided under this Agreement include the following:

(a)    or Licensed Products (non-Pulp) development;

(b)    or Licensed Products (non-Pulp) sales support;

(c)    marketing with respect to Licensed Products;

(d)    sales support related to Licensed Products; and

(e)    such other services as Licensor may reasonably request.

SFT shall provide no Consulting Services without first obtaining Licensee's prior authorization and direction.  In no event shall the Consulting Services include Implementation Services or Project Services covered by the Allocated Hours in Exhibit D for the Initial Licensed Facility.  The fees for any Licensor services which are in addition to the Allocated Hours for Implementation Services and the Project Services or required in connection with development, implementation or operation of Additional Facilities, whether or not they are Implementation Services or Project Services, must be mutually agreed upon by the Parties but the applicable hourly rate shall not exceed Two Hundred and Dollars US per Hour (US$200/hour).  Licensee shall pay the Service Fees within thirty (30) days following receipt of Licensor's invoice.

2.    Compensation.

SFT will provide the Consulting Services to Licensee at a rate of USD $200 per hour.

In addition, Licensee shall reimburse SFT for Reimbursable Expenses and Committed Expenses, as those terms are defined below.

"Reimbursable Expenses" means travel and other out-of-pocket expenses reasonably and properly incurred by SFT in connection with the Consulting Services and approved in advance by Licensee, and taxes and similar assessments levied against any such expenses.

"Committed Expenses" means costs and expenses, including without limitation commitments to purchase products or services from third parties which were approved in advance by Licensee.

Confidential License Agreement – Schedule 1 to Exhibit J

## EXHIBIT K

## ESCROW AGREEMENT

This Escrow Agreement ("**Escrow Agreement**") is effective _____, 2018 between _____ ("**Escrow Agent**"), Sustainable Fiber Technologies, LLC, a Nevada limited liability company with its primary office located at 101 Convention Center Dr., Suite 850, Las Vegas, Nevada 89109 ("**Licensor**"), and Red Leaf Fibre Ltd, a limited liability company organized under the laws of British Columbia, Canada with its primary office located at 206-3200 Richter Street, Kelowna, BC V1W 5K9 ("**Licensee**").

## RECITALS

A.      Licensor and Licensee have entered into a License Agreement dated _____ ("**License Agreement**") under which Licensor has agreed to license certain "**Technology**" to Licensee and to sell Licensee certain "**Associated Products**" for use with the Technology, each as defined in the License Agreement.

B.      In order to ensure that Licensee has access to the Associated Products and to protect Licensor's trade secret and other intellectual property rights in the Associated Products and Technology from unauthorized use or disclosure, the Parties have executed this Escrow Agreement for the retention, administration and, upon certain conditions, delivery of certain information relating to the Associated Products to Licensee.

Now, therefore, in consideration of the foregoing, of the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.      Definitions.** Capitalized terms shall have the meanings given to them in the License Agreement, unless otherwise specified herein.

**2.      Escrow Fees.**

2.1     Escrow Fees. The fees for Escrow Agent's services under this Escrow Agreement are set forth in Schedule A, attached hereto ("**Escrow Fees**"). Licensor and Licensee shall each be responsible for fifty percent (50%) of the Escrow Fees. Escrow Agent shall invoice Licensor for Escrow Fees as provided in the Schedule A, with a copy to Licensee. Licensor shall pay the Escrow Fees as invoiced and shall invoice Licensee for its share of the Escrow Fees, which Licensee shall pay to Licensor within twenty (20) days' after receipt of Licensor's invoice. If Licensor does not pay the Escrow Fees when due, Escrow Agent shall notify Licensee in writing (with a copy to Licensor) and Licensee may pay the unpaid fees directly to Escrow Agent and set-off such amounts against any amounts owing to Licensor as Royalties under the License Agreement. If Licensee does not reimburse Licensor for its portion of the Escrow Fees as provided above, Licensor may terminate the Escrow Agreement upon written notice to Licensee and Escrow Agent. Upon termination of the Escrow Agreement, Escrow Agent shall immediately return the Escrow Items to Licensor.

**3.    Deposit.**

3.1    Delivery. Upon receiving payment of the entire License Fee under the License Agreement, Licensor shall deliver the following items with the Escrow Agent ("**Escrow Items**") and provide written notice to Licensee of the delivery: (a) the name and contact information of each Contract Supplier capable of producing the Associated Products licensed under the License Agreement; (b) a copy of Licensor's contract with each Contract Supplier, which contract authorizes Licensee and its Affiliates to purchase and requires the Contract Supplier to sell the Associated Products to Licensee on the terms and conditions of such contract; (c) a list of the Constituent Chemicals required to produce the Associated Products licensed under the License Agreement, along with the identity of the manufacturer(s) from which Licensor sources the Constituent Chemicals; and (d) the formulae for the Associated Products licensed under the License Agreement ("**Initial Deposit**").

3.2    Deposit Updates. Licensor shall update the Escrow Items periodically to reflect any changes in the Associated Products licensed under the License Agreement ("**Deposit Updates**" and, collectively with the Initial Deposit, the "**Deposit**"). All references in this Escrow Agreement to the Escrow Items shall include the Initial Deposit and any Deposit Updates.

**4.    Release of Escrow Items.**

4.1    Permission to Release Deposit. Licensor agrees that the Escrow Agent shall be permitted to deliver the Deposit to Licensee, upon Escrow Agent's receipt of a valid written release request ("**Release Request**") from Licensee documenting a Release Event, Escrow Agent shall release the Deposit to Licensee as provided in Section 4.5 below. For purposes of this Escrow Agreement, a "**Release Event**" means: (a) Licensor has failed to timely fulfill any accepted purchase order for Associated Products or (b) Licensor discontinues the Associated Products in violation of the terms of Section 5.4 of the License Agreement; or (c) none of the manufacturers listed in the Escrow Items remain in business or are able or willing to provide the Associated Products to Licensee on the terms set forth in Section 5.6 of the License Agreement.

4.2    Release Request. Provided that there does not exist any material uncured breach of the License Agreement as to which written notice has been given by Licensor to Licensee, Licensee will be entitled to request the Escrow Agent release the Deposit upon a Release Event. Licensee shall deliver the Release Request to the Escrow Agent at the address specified below, with a copy provided simultaneously to Licensor. The Release Request shall set forth with particularity the specific Release Events forming the basis of Licensee's request (including related documentation) and include Licensee's written notice to Licensor that such events constitute a breach of the License Agreement and a sworn statement by an officer of Licensee that Licensor has failed to cure such breach within the time specified in the License Agreement. At the time of submitting the Release Request, Licensee shall pay all Escrow Fees then due and owing to Escrow Agent. Upon receipt of the Release Notice and Escrow Fees, the Escrow Agent shall proceed as set forth in Sections 4.3 – 4.5.

4.3    Exceptions. Notwithstanding Section 4.1 and subject to Sections 5.2 and 5.3 of this Escrow Agreement, Escrow Agent will continue to store the Deposit without release (a) pursuant to joint instructions from Licensor and Licensee; (b) pending dispute resolution pursuant to Section 6.4; or (c) in compliance with an order from a court of competent jurisdiction. Further, if the Release Request is submitted under Section 4.1(c) and Licensee will engage a Licensee Supplier to manufacture the Associated Products, Escrow Agent will continue to store the Deposit without release if Licensor has

29591.141018.PWM.15287654.4

agreed in writing to disclose the formulation of the Associated Products to the Licensee Supplier under Licensor's standard form of non-disclosure agreement.

4.4     Interpleader. Escrow Agent shall have the absolute right, at its election, to file an action in interpleader requiring Licensor and Licensee to answer and litigate their several claims and rights amongst themselves. Escrow Agent is hereby authorized to comply with the applicable interpleader statutes of the State of Washington in this regard. Licensor and Licensee agree that the non-prevailing party in any such action shall pay the reasonable attorneys' fees and costs incurred by Escrow Agent in connection with such interpleader action.

4.5     Release of Deposit. Except as provided in Section 4.3 or in the event of an action filed by Escrow Agent under Section 4.4, Escrow Agent is authorized to release the Deposit to Licensee within seven (7) Business Days after receiving a Release Request in compliance with Section 4.2 as follows:

        (a)     If the grounds for release stated in the Release Request are that Licensor has failed to deliver Associated Products or provide for equivalent replacements, Escrow Agent may deliver only the list of Contract Suppliers authorized to manufacture the Associated Products to Licensee; and

        (b)     If the grounds for release stated in the Release Request are that none of the Contract Suppliers listed in the Escrow Items remain in business or are able or willing to provide the Associated Products to Licensee, Escrow Agent may deliver the list of constituent chemicals comprising the Associated Products and instructions for mixing them to Licensee only if (i) Licensor has refused to provide the formulation to Licensee Supplier under Section 4.3 or (ii) Licensee will manufacture the Associated Products directly, without the aid or assistance of any third party.

However, Escrow Agent is entitled to receive any Escrow Fees due Escrow Agent before making the release. This Escrow Agreement will terminate upon the release of the Deposit held by Escrow Agent.

4.6     Licensee Storage of Deposit.   Licensee shall hold all Escrow Items in confidence under the requirements of Section 5.6 and Article 11 of the License Agreement.  In addition, if the disclosure to Licensee includes or indemnifies any of the  constituent chemicals comprising the Associated Products or instructions for mixing them, Licensee shall label those materials "Attorneys Eyes Only", store them in a sealed envelope in a safe, and only permit access to them by Licensee's attorney who may disclose the contents only to those Personnel who are directly involved in and need to know the same in order to manufacture the Associated Products for Licensee and have executed a non-disclosure agreement as provided in Section 11.2 of the License Agreement.  Licensee shall keep a complete and accurate written record of all persons with access to the Deposit indicating their relationship to Licensee and the date and purpose of disclosure, which it shall provide to Licensor upon written request.

4.7     Right to Use Following Release. Following release of the Deposit, Licensee's rights to use the Deposit shall be as set forth in Article 2 of the License Agreement. Licensee acknowledges that: (a) the Escrow Items and the information contained therein are Trade Secrets of Licensor; (b) that Licensor retains all title and ownership in the Escrow Items and any modifications, enhancements, updates or derivative works thereof; (c) that Licensee's use of the Escrow Items shall be strictly limited as provided herein and shall, in addition, be subject to the limitations and requirements applicable to Licensee's use of the Licensed Property, including the obligation to pay Licensor Royalties on all Licensed Product and Co-Product manufactured using any part of the Licensed Property; and (d) that Licensee's use or disclosure of the Escrow Items in any manner contrary to the terms hereof of the License Agreement shall constitute

29591.141018.PWM.15297654.4

a breach of the License Agreement and cause Licensor irreparable harm, which may not be adequately compensable by monetary damages. For avoidance of doubt, Licensee may only use the Escrow Items to purchase or manufacture Associated Products for its own use and may not use them to purchase or manufacture Associated Products for resale or for use in any manner other than as provided in the License Agreement.

**5.    Term and Termination.**

5.1    Term of Agreement. The initial term of this Escrow Agreement is for a period of one year. Thereafter, this Escrow Agreement shall automatically renew from year-to-year unless Licensor and Licensee jointly instruct Escrow Agent in writing that the License Agreement is terminated or it shall be terminate as provided in Sections 2.1, 4.5, 5.2 hereof.

5.2    Nonpayment. In the event of the nonpayment of any Escrow Fees owed to Escrow Agent, Escrow Agent shall provide written notice of delinquency to Licensor and Licensee, each of which shall have the right to make the payment to Escrow Agent to cure the default. If the past due payment is not received in full by Escrow Agent within one (1) month of the date of such notice, then Escrow Agent shall have the right to terminate the Escrow Agreement at any time thereafter by sending written notice of termination to Licensee and Licensor. Escrow Agent shall have no obligation to take any action under the Escrow Agreement so long as any Escrow Fees remain unpaid.

5.3    Disposition of Escrow Items upon Termination. Subject to the foregoing termination provisions, and upon termination of the License Agreement and/or this Escrow Agreement, Escrow Agent shall destroy, return to Licensor, or otherwise deliver the Escrow Items in accordance with Licensor's instructions. If there are no instructions, Escrow Agent may, at its sole discretion, destroy the Escrow Items or return them to Licensor. Escrow Agent shall have no obligation to destroy or return the Escrow Items if the Escrow Items has been totally released to the Licensees in accordance with Section 4.4 or 4.7.

5.4    Survival of Terms Following Termination. Upon termination of this Escrow Agreement, the limitations on Licensee's use of the Escrow Items herein and the following provisions of this Escrow Agreement shall survive: Sections 5 - 7.

**6.    Liability and Disputes.**

6.1    Right to Rely on Instructions. Licensor and Licensee agree that the Escrow Agent may act in reliance upon any instruction, instrument, or signature reasonably believed by Escrow Agent to be genuine.

6.2    Injunctive Relief. Nothing contained in this Escrow Agreement is intended to, nor shall it, limit either Licensor or Licensee's right to obtain, in court, injunctive relief and/or other equitable remedies against any actual or threatened conduct that may cause it irreparable and/or similar harm, without necessity of posting bond.

6.3    Compliance with Terms. Escrow Agent shall perform its obligations under this Escrow Agreement in a professional manner and act in a reasonable and prudent manner with regard to the escrow arrangement contemplated by this Escrow Agreement.

6.3    Controlling Law. This Escrow Agreement is to be governed and construed in accordance with the laws of the State of New York, without regard to its conflict of law provisions. Venue for any action hereunder shall exclusively lie in the state and/or federal courts located in New York, New York.

6.4    Dispute Resolution. Any dispute relating to or arising from this Escrow Agreement shall be submitted to, and settled by arbitration by, a single arbitrator chosen by the American Arbitration Association in accordance with the Commercial Rules of the American Arbitration Association. The arbitration shall take place in New York, New York and the arbitrator shall apply the law of the State of New York. Any court having jurisdiction over the matter may enter judgment on the award of the arbitrator. Service of a petition to confirm the arbitration award may be made by registered mail or by commercial express mail, to the attorney for the Party or, if unrepresented, to the Party at the last known business address.

## 7.    General Provisions.

7.1    Relationship to Licensee's Rights Under Existing Agreements. Nothing in this Escrow Agreement shall be interpreted or construed to grant Licensee rights to access or use Associated Products, Escrow Items, or Licensed Property (as defined in the License Agreement) in any manner contrary to or beyond that set forth in the License Agreement.

7.2    Entire Agreement. This Escrow Agreement, together with the provisions of the License Agreement incorporated herein, embodies the entire understanding among the Parties with respect to its subject matter and supersedes all previous communications, representations or understandings, either oral or written. No amendment or modification of this Escrow Agreement shall be valid or binding unless signed by all the Parties hereto.

7.3    Notices. All notices, invoices, payments, deposits and other documents and communications shall be given to the Parties at the addresses set forth on the signature page to this Escrow Agreement. It shall be the responsibility of the Parties to notify each other in the event of a change of address.

7.4    Severability. In the event any provision of this Escrow Agreement is found to be invalid, voidable or unenforceable, the Parties agree that unless it materially affects the entire intent and purpose of this Escrow Agreement, such invalidity, voidability or unenforceability shall affect neither the validity of this Escrow Agreement nor the remaining provisions herein, and the provision in question shall be deemed to be replaced with a valid and enforceable provision most closely reflecting the intent and purpose of the original provision.

7.5    Successors. This Escrow Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assigns of the Parties to the License Agreement. None of the Parties to this Escrow Agreement may assign or transfer, in whole or in part, their rights and obligations under this Escrow Agreement to any third party without the prior written consent of the other Parties to this Escrow Agreement, which shall not be unreasonably withheld.

7.6    Regulations. Licensor is responsible for and warrants compliance with all applicable laws, rules and regulations, including, but not limited to, customs laws, import, export, and re-export laws and government regulations of any country from or to which the Escrow Items may be delivered in accordance with the provisions of this Escrow Agreement.

7.7    Waiver. Any term of this Escrow Agreement may be waived by the Party entitled to the benefits thereof, provided that any such waiver must be in writing and signed by the Party against whom the enforcement of the waiver is sought. No waiver of any condition, or breach of any provision of this Escrow Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of such condition or breach. Delay or failure to exercise any right or remedy shall not be deemed the waiver of that right or remedy.

7.8    Attorneys' Fees. The substantially prevailing Party in any dispute shall be entitled to an award of its attorneys' fees and costs in connection with such action.

7.9    No Third-Party Rights. This Escrow Agreement is made solely for the benefit of the Parties hereto and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Escrow Agreement unless otherwise agreed to by all the Parties hereto.

7.10    Authority to Sign. Each of the Parties herein represents and warrants that the execution, delivery, and performance of this Escrow Agreement has been duly authorized and signed by a person who meets statutory or other binding approval to sign on behalf of its business organization as named in this Escrow Agreement.

7.11    Counterparts. This Escrow Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

IN WITNESS WHEREOF, each of the Parties has caused its duly authorized officer to execute this Escrow Agreement as of the Effective Date.

**Licensor:**                                                  **Licensee:**

Sustainable Fiber Technologies, LLC          Red Leaf Fibre Ltd.

By: _____          By:_____

Name: _____          Name:_____

Title:_____          Title:_____

Date: _____          Date:_____

**Escrow Agent:**

_____

By: _____

Name: _____

Title: _____

Date: _____

Confidential License Agreement – Exhibit K

29591.141018.PWM.15297654.4

## Schedule 1 to Exhibit K

### Escrow Fees

**Licensor: Sustaniable Fiber Technologies, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**Licensee:**

By: _____

Name: _____

Title: _____

Date: _____

# Exhibit 3

## Scott, Roger L.

**From:** Jay Miele <jmiele@allnorth.com>
**Sent:** Friday, December 20, 2019 6:44 AM
**To:** Tyler Campbell <tyler@sustainablefibertechnologies.com>
**Cc:** Mark Lewis <mark@sustainablefibertechnologies.com>; Nick Nazar <nnazar@allnorth.com>; Kevin Peterson <kpeterson@allnorth.com>; Darby Kreitz <darby@allnorth.com>
**Subject:** Dayton Visit

Tyler,

On behalf of Allnorth I would like to thank you for taking the time to Show Nick, Kevin and I around the Dayton operation.  I now have a much better understanding of the process and the wheat straw pulp, this visit was a very beneficial for me.

Looking forward to continued collaboration with SFT.

Please send along our thanks and holiday wishes to John, Mike, Jerome and the rest of the SFT team.

Merry Christmas/Happy Holidays!

Jay

PS – my trip home was uneventful.



**Jay Miele** | Vice President Operations, Allnorth Americas
**Allnorth Americas**
12735 Morris Road Ext.  Suite 175, Alpharetta, GA   30004
Main: +1 678-543-9444       Direct: +1 678-543-9445
Mobile: +1 678-896-1606

**pulpandpapersolutions.com**

1

# Exhibit 4

## Scott, Roger L.

**From:** Martin Pudlas <mpudlas@redleafpulp.com>
**Sent:** Friday, January 17, 2020 5:15 PM
**To:** Mark Lewis <mark@sustainablefibertechnologies.com>
**Subject:** RE: Nice to Meet You

Mark,

Great to meet you as well and thanks for hosting us at Dayton.

I will likely ask a lot of questions to understand the differences between wood and straw pulp from an technical perspective, but mainly to have the confidence and understanding in the process when pursuing governmental funding or support from the financing community.  They may not ask, but as one of my old bosses said "I don't need to know, but I need to know if you know".

We had a good visit at Columbia – they certainly have their challenges, but we have opened up good lines of communication and there is an appetite to co-operate with RLP.  I strongly believe that we need to collaborate and should even be exploring a JV to jointly market our products.  We are not competitors, we actually are confirmers of each other in the marketplace.

Have a great weekend.



**Martin Pudlas** | Chief Executive Officer

**Red Leaf Pulp**
505 - 2755 Tutt Street, Kelowna, BC   V1Y 0G1
Direct: +1 778-738-2977
Cell: +1 250 552-2776
"Safety in everything we do"

---

**From:** Mark Lewis <mark@sustainablefibertechnologies.com>
**Sent:** Friday, January 17, 2020 5:03 PM
**To:** Martin Pudlas <mpudlas@redleafpulp.com>
**Subject:** Nice to Meet You

Martin,

It was a pleasure to meet you this week.  Some of the information that you have asked for of me and my team we have already supplied Lauren.  Some of the data regarding the PPP-03 is old so I will have to dig through my archives.  PPP-03 is nothing like AQ which you were asking Tyler about.  This is not wood pulping and it is a completely different chemistry blend which has components which make the other chemistries much more functional the way Sodium Silicate works in peroxide bleaching, or the way Mag Sulfate makes an oxygen stage work much better.  We have seen it time and time again, and some other folks like Andritz have seen it in work they have done.  In the early days, we would see a bad cook and ask questions of the operators and find them looking at one another as if to say "you put it in didn't you".  The thing about doing this for about 15 years, we have tried a number of things.  PPP-03 has morphed from what it was originally to what it is now.

Regards,

Mark



**Mark Lewis**
CEO
206-818-4130

mark@sustainablefibertechnologies.com
www.sustainablefibertechnologies.com

Sustainable Fiber Technologies • 234 SW 43rd St. • Renton, WA 98057

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone. Please send us by fax any message containing deadlines as incoming e-mails are not screened for response deadlines. The integrity and security of this message cannot be guaranteed on the Internet.